UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| JANET JENKINS, for herself and as next friend of ISABELLA MILLER-JENKINS, a/k/a ISABELLA MILLER, | ) ) ) | CIVIL DOCKET NO.:  2:12-cv-00184-wks |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | |
| KENNETH L. MILLER, LISA ANN MILLER f/k/a LISA MILLER-JENKINS, TIMOTHY D. MILLER, ANDREW YODER, individually and as agent for CHRISTIAN AID MINISTRIES, INC., CHRISTIAN AID MINISTRIES, INC., RESPONSE UNLIMITED, INC., PHILIP ZODHIATES, individually and as agent for RESPONSE UNLIMITED, INC., VICTORIA HYDEN, f/k/a VICTORIA ZODHIATES, individually and as agent for both RESPONSE UNLIMITED, INC., and LIBERTY UNIVERSITY, INC., and its related ministry THOMAS ROAD BAPTIST CHURCH, INC., LINDA M. WALL, individually and as agent for THOMAS ROAD BAPTIST CHURCH, INC., and DOUGLAS WRIGHT, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) | |

## DEFENDANT DOUGLAS WRIGHT'S MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

**NOW COMES** Defendant, Douglas Wright ("Wright"), by and through his attorneys, Paul

Frank + Collins, P.C., and, in accordance with Federal Rules of Civil Procedure 12(b)(2) and

12(b)(6), moves to dismiss the Complaint for lack of personal jurisdiction and for failure to state a

claim upon which relief can be granted.  For the reasons set forth below, Wright respectfully

requests that the Complaint against him be dismissed in its entirety.

<u>**MEMORANDUM OF LAW**</u>

**I.      <u>FACTUAL ALLEGATIONS</u>**

This action arises out of a widely publicized and protracted legal battle between Lisa Miller ("Miller") and Janet Jenkins ("Jenkins" or "Plaintiff") over the custody of their daughter, Isabella, who was born in 2002 of a same-sex civil union between Miller and Jenkins – a union duly consummated in accordance with Vermont law.  *Am. Complaint* (Doc. 25-1) at ¶¶ 5-7, 19.  In her Amended Complaint, Jenkins alleges that, in 2004, Miller converted to fundamental Christianity, espoused a belief that "homosexuality was sinful," moved with her daughter to Virginia, and petitioned a Vermont court to dissolve her union with Jenkins.  *Id.* at ¶¶ 19, 20.  While in Winchester, Virginia, Miller joined the Keystone Baptist Church and befriended its pastor, Rev. Douglas Wright ("Wright").  *Id.*  In June 2007, the Vermont court entered a final order dissolving the union between Miller and Jenkins, awarding legal and physical parental rights and responsibilities to Miller (Isabella's biological mother), and awarding Jenkins contact during holidays, vacations and certain weekends.  *Id.* at ¶ 23.

Jenkins goes on to allege that, in the spring of 2008, Miller moved to Lynchburg, Virginia and joined the Thomas Road Baptist Church ("TRBC").  *Id.* at ¶ 25.  On August 21, 2009, the Vermont court held a hearing on Jenkins' motion to transfer full legal and physical custody of Isabella to her, and Miller did not appear for that hearing.  *Id.* at ¶ 30.  On August 25, 2009, a Virginia court adjudged Miller in contempt of the parent-child contact order issued by the Vermont court.  *Id.* at ¶ 31.  On September 4, 2009, while Jenkins' motion to transfer custody was under consideration, the Vermont court ordered Miller to facilitate contact between Jenkins and Isabella from September 25, 2009 until September 27, 2009.  *Id.* at ¶ 32.

Jenkins alleges that, on September 22, 2009, Miller and Isabella crossed the Canadian

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT
PLATTSBURGH, NEW YORK

border in clandestine fashion with the help of TRBC and the Brotherhood, and from there absconded by plane to Nicaragua.  *Id.* at ¶¶ 36-40.  Plaintiff suspects that Miller and Isabella may be living among a Beachy Amish-Mennonite Community in Nicaragua under aliases.  *Id.* at ¶¶ 39, 61.  Following the disappearance of Miller and Isabella, the Vermont court awarded Plaintiff full legal and physical custody of Isabella. *Id.* at ¶ 43.

In her Amended Complaint, Plaintiff claims that agents of TRBC and the Brotherhood aided and abetted Miller's international kidnapping of Isabella because of their religious or moral disapproval of homosexual relationships.  *Id.* at ¶¶ 45, 47-51, 62-64.  Plaintiff asserts several tort claims against Miller, TRBC, the Brotherhood, and their various agents and affiliates (collectively "co-Defendants"), *viz.*, intentional kidnapping, violations of the Racketeer Influence and Corrupt Organizations Act ("RICO"), and conspiracy to violate her civil rights under 42 U.S.C. § 1985(3).  *Id.* at ¶¶ 63-75.  In support of her § 1985(3) claim, Plaintiff alleges that co-Defendants conspired to deprive her of equal protection of the laws "on account of gender," and "to prevent the Courts of Vermont from securing [Plaintiff] and Isabella … equal protection of their rights to a parent-child relationship under the law."  *Id.* at ¶ 75.  She also claims that co-Defendants violated her "rights to a parent-child relationship on account of Isabella having two mothers instead of a mother and a father."  *Id.* at ¶ 62.

Plaintiff does <u>not</u> allege any kidnapping, RICO violations, or conspiracy claims against Wright.  She does not claim that Wright participated in any way in the alleged kidnapping conspiracy involving the co-Defendants, and there is no allegation that Wright even knew about such a conspiracy.  The only claim Plaintiff brings against Wright is set forth in count five, and that claim is based on his alleged failure to prevent Miller from violating Plaintiff's civil rights.  *Id.* at ¶¶ 76-77.  Plaintiff maintains that her tort claim against Wright is actionable under 42 U.S.C.

§ 1986.  *Id.*  In support of her § 1986 claim, Plaintiff alleges that (1) Wright met Miller in a parking lot in Winchester, Virginia on September 19, 2009 to say "goodbye," (2) he agreed to dispose of some of Miller's personal belongings at her request, (3) he knew that Miller was planning to "abduct" Isabella "in order to violate the Plaintiff's right to equal protection, and (4) "he did nothing to notify law enforcement of the situation."  *Id.* at ¶¶ 35, 77.

Plaintiff admits that Wright resides and works in Virginia, but claims that Wright "has sufficient ties to the State of Vermont to subject him to the jurisdiction of this Court, including personal appearance in Vermont to give testimony in the criminal trial of Defendant Kenneth Miller."  *Id.* at ¶ 18.  Wright appeared under subpoena in this court (not a Vermont state court) on two occasions to give testimony relating to the disappearance of Miller and Isabella.  *Affidavit of Douglas Wright*, ¶¶ 3, 9, 10, 11 (attached hereto as **Ex. 1**).  In June 2012, Wright was subpoenaed by the United States government to testify in a grand jury proceeding relating to the matter.  *Id.* at ¶ 9.  In August 2012, Wright was again subpoenaed to testify as a government witness in the criminal prosecution of co-Defendant, Rev. Kenneth Miller, who was ultimately convicted of abetting the international parental kidnapping of Isabella.  *Id.* at ¶ 10.

Wright is a resident of the Commonwealth of Virginia, and the alleged tortious omission Plaintiff attributes to Wright occurred exclusively in Virginia.  *Aff.* at ¶ 13; *Am Complaint* at ¶ 35, 44.  Aside from his involuntary appearances in a federal court located in Vermont to give testimony in criminal proceedings, Wright has absolutely no contacts with Vermont.  He has never resided in Vermont; has never owned or leased property in Vermont; has never worked in Vermont; has never transacted or contracted for any business in Vermont; has never been a party to any actions at law or equity in Vermont courts; has never held a license or other professional certification in Vermont; has never registered to do business, appointed a registered agent, or otherwise sought to avail

himself of the privilege of doing business in Vermont; has never paid taxes, fees or charges of any kind to the State of Vermont; and has never created any obligations between himself and any Vermont resident. *Aff.* at ¶¶ 4-8.

**II.   STANDARD OF REVIEW**

On a motion to dismiss, the court must "consider the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor." *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). In accordance with the Supreme Court's decisions in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the Second Circuit applies a "plausibility standard" in assessing the sufficiency of a complaint "which is guided by two working principles." *Harris*, 572 F.3d at 71. "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 72 (quoting *Iqbal*, 556 U.S. at 678). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* (quoting *Iqbal*, 556 U.S. at 679). "A clam has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

All civil actions, including those involving civil conspiracy and civil rights claims, are subject to the *Twombly-Iqbal* plausibility standard. *See, e.g., Twombly*, 550 U.S. at 564-567 (holding that plaintiff failed to state plausible claim for antitrust conspiracy); *Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir. 1999)("complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss"); *Emmerling v. Town of Richmond*, 434 Fed.Appx. 10, 12 (2d Cir. 2011)(affirming

dismissal of § 1985(3) claim because plaintiff "provided only vague and conclusory allegations of conspiracy"); *Brown v. Castleton State College*, 663 F.Supp.2d 392 (D.Vt. 2009)(dismissing race and gender discrimination claims under plausibility standard).  Dismissal is, of course, also warranted where a private litigant asserts a claim that is not based on any recognized private right of action.  *Bellikoff v. Eaton Vance Corp.,* 481 F.3d 110, 115-17 (2d Cir. 2007).

### III.   ARGUMENT

#### A.   Plaintiff's Complaint Must Be Dismissed for Lack of Personal Jurisdiction Because Wright Does Not Have the "Minimum Contacts" with the State of Vermont Necessary to Subject Him to the Jurisdiction of Vermont Courts Consistent with The Due Process Clause Of The Fourteenth Amendment.

"The plaintiff bears the burden of establishing that the court has jurisdiction over the defendant when served with a Rule 12(b)(2) motion to dismiss."  *Whitaker v. American Telecasting, Inc.,* 261 F.3d 196, 208 (2d Cir. 2001).  In order to successfully shoulder this burden, a plaintiff must either plead "legally sufficient allegations of jurisdiction, i.e., by making a 'prima facie showing' of jurisdiction," *Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 184 (2d Cir. 1998), or submit "an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant."  *Whitaker*, 261 F.3d at 208.

Plaintiff's § 1986 claim against Wright invokes the court's "federal-question" jurisdiction. In such cases, the court must first determine whether the federal statute at issue provides for nationwide service of process.  If it does not, the court must look to the long-arm statute of the forum state and then, if necessary, to the due process requirements of the Fourteenth Amendment, in deciding whether personal jurisdiction exists over a nonresident defendant.[1]  The Civil Rights

---

[1] *See, e.g., Omni Capital Int'l v. Rudolf Wolff & Co.,* 484 U.S. 97, 105 (1987)(holding that, in the absence of a federal statute authorizing nationwide service of process, courts in federal-question cases must look "to the long-arm statute of the State in which it sits to determine whether a defendant is amenable to service, a prerequisite to its exercise of personal jurisdiction"); *Mareno v. Rowe,* 910 F.2d 1043, 1046 (2d Cir. 1990)("Where the underlying action is based on a federal statute, we are to apply state personal jurisdiction rules if the federal statute does not specifically provide for

Act, of which § 1985(3) and § 1986 are a part, does <u>not</u> authorize nationwide service of process.[2]

Therefore, in accordance with *Omni Capital Int'l v. Rudolf Wolff & Co.,* 484 U.S. 97 (1987) and

Fed.R.Civ.P. 4(k)(2),[3] the court must determine whether personal jurisdiction can be asserted over

Wright consistent with Vermont's long-arm statute and federal due process restraints.

It is well-settled that "Vermont's long-arm statute, 12 V.S.A. § 913(b), confers jurisdiction

over nonresident defendants to the full extent permitted by the Due Process Clause." *Dall v. Kaylor*,

163 Vt. 274, 275 (1995).  As a result, the operative inquiry is whether the court's exercise of

personal jurisdiction over Wright satisfies the demands of due process.  *Metro. Life Ins. Co. v.

Robertson-Ceco Corp.,* 84 F.3d 560, 567 (2d Cir. 1996)("the first part of our inquiry – the

interpretation of the Vermont law governing service of process – merges with the second part of the

jurisdictional test: whether the court's exercise of personal jurisdiction over the defendant satisfies

the requirements of due process"); *Bechard v. Constanzo,* 810 F. Supp. 579, 583 (D. Vt. 1992)("the

question of whether Vermont's long-arm statute reaches a defendant merges with the second prong

of the Court's inquiry, the federal due process question").

---

national service of process"); *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir. 1997)("In a federal question case where a defendant resides outside the forum state, a federal court applies the forum state's personal jurisdiction rules if the federal statute does not specifically provide for national service of process"); *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.,* 554 F. Supp. 2d 523, 529 (S.D.N.Y. 2008)("For cases arising under federal law that involve a defendant residing outside the forum state, the district court applies the personal jurisdiction rules of the state in which it sits unless the federal statute explicitly provides for nationwide service of process").

[2] *See, e.g., Hoffman v. Connecticut*, 2009 WL 3055137 at *5, No. 09-CV-79-B-H (D.Me. Aug. 7, 2009)("Because the Civil Rights Act does not provide for nationwide service of process, the defendants' amenability to suit in Maine turns on their amenability to service of process issued by a Maine court"); *Cote v. Kontos,* No. 88 C 4751, 1989 WL 10854 at *4, (N.D.Ill. Feb. 8, 1989)("The Civil Rights Act does not authorize nationwide service of process"); *Carter v. Three Unknown Police Officers of Wilmington Police Dept.,* 112 F.R.D. 48, 49 (D.Del. 1986)("[T]he Civil Rights Act, 42 U.S.C. § 1983 *et seq.,* does not authorize nationwide service of process in actions brought under the Act"); *Snow v. American Morgan Horse Ass'n Inc.,* 1994 WL 287719 at *4, No. Civ. 93-463-JD (D.N.H. 1994)("The Civil Rights Act does not authorize nationwide service of process").

[3] Wright & Miller, 4 *Federal Practice and Procedure Civil 3d* § 1068.1 at 616-17 (2002)("Implicit in Rule 4(k)(2) is the concept that when a federal district court employs any applicable state long-arm statute it must use a Fourteenth Amendment due process analysis to assess the exercise of personal jurisdiction over a nonresident of the forum state … in federal question cases when Congress has not enacted a personal jurisdiction statute for the federally created cause of action").

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT
PLATTSBURGH, NEW YORK

"The due process requirement for personal jurisdiction … protects a person without meaningful ties to the forum state from being subjected to binding judgments within its jurisdiction."  *Metro. Life Ins. Co.*, 84 F.3d at 567 (citing *International Shoe Co. v. Washington*, 326 U.S. 310 (1945)).  In deciding whether the exercise of personal jurisdiction is constitutionally permissible, the court must "undertake an analysis consisting of two components: the 'minimum contacts' test and the 'reasonableness' inquiry." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 127 (2d Cir. 2002).

In ascertaining whether a defendant has established the requisite "minimum contacts" with the forum state to confer personal jurisdiction, the court must distinguish between "general" and "specific" jurisdiction.  General jurisdiction "is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts."  *Metro. Life Ins. Co.*, 84 F.3d at 568 (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984)).  "Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's 'continuous and systematic general business contacts.'" *Id.*  In order to establish general jurisdiction, a plaintiff must show that the defendant's contacts "are so continuous and systematic as to render [it] essentially at home in the forum State." *Goodyear Dunlop Tires Operations v. Brown*, 131 S.Ct. 2846, 2851 (2011).

"Specific jurisdiction, on the other hand, depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place <u>in</u> the forum State and is therefore subject to the State's regulation."  *Goodyear*, 131 S.Ct. at 2851 (emphasis added); *see also Metro. Life Ins. Co.*, 84 F.3d at 568 ("Specific jurisdiction exists when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT
PLATTSBURGH, NEW YORK

with the forum")(quoting *Helicopteros*, 466 U.S. at 414-16)).  "As a general rule, the exercise of judicial power is not lawful unless the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S.Ct. 2780, 2785 (2011).

The "constitutional touchstone" in such cases "remains whether the defendant purposefully established 'minimum contacts' in the forum State … such that he should reasonably anticipate being haled into court there."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *see also Bank Brussels Lambert*, 305 F.3d at 127 ("Where the claim arises out of, or relates to, the defendant's contacts with the forum – i.e., specific jurisdiction – minimum contacts exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there").  The "purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King,* 471 U.S. at 475.

If a plaintiff makes a threshold showing of minimum contacts under a general or specific jurisdiction framework, the court then "asks whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice' – that is, whether it is reasonable under the circumstances of the particular case."  *Metro. Life Ins. Co.*, 84 F.3d at 568 (quoting *International Shoe*, 326 U.S. at 316)).  This "reasonableness" analysis requires the court to balance five factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."

*Bank Brussels Lambert*, 305 F.3d at 129 (citations omitted).

Here, Plaintiff has not alleged any facts sufficient to confer general or specific jurisdiction over Wright in this or any other district within the Second Circuit.  As Wright attests, he has never resided, worked, owned or leased property, transacted any business, or entered into any contracts in Vermont.  *Aff.* at ¶¶ 4-8.  He has never previously been a defendant or a plaintiff in any lawsuit in Vermont, and the alleged conduct giving rise to Plaintiff's § 1986 claim against Wright occurred in Virginia.  *Aff.* at ¶ 4, 13; *Am Complaint* at ¶ 35, 44.  The only factual "hook" on which Plaintiff hangs her claim for jurisdiction over Wright is his appearance, under government issued subpoena, in <u>this</u> court (not a Vermont state court) to give testimony relating to the criminal prosecution of Brotherhood pastor, Rev. Kenneth Miller.  *Am. Complaint* at ¶ 18.

General or "all-purpose" jurisdiction over Wright is totally lacking because it cannot be said that his involuntary appearances in a federal criminal proceeding constituted such "continuous and systematic" contact with the State of Vermont as to render him "essentially at home" here.  *Helicopteros*, 466 U.S. at 416; *Goodyear,* 131 S.Ct. at 2851; *Metro. Life Ins. Co.*, 84 F.3d at 568; *Bank Brussels Lambert*, 305 F.3d at 127.  Under controlling precedent, Plaintiff cannot possibly muster a *prima facie* showing of general jurisdiction over Wright in this action.

Plaintiff fares no better under a specific-jurisdiction method of analysis.  According to her, Wright's liability under § 1986 arises exclusively from a tortious <u>omission</u> that occurred in Virginia, *viz.,* a failure to alert law enforcement authorities to Miller's plan to leave the United States with her daughter.[4]  This action does not arise out of Wright's testimony in Vermont – it springs from alleged conduct that occurred within the Commonwealth of Virginia in September 2009.  In sum, Plaintiff has not identified a single voluntary, affirmative act whereby Wright could be said to have

---

[4] Significantly, Plaintiff does not allege that Wright participated in the international kidnapping scheme or even knew about the alleged conspiracy between Miller, TRBC and the Brotherhood.

"purposefully availed" himself of the privilege of conducting activities within the State of Vermont such that he could reasonably anticipate being haled into a Vermont court.  *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008)("To have purposefully availed itself of the privilege of doing business in the forum, a defendant must have performed some type of <u>affirmative</u> conduct which allows or promotes the transaction of business within the forum state")(emphasis added).  The requisite "case-specific" nexus or "minimum contacts" between Wright and the State of Vermont is nonexistent.

Assuming Wright's compulsory attendance at the federal criminal trial of Rev. Miller can even be considered "contacts" with the State of Vermont, it is precisely the kind of "random, fortuitous, or attenuated contacts" or "unilateral activity of another party or a third person" the purposeful availment requirement is designed to eliminate as a basis for specific jurisdiction. *Burger King*, 471 U.S. at 474.  Because Wright made no purposeful, deliberate, overt or affirmative attempts to conduct any activities within the State of Vermont relating to the claim asserted against him in this action, he was not amenable to service of process and this court may not exercise personal jurisdiction over him.  *J.McIntyre*, 131 S.Ct. at 2788 ("those who live or operate primarily outside a State have a due process right not to be subjected to judgment in its courts as a general matter"); *Dall,* 163 Vt. at 276 ("The reasonableness requirement also prevents a defendant from being subjected to jurisdiction on the basis of fortuitous, attenuated, or random contacts").

The only fact Plaintiff points to in support of her jurisdictional claim against Wright is that he, in compliance with a trial subpoena, appeared in a federal court sitting in Vermont to give testimony in the criminal trial of co-Defendant, Rev. Kenneth Miller.  This limited, tangential, incidental and involuntary "contact" with Vermont is patently insufficient to confer personal jurisdiction over Wright for purposes of this action.  *American Telephone & Telegraph Co. v.*

*Maydak*, 1993 WL 812550, Civ. A. No. 93-1824 (W.D.Pa. Nov. 3, 1993)(Defendant's appearance in forum state for purpose of testifying in related criminal proceeding was insufficient to confer personal jurisdiction under minimum contacts test). At no time did Wright freely and affirmatively initiate contact with the State of Vermont, purposefully avail himself of the privilege of conducting activities within Vermont, or attempt to invoke the benefits or protections of Vermont's laws.

Because Plaintiff has not established – and cannot establish – this Court's general or specific jurisdiction over Wright under the minimum-contacts test, the Complaint against him must be dismissed under Fed.R.Civ.P. 12(b)(2).[5]

> **B.** **Plaintiff's Complaint Should Be Dismissed for Failure to State a Claim Against Wright under 42 U.S.C. § 1986.**

>> **i.** ***Plaintiff Fails to Allege that Wright Had Actual Knowledge of a Conspiracy To Violate Her Rights.***

In count four of her Complaint, Plaintiff alleges that all co-Defendants (that is, every Defendant <u>except</u> Wright) engaged in, and acted in furtherance of, a conspiracy to violate her civil rights, thereby giving rise to tort liability under 42 U.S.C. § 1985(3). Plaintiff does not level a § 1985 conspiracy claim against Wright. Rather, in count five, she alleges that Wright is liable under 42 U.S.C. § 1986 for having failed to prevent co-Defendants from carrying out their international kidnapping conspiracy. Section 1986 flows explicitly from § 1985(3), and states in relevant part:

> Every person who, <u>having knowledge</u> that any of the wrongs <u>conspired</u> to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence

---

[5] Because Plaintiff has failed to identify the necessary minimum contacts between Wright and the State of Vermont, the Complaint against him must be dismissed for lack of jurisdiction without regard to "reasonableness" considerations. *Metro. Life Ins. Co*., 84 F.3d at 569 ("A reviewing court must first examine the defendant's contacts with the forum. If the same do not exist in sufficient abundance, that is, if the constitutionally necessary first-tier minimum is lacking, the inquiry ends")(citations omitted); *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008)("if the plaintiff fails at the first step, the jurisdictional inquiry ends and the case must be dismissed").

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT
PLATTSBURGH, NEW YORK

could have prevented; and such damages may be recovered in an action on the case. 42 U.S.C. § 1986 [emphasis added].

By its plain and inescapable language, the statute requires a plaintiff to plead and prove, *inter alia*, that the defendant had <u>actual knowledge</u> of a § 1985 <u>conspiracy</u>. *Mian*, 7 F.3d at 1088 (reciting "knowledge" element of § 1986 claim); *Whitehurst v. 230 Fifth, Inc.,* 11 CIV. 0767 CM, 2011 WL 3163495 *7 (S.D.N.Y. July 26, 2011)("Section 1986 creates a cause of action against anyone who, knowing that equal protection is about to be denied as a result of conspiratorial action, and having the power to prevent such wrong, fails to act"); *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994) (Plaintiff must show "the defendant had actual knowledge of a § 1985 conspiracy" in order to recover under § 1986); *Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998)("Liability under § 1986 is dependent on proof of actual knowledge by a defendant of the wrongful conduct").

In support of her § 1986 claim, Plaintiff alleges that "Wright knew that Lisa Miller was planning to abduct Isabella in order to violate the Plaintiff's right to equal protection" and did nothing to prevent Miller from carrying out her plan. *Am. Complaint* at ¶ 77.  This allegation indicates only that Wright had knowledge of the kidnapping "intentions" or "plan" of a single person – Lisa Miller.  A conspiracy, of course, exists only where there is an agreement between "two or more persons" to achieve an unlawful end.  42 U.S.C. § 1985(3); *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995)("Establishment of a § 1985(3) claim requires proof of a conspiracy between 'two or more persons'"); *Clark v. Town of Ticonderoga*, 213 F. Supp. 2d 198, 200 (N.D.N.Y. 2002)("A conspiracy is an agreement between at least two individuals, where the individuals act in furtherance of the objective of the conspiracy, and each individual has knowledge of the nature and scope of the conspiracy").  Nowhere in her Complaint does Plaintiff allege that Wright had actual knowledge of the alleged conspiracy involving Miller and co-Defendants.

Because Plaintiff fails to allege any facts in support of the essential "knowledge" element of

her § 1986 claim, the Complaint against Wright must be dismissed.

> ii.     ***The Factual Allegations of the Complaint Do Not Support a Claim of Gender-Based Animus under § 1985(3) and § 1986.***

It is well-settled that a cause of action under § 1986 exists only to the extent liability can be established under § 1985(3).  *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir.1999)("a § 1986 claim must be predicated upon a valid § 1985 claim"); *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of New York, Inc.,* 968 F.2d 286, 292 (2d Cir. 1992)("Liability under § 1986 is derivative of § 1985 liability, *i.e.,* there can be no violation of § 1986 without a violation of § 1985").  The critical inquiry, therefore, is whether Plaintiff has stated a facially plausible conspiracy claim under § 1985(3).  If Plaintiff cannot state a cognizable claim against co-Defendants under § 1985(3), then her § 1986 claim against Wright must be dismissed.

In order to establish liability against co-Defendants under § 1985(3), Plaintiff must prove: (1) a conspiracy; (2) an intent to deprive plaintiff of the equal protection of the laws or the equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) a deprivation of federally guaranteed rights.  *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971); *United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983); *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.,* 7 F.3d 1085, 1087 (2d Cir. 1993); *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999).

Section 1985(3) is the surviving version of § 2 of the Civil Rights Act of 1871, originally dubbed the "Ku Klux Klan Act."  In passing the Act, the 1871 Congress intended to provide "a weapon against the wave of anarchic and violent civil resistance to Reconstruction that marred the post-Civil War South." *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006).  Consistent with the Act's legislative history, the Supreme Court has concluded that § 1985(3) primarily targets conspiracies rooted in racial animus:

The central theme of the bill's proponents was that the Klan and others were forcibly resisting efforts to emancipate Negroes and give them equal access to political power.  The predominate purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters.  The latter included Republicans generally, as well as others, such as Northerners who came South with sympathetic views towards the Negro.  *Carpenters v. Scott*, 463 U.S. 825, 837 (1983)(emphasis added).

"Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Great American Fed. S. & L. Ass'n v. Novotny*, 442 U.S. 366, 372 (1979).  That is to say, a valid § 1985(3) claim must be explicitly predicated on a violation of "some otherwise defined federal right." *Novotny*, 442 U.S. at 376.  The Supreme Court has emphatically stated that § 1985(3) does not provide a remedy for "all tortious, conspiratorial interferences with the rights of others," and should not be interpreted as "a general federal tort law." *Griffin*, 403 U.S. at 101-02.

With respect to the second element of a § 1985(3) claim – intent to deprive a citizen of equal protection of the laws – a plaintiff must show "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993)(quoting *Griffin*, 403 U.S. at 102).  Despite the "perhaps otherwise class-based" dictum in *Griffin*, the Court has never extended the protections of § 1985(3) to reach any class other than race.  In the only two cases in which the Court has had the opportunity to extend the statute's coverage to nonracial class-based animus, it has expressly declined to do so. *Bray*, 506 U.S. at 269 ("women seeking abortion" not a qualifying class); *Carpenters*, 463 U.S. at 838-39 ("conspiracies motivated by economic or commercial animus" not within purview of statute).  The Court itself has characterized *Griffin*'s "perhaps" dictum as "speculative," *Bray*, 506 U.S. at 269, and noted that "it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans." *Carpenters*, 463 U.S. at 836.  The tentative tenor of the Court's jurisprudence

in this area imparts a noticeable lack of enthusiasm for extending § 1985(3) beyond its core concern

for racial equality.

The Court has also sharply circumscribed § 1985(3)'s application to purely private

conspiracies by requiring plaintiffs in such cases to causally link the conspiracy to a deprivation of a

right that is constitutionally protected against private infringement.  *Bray*, 506 U.S. at 268 ("a

plaintiff must show … that the [private] conspiracy aimed at interfering with rights that are

protected against private, as well as official, encroachment")(quoting *Carpenters*, 463 U.S. at 833).

In other words, § 1985(3) does not apply to private conspiracies aimed at violating rights that are,

by definition, constitutionally safeguarded <u>only</u> against state action.[6]

---

[6] Section 1985(3) has two clauses.  The first, referred to as the "deprivation" clause, provides a cause of action against those who conspire "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws…" 42 U.S.C. § 1985(3).  The second, referred to as the "hindrance" or "prevention" clause, provides a cause of action against those who conspire "for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws."  *Id*.  In this case, Plaintiff appears to allege violations of both clauses.

*Carpenters* and *Bray* clearly hold that the state action requirement applies to all private conspiracy claims subject to the deprivation clause where the right claimed to have been infringed exists only against state actors.  The three dissenting opinions in *Bray*, however, argued that a plaintiff proceeding under the hindrance clause need not prove the requisite class-based animus or state involvement even if the conspiracy violated rights protected against only state encroachment.  *Bray*, 506 U.S. at 300-03 (Souter, J., dissenting); *Id.* at 339-343 (Stevens, J., dissenting); *Id.* at 355-56 (O'Connor, J., dissenting).  The *Bray* majority determined that the hindrance-clause issue was not properly before the Court, but it strongly suggested that the hindrance clause was subject to the same animus and state action elements as the deprivation clause:

> Judging from the statutory text, a cause of action under the 'hindrance' clause would seem to require the same 'class-based, invidiously discriminatory animus' that the 'deprivation' clause requires, and that we have found lacking here … Even, moreover, if the 'hindrance'-clause claim did not fail for lack of class-based animus, it would still fall unless the 'hindrance' clause applies to a private conspiracy aimed at rights that are constitutionally protected only against official (as opposed to private) encroachment.  Justice Stevens finds it 'clear' that it does, citing, surprisingly, *Carpenters*.  To the extent that case illuminates this question at all, it is clearly contrary to the dissent's view, holding that the 'deprivation' clause, at least, does *not* cover private conspiracies aimed at rights protected only against state encroachment. *Bray*, 506 U.S. at 282-83 (emphasis in original).

Justice Kennedy, who joined the majority opinion in *Bray*, remarked in a separate concurrence that "the dissenters' inability to agree on a single rationale confirms, in my view, the correctness of the Court's opinion."  *Bray*, 506 U.S. at 287 (Kennedy, J., concurring).  In the absence of a more explicit pronouncement from the Supreme Court, the animus and state action elements of a deprivation claim should be applied with equal force to hindrance claims.  *Friends of Falun Gong v. Pacific Cultural Enterprise, Inc.,* 288 F.Supp.2d 273, 280 (E.D.N.Y. 2003)("The majority opinion in Bray left [the] question open, but suggested in dictum that a state action requirement would apply to the hindrance clause as well"); *Tilton v. Richardson*, 6 F.3d 683, 687 (10th Cir. 1993)(holding that private conspiracy claims brought

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT
PLATTSBURGH, NEW YORK

*Griffin*, *Carpenters* and *Bray* address the "animus" and "rights-guaranteed-against-private encroachment" requirements in important respects.  In *Griffin*, the Court held that African Americans could pursue a § 1985(3) claim against private individuals acting in furtherance of a conspiracy motivated by racial animus.  In extending the statute to reach purely private racist conspiracies, the Court observed that the right to be free from racial discrimination and violence was firmly rooted in the Thirteenth Amendment, which prohibits both private and state-sponsored racism.  *Griffin*, 403 U.S. at 105.

In *Carpenters*, the Court rejected private conspiracy claims brought by a non-unionized construction contractor and two of its non-union employees against pro-union demonstrators who allegedly assaulted the contractor's employees and destroyed its property.  Plaintiffs claimed that the pro-union assailants conspired to deprive them of their First Amendment right to associate with fellow non-union employees, resulting in a deprivation of equal protection of the laws actionable under § 1985(3).  *Carpenters*, 463 U.S. at 830.  Without defining the precise contours of the "animus" requirement, the Court hewed closely to the legislative history and concluded that conspiracies aimed at certain economic groups or commercial activity fell short of the "animus" contemplated by the statute:

> [W]e find no convincing support in the legislative history for the proposition that the provision was intended to reach conspiracies motivated by bias towards others on account of their *economic* views, status, or activities.  Such a construction would extend § 1985(3) into the economic life of the country in a way that we doubt that the 1871 Congress would have intended when it passed the provision in 1871. *Carpenters*, 463 U.S. at 837 [emphasis in original].

*Carpenters* also established that § 1985(3) does not create a cause of action where private conspirators violate constitutional rights secured only against state interference.  *Id.* at 833 ("the right claimed to have been infringed has its source in the First Amendment.  Because that

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT
PLATTSBURGH, NEW YORK

under hindrance clause must be based on rights protected against both private and state infringement).  For these

Amendment restrains only official conduct, to make out their § 1985(3) case, it was necessary for [plaintiffs] to prove that the state was somehow involved in or affected by the conspiracy").[7]

In *Bray*, the Court held that § 1985(3) did not countenance a cause of action against persons obstructing access to abortion clinics.  Although the Court sidestepped the issue of whether § 1985(3) encompassed gender-based animus, it concluded that defendants' opposition to abortion did not reasonably reflect gender discrimination and that "women seeking abortion" were not a protected class under the statute.  *Bray*, 506 U.S. at 269-270.  The Court went on to hold that plaintiffs' private conspiracy claim was not actionable under § 1985(3) because, like the *Carpenters* plaintiffs, they failed to demonstrate "an intent to deprive persons of a right guaranteed against private infringement." *Id.* at 274.  While the conspiracy certainly interfered with plaintiffs' constitutional right to abortion, that right is not constitutionally protected against private infringement.  *Bray*, 506 U.S. at 277-78.

*Griffin*, *Carpenters* and *Bray* militate heavily in favor of dismissal in this case.  As a threshold matter, the factual allegations in the Complaint allege a conspiracy directed at Plaintiff solely because of her sexual orientation.  Plaintiff's allegation that she was deprived of equal protection of the laws "on account of gender" is factually unmoored and totally incongruous with the actual content of her Complaint.  *Am. Complaint* at ¶ 75.  While Plaintiff happens to be a woman, the conduct of which she complains was not undertaken because of her sex or gender. Plaintiff alleges only a conspiracy motivated by a moral disapproval of homosexual relationships,

---

reasons, Plaintiff's § 1985(3) claim should be subject to the animus and state action requirements irrespective of whether it is considered under the deprivation clause or the hindrance clause.

[7] A state is "affected" by a conspiracy only if "the aim of the conspiracy is to influence the activity of the state." *Carpenters*, 463 U.S. at 830-31.  Even the dissenting justices in *Carpenters* acknowledged that, in order to satisfy the state action requirement, the conspirators must induce the state or a public official to deprive the plaintiff of his or her federally guaranteed rights.  *Id.* at 840, n. 2 ("The Court does not require that the conspirators be state officials or act under color of state law.  Instead, the requirement is that the conspiracy intend to cause the State or a person acting under color of state law to deprive the victims of the conspiracy of their constitutional rights")(Blackmun, J., dissenting).

particularly state-sanctioned same-sex marriages, civil unions, and parental rights.  *Id*. at ¶¶ 45, 47-51, 62-64.  There are simply no factual allegations from which one could draw a reasonable inference that the alleged conspirators, many of whom are women, took aim at Plaintiff's rights because of her womanhood.  Even on a liberal reading, the Complaint alleges a conspiracy against Plaintiff based solely on her sexual orientation, *viz.,* her status as a same-sex parent and former partner in a same-sex union.  Plaintiff cannot plead her way into the "otherwise class-based" language of *Griffin* by invoking a potentially quasi-suspect class that is not in any way implicated by her own factual allegations.

The Second Circuit has consistently rebuffed attempts by plaintiffs to plead into coverage under Title VII by asserting gender stereotyping claims that run against the grain of factual allegations that are rife with references to sexual orientation.[8]  As the Rhode Island Supreme Court famously quipped in rejecting a transparent attempt to trigger insurance coverage by pleading negligent commission of sexual assault, "A plaintiff, by describing his or her cat to be a dog, cannot simply by that descriptive designation cause the cat to bark."  *Peerless Ins. Co. v. Viegas*, 667 A.2d 785, 789 (R.I. 1995).  The same basic logic applies here.  *Twombly* and *Iqbal* require the court to pierce the boilerplate language of the complaint and decide whether it alleges a facially plausible claim.  The factual allegations do not support a plausible § 1985(3) conspiracy "on account of gender."  Plaintiff's "gender" claim should, therefore, be discounted as facially implausible—if not altogether disingenuous – under *Twombly* and *Iqbal*.

---

[8] *Kiley v. American Society for Prevention of Cruelty to Animals*, 296 Fed.Appx. 107, 109 (2d Cir. 2008)("a plaintiff may not use a gender stereotyping claim to bootstrap protection for sexual orientation into Title VII"); *Vickers v. Fairfield Medical Center*, 453 F.3d 757, 763 (2d Cir. 2006)(recognizing "the faulty logic in viewing what is, in reality, a claim of discrimination based on sexual orientation as a claim of sex stereotyping"); *Dawson v. Bumble & Bumble*, 398 F.3d 211, 219 (2d Cir. 2005)("district courts in this Circuit have repeatedly rejected attempts by homosexual plaintiffs to assert employment discrimination claims based upon allegations involving sexual orientation by crafting the claim as arising from discrimination based upon gender stereotypes").

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT
PLATTSBURGH, NEW YORK

### iii.      Section 1985(3) Does Not Apply to Sexual Orientation

In the post-*Bray* period, most federal courts have been wary of extending § 1985(3) to reach any classes other than race.  Courts that have decided to plow forward and breathe life into *Griffin*'s "otherwise class-based" dictum have reasoned that it "encompasses only those groups with discrete and immutable characteristics such as race, national origin, and sex."  *Martin v. New York State Dept. of Correctional Services*, 115 F.Supp.2d 307, 316 (N.D.N.Y. 2000).  The court in *Martin* recognized that "§ 1985(3) was not intended to create a general federal tort law," and that it "should extend beyond its racial boundaries only when a class has been afforded suspect or quasi-suspect classification or when Congress has provided the class special protection."  *Id.*

Courts have uniformly held that discrimination based on sexual orientation cannot form the basis of a § 1985(3) claim.  *Vega v. Artus*, 610 F.Supp.2d 185, 204-05 (N.D.N.Y. 2009)(sexual orientation not protected under § 1985(3) because "homosexuality has only been afforded rational basis review, and it has not been given special protection by Congress"); *Jermano v. Taylor*, No. 11-10739, 2012 WL 4009897 at *4 (E.D.Mich. July 31, 2012)("Homosexuals are not a protected class for purposes of 42 U.S.C. § 1985(3)"); *Dix v. City of New York*, 2002, No. 01 CIV. 6186, WL 31175251 at *10 (S.D.N.Y. Sept. 30, 2002)("sexual orientation discrimination will not support a 42 U.S.C. § 1985(3) claim"); *Segreto v. Kirschner*, 977 F.Supp. 553, 565 (D.Conn. 1997)("white heterosexual males and homosexuals are not protected classes under Section 1985(3)"); *Yost v. Bd. of Regents, University of Maryland*, No. HAR 93-471, 1993 WL 524757 at * 4 (D.Md. Nov. 19, 1993)("courts have consistently held that homosexuals are not a class within the meaning of § 1985(3)").

In *Windsor v. United States*, __ F.3d __, 2012 WL 4937310 (2d Cir. Oct. 18, 2012), the Second Circuit sustained an equal protection challenge to Section 3 of the Defense of Marriage Act

("DOMA"), 1 U.S.C. § 7.  *Windsor* follows on the heels of the First Circuit's invalidation of DOMA, and the Ninth Circuit's invalidation of a state constitutional ban on same-sex marriage. *Massachusetts v. U.S. Dep't of Health and Human Services*, 682 F.3d 1 (1st Cir. 2012); *Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012).  Notably, the First and Ninth Circuits declined to recognize sexual orientation as a suspect or quasi-suspect class and, instead, determined that the legislation could not withstand rational-basis review.  *Massachusetts*, 682 F.3d at 9-10; *Perry,* 671 F.3d at 1082.  In contrast, *Windsor* held that classifications based on sexual orientation are "quasi suspect" and, therefore, trigger "intermediate scrutiny."  *Windsor*, 2012 WL 4937310 at *9.  In this respect, *Windsor* marks a dramatic and literally unprecedented development in American constitutional law.

The Supreme Court has, under the banner of rational basis review, invalidated legislation targeting specific classes such as homosexuals,[9] the poor,[10] and the mentally disabled,[11] but it has never recognized that these classes are among the longstanding "suspect" or "quasi-suspect" classes – *viz.,* race,[12] national origin,[13] illegitimacy,[14] religion,[15] and gender[16] – that warrant heightened scrutiny.  Consistent with *Romer v. Evans*, 517 U.S. 620 (1996), the modern trend among the lower federal courts is overwhelmingly in favor of invalidating illegitimate classifications targeting homosexuals by employing some form of rationality review.  It certainly cannot be said that existing Supreme Court precedent portends the creation of a new classification for homosexuality.[17]

If the Supreme Court grants certiorari and affirms the result in *Windsor*, it will likely

---

[9] *Romer v. Evans*, 517 U.S. 620 (1996).
[10] *U.S. Dept. of Agric. v. Moreno*, 413 U.S. 528 (1973).
[11] *City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432 (1985).
[12] *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235-36 (1995)(race subject to strict scrutiny).
[13] *United States v. Virginia*, 518 U.S. 515, 532 n. 6 (1996)(national origin subject to strict scrutiny).
[14] *Mathews v. Lucas,* 427 U.S. 495, 505-506 (1976)(illegitimacy subject to intermediate scrutiny).
[15] *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546-47 (1993)(religion subject to strict scrutiny).
[16] *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 723-24 (1982)(gender subject to intermediate scrutiny).

proceed prudentially in minimalist fashion (as it did in *Romer*) and eschew the creation of a new suspect or quasi-suspect class for fear of causing doctrinal ripple effects well beyond DOMA-type classifications.[18]  As the First Circuit observed in *Massachusetts*, "to create a new suspect classification for same-sex relationships would have far-reaching implications … That such a classification could overturn marriage laws in a huge majority of individual states underscores the implications." *Massachusetts*, 682 F.3d at *9-10.

The fact that homosexuals comprise a "quasi-suspect" class within the Second Circuit for purposes of <u>constitutional</u> analysis does not automatically translate into <u>statutory</u> coverage for sexual orientation under the Ku Klux Klan Act of 1871.[19]  Even under *Windsor*, Plaintiff cannot satisfy the "animus" element of her § 1985(3) claim.  The Supreme Court has never declared that all constitutionally suspect and quasi-suspect classes are, *ipso facto*, statutorily protected classes under § 1985(3).  Ultimately, the question at issue in this case is not whether sexual orientation is deserving of more searching scrutiny for purposes of constitutional analysis, but whether homosexuals are among the class or classes envisioned by the 1871 Congress that enacted § 1985(3).

Membership in a constitutionally suspect class is a poor proxy for determining § 1985(3) coverage in this context because (1) nothing in the legislative history of § 1985(3) evinces a congressional intent to grant homosexuals, as a class, a federal tort remedy as a means of securing their civil rights, and (2) Congress itself has specifically determined that homosexuals do not

---

[17] *See, e.g., Massachusetts*, 682 F.3d at 9 ("Nothing indicates that the Supreme Court is about to adopt [a] new suspect classification [for same-sex relationships] when it conspicuously failed to do so in *Romer* – a case that could readily have been disposed by such a demarche").

[18] *Windsor*, 2012 WL 4937310 at *26, n. 7 ("an affirmance by the Supreme Court of the majority's view would likely doom the laws of the forty-one states which exclude same-sex couples from civil marriage")(Straub, J., dissenting).

[19] Without *Windsor*, of course, there would be no precedential foothold for a finding that sexual orientation is a "quasi-suspect" class and, therefore, no possibility of satisfying the "animus" requirement of § 1985(3).  In this sense, *Windsor* underscores the potentially prejudicial effect of Plaintiff's attempt to obtain personal jurisdiction over Wright in this

Paul Frank + Collins P.C.
Attorneys At Law
Burlington, Vermont
Plattsburgh, New York

warrant – and should not receive – special federal assistance in protecting their civil rights. *Martin*, 115 F.Supp.2d at 316; *Vega*, 610 F.Supp.2d at 204-05.  While Congress has extended the protections of Title VII of the Civil Rights Act of 1964 to race, national origin, religion and sex, it has refused to grant homosexuals, as a class, special protection under Title VII despite ample opportunity to do so.  *Simonton v. Runyon*, 232 F.3d 33, 35 (2d Cir. 2000)("The law is well-settled in this circuit and in all others to have reached the question that … Title VII does not prohibit harassment or discrimination because of sexual orientation"); *Williamson v. A.G. Edwards & Sons, Inc.,* 876 F.2d 69, 70 (8th Cir. 1989)("Title VII does not prohibit discrimination against homosexuals").  This is evidenced "by Congress's rejection, on numerous occasions, of bills that would have extended Title VII's protection to people based on their sexual preferences."  *Simonton*, 232 F.3d at 35.

DOMA, for its part, prohibits same-sex couples from receiving federal marriage-based benefits available to heterosexual couples, thereby limiting the rights afforded to this class under state law.  *Windsor*, 2012 WL 4937310 at *1.  However constitutionally problematic DOMA may be, it throws into stark relief the absence of congressional solicitude for homosexuals as a class.  To deduce that sexual orientation is a qualifying class under § 1985(3) would be to attribute to the 42nd Congress a legislative beneficence obviously not shared by even the 104th Congress.  In light of the race-oriented legislative history of § 1985(3), the Supreme Court's refusal to expand the statute's coverage beyond that envisioned by those who enacted it, and Congress's sustained opposition to granting special federal assistance to homosexuals as a class, it is clear that Plaintiff cannot satisfy the essential "class-based animus" requirement.  As a result, her §1986 claim against Wright must be dismissed.

---

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT
PLATTSBURGH, NEW YORK

court.  Were this action brought in any district court with constitutional authority to exercise personal jurisdiction over Wright, controlling precedent would compel dismissal of Plaintiff's § 1986 claim without the need for further analysis.

### iv.     *Plaintiff Does Not Allege Any State Involvement in the Private Conspiracy to Violate Her Fourteenth Amendment Right to Equal Protection of the Laws.*

Even if Plaintiff could prove that the remedial scope of § 1985(3) is broad enough to encompass animus based on sexual orientation, her claim would still be subject to dismissal for failure to identify any state involvement in the alleged conspiracy.  State action must be alleged where the right violated by the conspiracy is protected only against state interference.  *Carpenters*, 463 U.S. at 833; *Bray*, 506 U.S. at 268.

Plaintiff makes no allegation that the alleged kidnapping conspiracy was anything but wholly private, and she alleges only a deprivation of her "right to equal protection."  This right is enshrined in the Fourteenth Amendment, and it is axiomatic that the Fourteenth Amendment operates as a bulwark against the state, not private actors.  *Carpenters*, 463 U.S. 825, 831 ("It is commonplace that rights under the Equal Protection Clause itself arise only where there has been involvement of the State or of one acting under the color of its authority … The Fourteenth Amendment protects the individual against *state action*, not against wrongs done by *individuals*")(citations omitted)(emphasis in original); *Bray*, 506 U.S. at 278 ("Fourteenth Amendment liberty" is "obviously *not* protected against private infringement")(emphasis in original); *Edmond v. Hartford Ins. Co*., 27 Fed.Appx. 51, 53 (2d Cir. 2001)("a claim under § 1985(3) for conspiracy to deny equal protection in violation of the Fourteenth Amendment is not actionable in the absence of state action"); *Peavey v. Polytechnic Institute of New York,* 775 F.Supp. 75, 79 (E.D.N.Y. 1991)("It has always been held that the 14th Amendment guards [due process and equal protection] rights only from infringement by state actors").

"In order to establish state involvement in a civil rights conspiracy, a plaintiff is required to allege with particularity that the public entity conspired with the private defendants to deprive plaintiff of his rights." *Peavey*, 775 F.Supp. at 78.  Plaintiff does not claim that any state actor was

involved in the alleged kidnapping conspiracy, nor does she claim that the alleged conspirators caused or induced the State or a person acting under color of state law to deprive her of "equal protection" rights.  *Comtel Technologies, Inc. v. Paul H. Schwendener, Inc.,* 04 C 3879, 2005 WL 433327 (N.D. Ill. Feb. 22, 2005)("a viable § 1985(3) claim involving a private conspiracy to influence state action requires <u>injury at the state's hands</u>")(emphasis added).

Because Plaintiff has failed to allege a violation of any right protected against private infringement, she has no right of action against Defendants under § 1985(3).  As a result, her § 1986 claim against Wright must be dismissed.

**IV.    <u>CONCLUSION</u>**

For the foregoing reasons, Wright respectfully requests that the Court dismiss Plaintiff's Complaint against him with prejudice.

DATED at Burlington, Vermont, this 7th day of November, 2012.

DOUGLAS WRIGHT

BY:  PAUL FRANK + COLLINS P.C.

By:____/s/ Robert G. Cain, Esq._____
        Robert G. Cain, Esq.
        P.O. Box 1307
        Burlington, VT  05402-1307

1223001_v1: 10749-00001