UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JANET JENKINS, for herself and as    :
next friend of ISABELLA MILLER-      :
JENKINS, a/k/a ISABELLA MILLER,      :
                                     :
        Plaintiffs,                  :
                                     :
            v.                       :   Case No. 2:12-cv-184
                                     :
KENNETH L. MILLER, LISA ANN MILLER   :
f/k/a LISA MILLER-JENKINS, TIMOTHY   :
D. MILLER, ANDREW YODER,             :
individually and as an agent for     :
CHRISTIAN AID MINISTRIES, INC.,      :
CHRISTIAN AID MINISTRIES, INC.,      :
RESPONSE UNLIMITED, INC., PHILIP     :
ZODHIATES, individually and as an    :
agent for RESPONSE UNLIMITED, INC.,  :
VICTORIA HYDEN, f/k/a VICTORIA       :
ZODHIATES, individually and as an    :
agent for both RESPONSE UNLIMITED,   :
INC., and LIBERTY UNIVERSITY, INC.   :
and its related ministry THOMAS      :
ROAD BAPTIST CHURCH, INC., LINDA M.  :
WALL, individually and as agent for  :
THOMAS ROAD BAPTIST CHURCH, INC.,    :
and DOUGLAS WRIGHT,                  :
                                     :
        Defendants.                  :


**OPINION AND ORDER**

    Plaintiff Janet Jenkins, for herself and as next friend of
her daughter Isabella Miller-Jenkins, has brought suit against
several individuals and organizations, alleging that they
kidnapped and conspired to kidnap Isabella.  Plaintiffs assert
claims of commission of and conspiracy to commit an intentional
tort of kidnapping, violations of the Racketeer Influenced and
Corrupt Organizations Act ("RICO") under 18 U.S.C. § 1962(c) and

(d), conspiracy to violate civil rights under 42 U.S.C. § 1985(3), and failure to prevent a violation of civil rights under 42 U.S.C. § 1986.  All of the served Defendants[1] have moved to dismiss on various grounds, including lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), improper venue pursuant to Fed. R. Civ. P. 12(b)(3), and failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6).  In the alternative, several Defendants have moved for a change of venue to the Western District of Virginia pursuant to 28 U.S.C. § 1404(a).  For the reasons set forth below, the motions to dismiss are **granted in part and denied in part.**  The motions for change of venue are **denied.**

Defendants Andrew Yoder, Christian Aid Ministries, Inc., Liberty University, Inc., Thomas Road Baptist Church, Inc. and Douglas Wright are **dismissed** from the case for lack of personal jurisdiction.  Jurisdictional discovery is permitted with respect to Defendant Response Unlimited, Inc.

The motions to dismiss Count One, alleging an intentional tort of kidnapping/custodial interference are **denied.**  Counts Two and Three, alleging violations of RICO, are **dismissed** for failure to state a claim upon which relief can be granted.  Count Five, alleging a violation of 42 U.S.C. § 1986 and brought solely

---

[1]  Defendants Lisa Ann Miller and Timothy D. Miller have not been served.

against Defendant Douglas Wright, is **dismissed without prejudice**, for lack of personal jurisdiction over the Defendant.

Count Four, brought under 42 U.S.C. § 1985(3) and alleging a conspiracy to violate Plaintiffs' civil rights, is **dismissed with leave to amend.** As discussed in more detail below, last term the United States Supreme Court held that the definition of "marriage" and "spouse" in the Defense of Marriage Act ("DOMA") unconstitutionally deprived married same-sex couples of the equal protection of the laws guaranteed by the Fifth Amendment to the United States Constitution. *United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013). The Court explained that the law "divest[ed] married same-sex couples of the duties and responsibilities that are an essential part of married life" and that "the principal purpose and the necessary effect of this law are to demean those persons who are in a lawful same-sex marriage." *Id.* Specifically,

> [t]he class to which DOMA directs its restrictions and restraints are those persons who are joined in same-sex marriages made lawful by the State. DOMA singles out a class of persons deemed by a State entitled to recognition and protection to enhance their own liberty. . . . DOMA instructs all . . . persons with whom same-sex couples interact, including their own children, that their marriage is less worthy than the marriages of others. . . . [N]o legitimate purpose overcomes the purpose and effect to disparage and to injure those whom the State, by its marriage laws, sought to protect in personhood and dignity.

*Id.* at 2696. In so holding, the Supreme Court necessarily

concluded that same-sex couples whose unions are recognized under State law constitute a class that is entitled to equal protection.  *See id.; see also id.* at 2690 ("[DOMA's] operation is directed to a class of persons that the laws of New York, and of 11 other States, have sought to protect."); *id.* at 2692 ("What the State . . . treats as alike the federal law deems unlike by a law designed to injure the same class the State seeks to protect."); *id.* at 2693 ("DOMA seeks to injure the very class New York seeks to protect.  By doing so it violates basic due process and equal protection principles applicable to the Federal Government.").

Plaintiffs' Count Four alleged discriminatory animus on the basis of gender, a claim which cannot survive a motion to dismiss.  The facts alleged in the Amended Complaint would support a claim however that Defendants harbored invidiously discriminatory animus against same-sex couples, and sought to thwart the operation of state laws designed to guarantee them equal protection.

Plaintiffs may move to amend to plead a claim, under the hindrance clause of 42 U.S.C. § 1985(3), of conspiracy to violate their civil rights based on discriminatory animus against same-sex couples, and to prevent the courts of Vermont and Virginia from securing to them the equal protection of the law.

**Background**

## I.   The Litigation between Lisa Miller and Janet Jenkins

Isabella Miller-Jenkins is the daughter of Defendant Lisa Miller and Janet Jenkins.  She is the biological child of Lisa Miller, born in April 2002 while the two women were joined in a civil union, which they obtained in Vermont in 2000.[2]  At first the family lived in Virginia, but moved to Vermont in August 2002.  When Isabella was seventeen months old Miller and Jenkins separated, and Miller moved with Isabella back to Virginia.  Miller petitioned the Vermont Family Court to dissolve the union and to determine parental rights and responsibilities[3] with respect to Isabella.  The family court issued a temporary order on June 17, 2004, granting temporary legal and physical responsibility to Miller and setting a visitation schedule for parent-child contact between Jenkins and Isabella, including monthly visits and daily telephone contact.  Other than a visit on the first weekend of the visitation schedule, Miller did not allow Jenkins to have parent-child contact either in person or by

_____

[2]  Under Vermont law two members of the same sex may enter into a civil union and thereby receive the benefits and protections and be subject to the responsibilities of spouses.  Vt. Stat. Ann. tit. 15, §§ 1201, 1202, 1204.

[3]  Under Vermont law, "'[p]arental rights and responsibilities' means the rights and responsibilities related to a child's physical living arrangements, parent child contact, education, medical and dental care, religion, travel and any other matter involving a child's welfare and upbringing." Vt. Stat. Ann. tit. 15, § 664(1).  The term embraces both "legal responsibility" and "physical responsibility." _Id._  The Vermont family courts have jurisdiction over proceedings relating to the dissolution of civil unions, including the determination of parental rights and responsibilities of a minor child.  _See id._ §§ 665, 1206.

telephone.

Instead, she filed a new petition in the Circuit Court of Frederick County, Virginia, asking that court to declare her the sole parent of Isabella and to rule that Jenkins had no parental or visitation rights.  On appeal from an order granting Miller's requested relief, the Virginia Court of Appeals held that by filing her petition in Vermont Miller had invoked the jurisdiction of the courts of Vermont, that Virginia courts lacked jurisdiction over her subsequent petition and were required to extend full faith and credit to the custody and visitation orders of the Vermont court.  *Miller-Jenkins v. Miller-Jenkins*, 637 S.E.2d 330, 338 (Va. App. 2006).

In June 2007 the Vermont family court ordered sole physical and legal custody of Isabella to Miller, and awarded Jenkins visitation rights.  The Court warned Miller however that continued interference with the relationship between Isabella and Jenkins could warrant a modification of the custody order.  *See Miller-Jenkins v. Miller-Jenkins*, 2010 VT 98, ¶ 5, 12 A.3d 768, 772 (entry order).  Although Miller did comply with the visitation schedule on several occasions in the last half of 2007, by the spring of 2008 Miller renewed her defiance of the visitation orders, and was found in contempt of court multiple times.  In August 2009 Jenkins moved to modify the family court order concerning parental rights and responsibilities.  Miller

6

did not attend the hearing on the motion, but filed an objection to any transfer of custody.

Before the Vermont family court ruled on Jenkins' motion, Miller left the country with Isabella on September 22, 2009.  On November 20, 2009, the Vermont family court concluded that Miller had willfully interfered with Jenkins' visitation rights, and it transferred legal and physical rights and responsibilities for Isabella to Jenkins as of January 1, 2010.  As far as is known however neither Isabella nor Miller have returned to this country.

## II.  The Criminal Investigation and Prosecution

The Government investigated Miller's disappearance with Isabella.  It determined that they traveled by car from Virginia to Buffalo, New York, where they took a taxi across the border to Ontario, Canada.  On September 22, 2009, Miller and Isabella flew from Toronto, Ontario to Mexico City and on to Managua, Nicaragua through El Salvador.  The tickets were purchased by Defendant Timothy Miller (no relation to Lisa Miller), an Amish Mennonite pastor and missionary affiliated with Christian Aid Ministries ("CAM") living in Managua, Nicaragua.

The Government further determined that Defendant Kenneth Miller (no relation to Lisa or Timothy Miller), a Beachy Amish Mennonite pastor from Virginia, had contacted Timothy Miller through Tim Schrock, another pastor affiliated with CAM, to

request Timothy's assistance in getting Lisa Miller and Isabella to Nicaragua.  Timothy Miller agreed to purchase one-way plane tickets and to meet them at the airport in Managua.  He took them to Jinotega, a city about two hours distant from Managua, and left them with another member of his church.  Some six weeks later Lisa Miller and Isabella came to Managua, and stayed there until April, 2010, after which they returned to Jinotega.

On April 27, 2010, an arrest warrant was issued for Lisa Miller.  Timothy Miller and Kenneth Miller were charged with aiding and abetting the international parental kidnapping of Isabella, in violation of 18 U.S.C. § 1204.  The charge against Timothy Miller was dropped in exchange for his agreement to cooperate with the investigation and to provide testimony if needed.  The case against Kenneth Miller went to trial in August 2012.  On August 14, 2012, a jury returned a guilty verdict on the charge of aiding and abetting an international parental kidnapping.  Kenneth Miller was sentenced on March 4, 2013 to a term of imprisonment of twenty-seven months.  The sentence has been stayed pending appeal.

At trial, several witnesses provided additional details of a scheme to assist Lisa Miller to remove Isabella from the United States and to help them once they had left.  Ervin Horst, a Mennonite pastor from Ontario, testified that he received a telephone call from Kenneth Miller asking if he would assist

8

someone to leave the country by traveling to Buffalo, New York and crossing the border with her. When Horst understood that the reason for her leaving involved a custody dispute, he refused to enter the United States, but did agree to pick her up once she had crossed the border into Canada and to take her to the airport.

Horst also talked with a man identified as "Philip," who he understood was bringing Lisa Miller and Isabella from Virginia to Buffalo. Defendant Philip Zodhiates' cell phone traveled north from Virginia to Buffalo that day. Another cell phone, assigned to Defendant Response Unlimited, Inc. ("RUL"), made a similar journey on the same day.

Defendant Andrew Yoder, field director of CAM in Managua from 2007 to October 2011, attended the Amish-Mennonite church where Timothy Miller was pastor. He testified that he became aware of Lisa Miller and Isabella and their situation shortly before they arrived in Nicaragua, in an email from Timothy Miller. He met Lisa Miller, knew where she was living, and was aware that she was using a false name and was disguised as an Amish Mennonite.

In early November 2009 Yoder notified CAM that Lisa Miller was in Nicaragua. CAM responded with instructions that he was not to be involved in helping Lisa Miller in any way. Yoder communicated to Timothy Miller that CAM could not help Lisa

Miller.

Yoder and CAM remained sympathetic to her case, however.  In May 2010 Timothy Miller sent Kenneth Miller Yoder's name and a Tennessee address in order for Yoder to cash a check from Kenneth Miller for $500.00 during Yoder's trip to the United States, and to bring the cash back to Nicaragua.  The check was issued by Milmont Greenhouses, the Kenneth Miller family business.  Yoder had never done business with Milmont Greenhouses, and the company did not owe him money.  Yoder suspected that the cash might be for Lisa Miller.  He cashed the check and delivered the cash to Timothy Miller.

## III. Factual Allegations of the Amended Complaint

Plaintiffs' Amended Complaint alleges that while living in Virginia Lisa Miller joined the Keystone Baptist Church in Winchester, Virginia, and became acquainted with its pastor, Defendant Douglas Wright.  At about that time she began to prevent Jenkins from seeing Isabella and to interfere with the court-ordered visitation schedule.  Miller regularly discussed her custody case with Wright between 2004 and 2009.

In the spring of 2008, Lisa Miller moved from Winchester to Lynchburg, Virginia, and obtained housing, employment and a vehicle from Defendant Thomas Road Baptist Church ("TRBC"), affiliated with Defendant Liberty University.  Miller was hired as a teacher at TRBC's elementary school, Liberty Christian

Academy, and Isabella was enrolled there.

In the ongoing custody and visitation dispute, Lisa Miller obtained the services of attorneys Mathew Staver and Rena Lindevaldsen of Liberty Counsel, affiliated with Liberty University School of Law and Liberty University. Defendant Linda Wall was involved in obtaining the representation, and in discussions of Lisa Miller's situation. The Amended Complaint alleges that Wall and Miller "decided and agreed as early as June of 2008 that Lisa Miller should flee with Isabella." Am. Compl. ¶ 26. After Miller and Isabella left the country, Wall publicly compared herself to Harriet Tubman and suggested she would take similar actions with regard to other children from same-sex families. *Id.* ¶ 41. She advised anyone with knowledge of Miller's whereabouts not to reveal it.

Wall and Lisa Miller and others, including members of TRBC, launched the Protect Isabella Coalition in the spring of 2008 to support Miller's efforts to avoid complying with court-ordered visitation. Donations were solicited and a Facebook site established. In May 2009 Miller made the acquaintance of Philip Zodhiates, the president of RUL, a direct mail marketing company specializing in Christian and conservative causes.

By the late summer of 2009, Lisa Miller and others had decided that she and Isabella would flee the country with the help of members of the Beachy Amish Mennonite Church and related

11

ministries.  On September 19, 2009, two days before she left, Lisa Miller and Isabella returned to Winchester, Virginia. Miller met her former pastor, Douglas Wright, in a parking lot to say goodbye.  Miller asked him to help her dispose of some personal items.  He understood from their meeting that he would not be seeing them again.

In 2009, Victoria Hyden, daughter of Philip Zodhiates, was an employee of RUL and a student at and employee of Liberty University School of Law.  She had attended grade school in Stuart's Draft, Virginia, where Kenneth Miller had been a pastor. Kenneth Miller was acquainted with Philip Zodhiates and Victoria Hyden.  On September 20, 2009, both Philip Zodhiates and Victoria Hyden called Lisa Miller's father for assistance in arranging a rendezvous at a Walmart parking lot where Lisa Miller abandoned her car.

Disguised as Amish Mennonites, Lisa Miller and Isabella were transported to the Canadian border by Philip Zodhiates and an employee of RUL on September 21, 2009.  After their flight to Nicaragua, Lisa Miller and Isabella lived near or among the Amish Mennonite community, the Nicaraguan Brethren, in Nicaragua.  They adopted the pseudonyms of Sarah and Lydia.  They managed however to continue to communicate with members of TRBC with the assistance of Zodhiates.  Since then Lisa Miller has received aid from the Amish Mennonite community, and at some point became a

12

member of the church.  The plaintiffs allege on information and belief that Zodhiates arranged to have money transferred to Lisa Miller through a phony purchase of hydrangea plants from Kenneth Miller's family business, the money having been transferred through a payroll account into a check for $500.00 to Andrew Yoder.  The check was mailed to Yoder at a United States address. He cashed the check and gave the cash to Timothy Miller in Nicaragua.

The Amended Complaint alleges that Victoria Hyden subsequently solicited donations for supplies for Lisa Miller from her co-workers at the law school to enable Miller to remain outside the country.  Elders at TRBC packed Miller's remaining belongings in Lynchburg, and Philip Zodhiates arranged to have them and some supplies transported to Timothy Miller in Nicaragua.  Kenneth Miller arranged for Pastor Wright to dispose of Lisa Miller's belongings in Winchester.

The Amended Complaint alleges that Lisa Miller's attorneys, Staver and Lindevaldsen, respectively a dean and a professor at Liberty University School of Law, routinely advised their students that the correct course of action for a person in Lisa Miller's situation would be to engage in civil disobedience and to defy court orders.  Despite Staver's acquaintance with Zodhiates, both attorneys have at all times maintained that they do not know their client's location; that she simply stopped

13

communicating with them and disappeared.  They did however proceed with the litigation of her case, citing advance instructions from Lisa Miller.

TRBC's pastor, Jonathan Falwell, is among the dozens of religious leaders who have signed the "Manhattan Declaration," a pledge to call for the church to take a stand that is anti-abortion, considers marriage to be a union solely between a man and a woman, and embraces a right to express freely one's deeply held religious convictions.  The Manhattan Declaration closes with a vow not to "bend to any rule purporting to force us to bless immoral sexual partnerships, treat them as marriages or the equivalent, or refrain from proclaiming the truth, as we know it, about morality and immorality and marriage and the family."[4]

The Amended Complaint alleges that TRBC and Liberty University therefore encouraged its agents to disregard state laws governing parental rights.

Defendant Douglas Wright has moved to dismiss the complaint against him for lack of personal jurisdiction and failure to state a claim upon which relief can be granted.  ECF No. 40. Defendant Kenneth Miller has moved to dismiss the complaint against him for lack of personal jurisdiction, failure to state a claim upon which relief can be granted, and improper venue.  In

---

[4]  Manhattan Declaration:  A Call of Christian Conscience 9 (released Nov. 20, 2009), http://manhattandeclaration.org.

the alternative he moves for a change of venue.  ECF No. 56.

Defendants Philip Zodhiates and RUL have moved to dismiss the

complaint for lack of personal jurisdiction and improper venue.

ECF No. 57.  Defendant Andrew Yoder has moved to dismiss the

complaint against him for lack of personal jurisdiction and

failure to state a claim upon which relief can be granted.  ECF

No. 62.  Defendant CAM has moved to dismiss for lack of personal

jurisdiction and failure to state a claim upon which relief can

be granted.  ECF No. 63.  Defendants Liberty University, TRBC and

Victoria Hyden in her alleged capacity as an agent of Liberty

University or TRBC have moved to dismiss for lack of personal

jurisdiction, lack of venue and failure to state a claim, ECF No.

66, and have moved for a change of venue to the United States

District Court for the Western District of Virginia.  ECF No. 67.

Defendant Linda Wall has moved to dismiss the complaint against

her for lack of personal jurisdiction, improper venue and failure

to state a claim upon which relief can be granted.  ECF No. 109.

## Discussion

**I.  Personal Jurisdiction**

On a pretrial motion to dismiss for lack of personal

jurisdiction, a district court may determine the motion on the

basis of affidavits alone, or it may permit discovery, or it may

conduct an evidentiary hearing on the merits.  *Dorchester Fin.*

*Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013)

15

(per curiam) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)).  The showing that a plaintiff must make to defeat the motion to dismiss varies with the procedure followed.  A court proceeding on the basis of affidavits assumes the truth of the plaintiffs' factual allegations for purposes of the motion and "'construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor.'"  *Id.* at 85 (*quoting S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010)).  In order to survive a motion to dismiss for lack of personal jurisdiction at this stage, a plaintiff must make a prima facie showing that jurisdiction exists, which must include an averment of facts that, if credited by the trier of fact, would suffice to establish jurisdiction.  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013), *petition for cert. filed*, (Sept. 9, 2013).

In resolving issues of personal jurisdiction, the Court assesses whether the exercise of personal jurisdiction comports with the requirements of due process.  *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).[5]  "Due

---

[5]  The Amended Complaint asserts both federal question and diversity jurisdiction.  Although in a diversity action a court must initially determine whether a plaintiff has shown that a defendant is amenable to process under the forum state's laws, Vermont's long-arm statute, Vt. Stat. Ann. tit. 12, § 913(b), "confers jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause."  *Dall v. Kaylor*, 658 A.2d 78, 79 (Vt. 1995); *see also Metro. Life*, 84 F.3d at 567.

16

process requirements are satisfied when in personam jurisdiction is asserted over a nonresident corporate defendant that has 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  "The due process test for personal jurisdiction has two related components:  the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Metro. Life*, 84 F.3d at 567; *accord Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010).

Personal jurisdiction may be general or specific:  "Specific jurisdiction exists when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum; a court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Metro. Life*, 84 F.3d at 567-68 (quotation marks and citation omitted).  In evaluating the strength of the contacts with the forum, a court looks to the totality of the circumstances. *Chloe*, 616 F.3d at 164.

**A.   General Jurisdiction**

Plaintiffs assert they have general jurisdiction over
Liberty University, CAM and RUL.  "A court may assert general
jurisdiction over foreign (sister-state or foreign-country)
corporations to hear any and all claims against them when their
affiliations with the State are so 'continuous and systematic' as
to render them essentially at home in the forum State." *Goodyear
Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851
(2011).  An appropriate forum for the exercise of general
jurisdiction over a corporation will include its place of
incorporation or its principal place of business, *see id.* at
2854, or a corporation may do sufficient business within a state
to allow the state to assert general jurisdiction over it.  *See
id.* at 2856 (citing *Helicopteros*, 466 U.S. at 416).

"The assessment of minimum contacts is fact-specific and
must necessarily be tailored to the circumstances of each case."
*Metro. Life*, 84 F.3d at 570.  The standard for general
jurisdiction is demanding, because a defendant subject to general
jurisdiction in a state may be haled into court "to answer for
any alleged wrong, committed in any place, no matter how
unrelated to the defendant's contacts with the forum." *uBID,
Inc. v. GoDaddy Gp., Inc.*, 623 F.3d 421, 426 (7th Cir. 2010);
*accord CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066,
1074 (9th Cir. 2011).

    **1.   Liberty University**

The Amended Complaint alleges that Liberty University is an educational institution organized under the laws of Virginia, with a principal place of business in Lynchburg, Virginia. Plaintiffs offer the following as evidence of Liberty University's continuous and systematic contacts with Vermont:  it currently enrolls twenty-nine tuition and fee-paying students—and an unknown number of online students—from Vermont; it markets itself to potential students in Vermont and solicits donations through a website which is accessed in Vermont; and Liberty University students participate in athletics in Vermont.

It is undisputed that Liberty University is not incorporated in Vermont, nor is its principal place of business in Vermont. It has no facilities, offices, mailing address or staff in Vermont; it is not registered to do business in the state; it does not own or lease real property in Vermont; it has no registered agent for service of process; and it pays no state taxes.  Although it derives some revenue from students from Vermont who attend the university, the total number of these students is relatively small (Liberty University has more than 12,000 residential students), and the revenue derived from their attendance is correspondingly small.

The plaintiffs' submissions, credited as true, do not amount to a prima facie showing that this Court has general jurisdiction over Liberty University, such that it is "essentially at home" in

Vermont.  In *Gehling v. St. George's School of Medicine, Ltd.*, for example, the Third Circuit held that forum-related activities that included, among other things, advertising in newspapers that circulated in the forum, having forum residents among its student body, and sending school representatives to the forum for media events were insufficient to establish general jurisdiction over a Grenadian medical college.  773 F.2d 539, 542-43 (3d Cir. 1985).

It observed that

> [a]dvanced educational institutions typically draw
> their student body from numerous states, and
> appellants' theory would subject them to suit on non-
> forum related claims in every state where a member of a
> student body resides. . . . [T]he fact that St.
> George's may be said to derive some percentage of its
> revenues from [forum] residents in return for services
> provided in Grenada does not subject it to *in personam*
> jurisdiction.

*Id.; see also Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 230 (D.D.C. 2007) (holding that recruiting activities in and students from the forum did not establish personal jurisdiction); *Scherer v. Curators of Univ. of Missouri & Law Sch. Admission Council*, 152 F. Supp. 2d 1278, 1282 (D. Kan. 2001) (holding that access to a website, availability of information, and student and staff residents within the forum did not provide general personal jurisdiction).  Similarly, participation in sporting events does not establish "continuous and systematic" contact; there is no suggestion that Liberty University's athletic events focus on Vermont any more than any other state.  *See, e.g., Gallant v.*

*Trustees of Columbia Univ. in the City of New York*, 111 F. Supp. 2d 638, 642 (E.D. Pa. 2000) (holding that general involvement in interstate collegiate sports that included events in the forum state did not establish a sufficient nexus with the forum).

> **2. CAM**

The Amended Complaint alleges that CAM is an Ohio corporation that employs pastors and relief workers around the world, including in Vermont.  It states that "CAM, through its agents and employees, including Andrew Yoder, has sufficient contacts with the State of Vermont to subject it to the jurisdiction of this Court."  Am. Compl. ¶ 11.  Plaintiffs also contend that CAM solicits donations through its website, which can be accessed in Vermont at www.christianaidministries.org, and that it has received approximately $8,000.00 annually from Vermont donors.  They also note that Andrew Yoder traveled twice to Vermont in connection with Kenneth Miller's criminal proceedings,[6] and assert that other agents or employees of CAM attended Miller's criminal trial and distributed CAM materials to Vermont residents.

It is undisputed that CAM is a nonprofit corporation that distributes humanitarian aid and Christian literature in the

---

[6] Pursuant to subpoena, Yoder traveled to testify before a grand jury on February 16, 2012, and to testify at the trial of Kenneth Miller on August 10, 2012.

United States and other countries.  Its administrative headquarters and principal place of business is in Berlin, Ohio. It has staff and centers in other states and countries, but no operations, staff or offices in Vermont.  It is not registered to do business in Vermont.  It does not own or lease property in Vermont.  It does not pay taxes in Vermont, nor does it employ any Vermont residents.  It has not provided disaster relief in Vermont.  The amount of donations received from Vermont residents is very small.

Andrew Yoder ceased to be an employee of CAM in 2011, well before he traveled to Vermont, but in any event his fleeting and involuntary contacts with Vermont do not supply general personal jurisdiction over CAM.  The assertion that individuals who traveled to Vermont to witness the trial and lend support to Kenneth Miller were agents or employees of CAM does not appear in any pleading, nor is it supported by affidavit.  *See In Re Terrorist Attacks*, 714 F.3d at 673 (advising courts reviewing a motion to dismiss not to "accept as true a legal conclusion couched as a factual allegation" or "draw argumentative inferences in the plaintiff's favor").  The plaintiffs' submissions, credited as true, do not amount to a prima facie showing that this Court has general jurisdiction over CAM.  *See, e.g.*, *Morton Grove Pharm., Inc. v. Nat'l Pediculosis Ass'n, Inc.*, 485 F. Supp. 2d 944, 948 (N.D. Ill. 2007) (holding that an

environmental group's distribution of newsletters, solicitation
and receipt of donations, maintenance of an interactive webpage
and receipt of grants from a forum-based foundation were not
continuous and systematic contacts).

### 3.   RUL

The Amended Complaint alleges that RUL is a Delaware
corporation that provides Christian direct mail and marketing
services nationally and internationally, including in Vermont.
Am. Compl. ¶ 14.  Plaintiffs assert further that RUL sells
contact lists, including the masterfile for The Vermont Country
Store, Inc., a Vermont company.

It is undisputed that RUL has no clients in Vermont nor does
it send out mailings on behalf of clients, nor does it have any
ongoing relationship with any Vermont brokers of mailing lists.
RUL contends that The Vermont Country Store contact list has not
been used in more than a decade.  The plaintiffs' submissions,
credited as true, do not amount to a prima facie showing that
this Court has general personal jurisdiction over RUL, but the
record concerning RUL is sparse, as discussed below.

### B.   Specific Jurisdiction

Specific personal jurisdiction exists when a defendant has
purposefully directed activities at residents of the forum, and
the litigation results from injuries that arise out of or relate
to those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S.

462, 472 (1985).  A defendant's intentional and allegedly tortious out-of-state activity, if expressly aimed at the forum state, may establish specific personal jurisdiction.  *See Calder v. Jones*, 465 U.S. 783, 789 (1984); *accord In re Terrorist Attacks*, 714 F.3d at 674.  In order to establish specific personal jurisdiction under *Calder*, Plaintiffs must plead facts to show that Defendants expressly aimed intentional tortious acts at a Vermont resident, that her injuries arise out of or relate to those activities, and that Defendants knew that the brunt of the injury would be felt in Vermont.  *See id.; see also Chaiken v. VV Pub. Corp.*, 119 F.3d 1018, 1028-29 (2d Cir. 1997) (discussing *Calder*).

### 1. Kenneth Miller, Philip Zodhiates, Victoria (Zodhiates) Hyden[7] and Linda Wall

The plaintiffs have pled specific facts showing that Kenneth Miller aimed intentional tortious acts at Janet Jenkins, and that the injurious effects of his actions were felt within the forum. They allege that he aided and abetted Isabella's kidnapping, that he participated in a RICO conspiracy, and that he conspired to violate their civil rights.  Specifically they allege that he arranged the purchase of plane tickets from Canada to Nicaragua and arranged Lisa Miller and Isabella's transport across the

---

[7] Counsel for Liberty University, TRBC and Victoria Hyden in her alleged capacity as an agent of Liberty University or TRBC appear to have argued for dismissal on behalf of Hyden personally as well as in her alleged agency capacity.  *See* Re-filed Mot. to Dismiss 11, 15, 17.  The Court addresses both arguments.

Canadian border, among other actions.  Janet Jenkins sustained emotional and financial damage as a result of his actions, including the deprivation of any contact with her daughter.

The plaintiffs have pled specific facts showing that Philip Zodhiates and Victoria Hyden aimed intentional tortious acts at Janet Jenkins.  They allege that Zodhiates and Hyden aided and abetted Isabella's kidnapping, participated in a RICO conspiracy, and conspired to violate their civil rights.  Specifically Plaintiffs allege that Zodhiates helped Kenneth Miller arrange the purchase of the plane tickets, drove Lisa Miller and Isabella disguised as Amish Mennonites to the Canadian border, and arranged a subsequent transportation of their belongings to Nicaragua.  He also arranged a false purchase of plants from the Miller family business to effect a transfer of cash to Lisa Miller in Nicaragua.  With respect to Hyden, Plaintiffs allege that she assisted in arranging Lisa Miller and Isabella's transportation from the location where Miller abandoned her car to the location where she departed for Canada and Nicaragua the next day.

The plaintiffs have pled specific facts showing that Linda Wall aimed intentional tortious acts at Janet Jenkins.  They allege that Wall aided and abetted Isabella's kidnapping and conspired to violate their civil rights.  Specifically they allege that as early as spring 2008 Lisa Miller and Wall agreed

25

that Lisa Miller should flee with Isabella to escape the Vermont and Virginia court rulings that permitted Janet Jenkins to see Isabella.  Having formed this agreement, they and others launched the Protect Isabella Coalition, whose purpose was to prevent the court-ordered contact, and to obtain donations to further that work.  After Lisa Miller and Isabella left the country, Wall publicly discussed her role in the scheme, compared herself to Harriet Tubman, and indicated that she would take similar actions with regard to more children from same-sex families.  Wall urged anyone with knowledge of Lisa Miller's whereabouts not to reveal it, and attempted to persuade law enforcement not to look for her.

These defendants at all times knew that Jenkins was a resident of Vermont.  Their actions were aimed at depriving her of lawful parental rights, and the brunt of the injury as a result of their actions was felt in Vermont. *See Calder*, 465 U.S. at 789.

### 2.   RUL

The plaintiffs have not pled specific facts showing that RUL, or Zodhiates or Hyden acting as RUL's agents, aimed intentional tortious acts at Jenkins.  The Amended Complaint alleges that Zodhiates is the president and sole owner of RUL and that Hyden is or was an employee and agent of RUL.  It also alleges that Zodhiates and an employee of RUL drove Lisa Miller

and Isabella to Canada.  These allegations however fail to
establish a prima facie case that RUL engaged in intentional
wrongdoing aimed at Janet Jenkins.  Assuming that Zodhiates and
Hyden were agents of RUL during the relevant time period, the
Amended Complaint fails to plead any facts that would establish
that either were acting within the scope of their agency when
they allegedly conspired to interfere with Jenkins' parental
rights.  *See, e.g.*, *Int'l Shoe*, 326 U.S. at 316 (holding that a
corporation's "presence" in the forum is manifested by activities
carried on *in its behalf* by those who are authorized to act for
it).

The information provided to the Court by both parties
concerning the presence or absence of contacts between RUL and
the forum state, or the existence of an agency relationship
between Hyden and RUL, or whether Zodhiates' or Hyden's activity
may be attributable to RUL, is sparse, and the plaintiffs have
requested jurisdictional discovery.  The plaintiffs have "'made a
sufficient start toward establishing personal jurisdiction.'"
*Uebler v. Boss Media, AB*, 363 F. Supp. 2d 499, 506 (E.D.N.Y.
2005) (quoting *Stratagem Dev. Corp. v. Heron Int'l N.V.*, 153
F.R.D. 535, 547-48 (S.D.N.Y. 1994)).  The facts necessary to
establish personal jurisdiction, or the absence of it, lie within
RUL's knowledge, and discovery may supply a more satisfactory
factual showing.  Accordingly, Plaintiffs' request for

27

jurisdictional discovery with respect to RUL is **granted.** *See, e.g.,* *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) ("[W]here issues arise as to jurisdiction . . . discovery is available to ascertain the facts bearing on such issues.").

### 3.  Liberty University

The plaintiffs have not pled specific facts showing that Liberty University, or its alleged employees or agents acting on its behalf, aimed intentional tortious acts at Janet Jenkins. They have argued that their action arises out of a conspiracy to aid and abet Lisa Miller in evading the orders of a Vermont court.  Lisa Miller's attorneys in the Vermont litigation that dissolved her civil union and determined parental rights and responsibilities with respect to Isabella are employed by or affiliated with Liberty University.  Plaintiffs contend that the actions of Lisa Miller's attorneys in litigating her case are sufficient to give this Court jurisdiction over Liberty University.  The cases cited in support of this bold assertion are neither binding on this Court nor apposite.

In this Circuit, a law firm's allegedly tortious conduct that caused injury in the forum will support specific jurisdiction where the firm has minimum contacts with the forum and has purposely availed itself of the privilege of doing business in the forum. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128-29 (2d Cir. 2002).  In *Bank*

*Brussels*, a legal malpractice suit, the law firm's engagement not only gave rise to the cause of action; the firm maintained an apartment in the forum, faxed newsletters to persons in the forum, had several additional clients in the forum, and promoted its presence and reputation in the forum.  These multiple contacts demonstrated "a law firm which seeks to be known in the [forum's] legal market, makes efforts to promote and maintain a client base there, and profits substantially therefrom."  *Id.* at 128.

There are at least two flaws in Plaintiffs' argument that the actions of Lisa Miller's attorneys support the exercise of specific personal jurisdiction over Liberty University.  One, there is no factual support for the assertion that the attorneys committed a tortious act—or conspired to commit a tortious act—that caused injury to Janet Jenkins.  There is no suggestion that the attorneys committed a tort by representing their client or publicly voicing their opinions concerning the issues.  Two, assuming at this pre-discovery stage of the litigation that Plaintiffs could prove that the attorneys were agents of or employed by Liberty University as opposed to its affiliated entity Liberty Counsel, or that the actions of Liberty Counsel should be attributed to Liberty University for purposes of assessing minimum contacts, the contacts with the forum do not amount to purposeful availment of the privilege of doing business

here.  Unlike the firm in *Bank Brussels*, there is no suggestion
that Miller's attorneys sought to be known in the Vermont legal
market, or made efforts to promote a client base here.  *See id.*
at 128-129.

Plaintiffs also argue that the actions of Victoria Hyden, as
a student and employee of Liberty University, subject Liberty
University to specific jurisdiction in Vermont.  Although they
assert conclusorily that Hyden is an agent of Liberty University,
they have pled no facts that would support the assertion.  An
agent is a person authorized by another to act on that other's
account.  Among other things, agency requires a "'manifestation
by the principal that the agent shall act for [it].'"  *Cabrera v.
Jakabovitz*, 24 F.3d 372, 386 (2d Cir. 1994) (quoting Restatement
(Second) of Agency § 1 cmt. b (1958)); *accord Springfield
Hydroelectric Co. v. Copp*, 779 A.2d 67, 72-73 (Vt. 2001) (citing
Restatement (Second) of Agency § 1).  It is undisputed that Hyden
has never been an officer, director, manager or authorized agent
of Liberty University.  There is no indication that Liberty
University manifested any consent that a student employee should
act as its agent.

Liberty University's motion to dismiss for lack of personal
jurisdiction is **granted.**  Given the dearth of specific facts that
connect Liberty University with tortious activity directed
against Plaintiffs, their request for jurisdictional discovery is

**denied.**  *See Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d
87, (2d Cir. 1975) (holding that it was not an abuse of
discretion to deny jurisdictional discovery where a plaintiff
failed to establish any basis for finding that a defendant
committed any tortious activity in the forum).

>           **4.    TRBC**

Plaintiffs allege that TRBC through its members voluntarily
attended and publicly demonstrated at hearings involving the
custody of Isabella in Vermont.  A member of TRBC provided
internet updates.  From this "voluntary involvement in custody
proceedings in Vermont," Plaintiffs conclude that TRBC has
"purposefully directed its activities at residents of the forum,
and this litigation results from alleged injuries that arise out
of or relate to those activities."  Pls.' Response 13, ECF No.
75.  Plaintiffs allege further that TRBC elders aided and abetted
the kidnapping of Isabella by packing their personal belongings
and maintaining a post office box for donations.  Finally they
allege that TRBC members and pastors publicly endorsed the
kidnapping of Isabella and made internet threats to continue such
activity.[8]

This jurisdictional argument suffers from a host of
deficiencies.  TRBC member activities within the forum

---

[8]  Plaintiffs do not argue that the actions of Defendants Victoria Hyden
and Linda Wall, allegedly agents of TRBC, give rise to specific jurisdiction
over TRBC.

state—attendance at hearings, public demonstrations, prayer meetings—are not tortious.  The activities have no connection to a conspiracy to spirit Lisa Miller and Isabella out of the country, nor is it alleged that these activities prevented any Vermont courts or other authorities from administering the law.

TRBC member activities outside Vermont allegedly aimed at causing injury to Plaintiffs in Vermont consist of packing Lisa Miller and Isabella's belongings and shipping them to Miller in Nicaragua, maintaining a post office box through which donations were accepted, and publicly endorsing the kidnapping.  The emotional and financial injuries Jenkins alleges she sustained as a result of the custody dispute and Isabella's kidnapping cannot reasonably be characterized as arising out of or relating to this activity.  Moreover, this Virginia-based church is not subject to specific personal jurisdiction in Vermont based on the actions of a small number of its thousands of members.  Based on the complete absence of a colorable claim of specific personal jurisdiction, TRBC's motion to dismiss for lack of personal jurisdiction is **granted.**  Jurisdictional discovery is **denied.**

### 5.   Andrew Yoder and CAM

Plaintiffs allege that Yoder, field director for CAM in Nicaragua, aided and abetted an intentional kidnapping, participated in a RICO conspiracy to kidnap Isabella, and conspired to violate Plaintiffs' civil rights.  They also contend

32

that CAM and Yoder conspired to kidnap Isabella.  Specifically
they allege that Yoder, knowing of Lisa Miller's custody battle
and that she was in Nicaragua disguised as an Amish Mennonite,
brought $500.00 in cash to Timothy Miller, suspecting that the
money would be given to Lisa Miller or used on her behalf.[9]  They
also allege that CAM was sympathetic to Lisa's case.  It is
undisputed that CAM advised Yoder not to assist Lisa Miller in
any way.

The plaintiffs have not made out a prima facie case that
Yoder's actions, if tortious, were purposefully directed at
injuring Janet Jenkins within the state of Vermont.  There is no
suggestion that he was involved in the initial scheme to get Lisa
Miller and Isabella out of the country, to thwart the visitation
orders of a Vermont court and to prevent Jenkins from having a
relationship with Isabella.  Assuming that Yoder knowingly
assisted other Defendants to enable Lisa Miller to remain outside
the United States with Isabella, that activity had only an
indirect effect within the forum.  Yoder's conduct did not focus

_____

[9]  Although Plaintiffs also allege that Yoder assisted Timothy Miller
with documentation to enable Lisa Miller to remain in Nicaragua, the
transcript of Yoder's testimony offered in support of this allegation does not
in fact support this contention.  Yoder testified that on September 22, 2009,
Timothy Miller had emailed him, asking about current residency requirements
for Nicaragua.  Miller Trial Tr. v. III 10:3-14, Aug. 10, 2012.  Yoder
explained that he was responsible for helping CAM workers get residencies, and
that one of the steps in securing Nicaraguan residency was to obtain
authenticated birth certificates, which was the responsibility of another CAM
worker.  *Id.* 11:15-12:2.  At no point did Yoder state or imply that he
assisted Timothy Miller with the authentication of birth certificate
documentation for Lisa Miller.

on injuring Janet Jenkins, or inflicting injury within the forum. Consequently Yoder's motion to dismiss on the ground of lack of personal jurisdiction is **granted.**

CAM's motion to dismiss is **granted** on the ground of lack of general or specific personal jurisdiction.  Even were the Court to find that Yoder's alleged activity on Lisa Miller's behalf subjected him to personal jurisdiction here, the plaintiffs have failed to make even a colorable claim that Yoder acted as an agent of CAM when engaging in this conduct.  Jurisdictional discovery is **denied** with respect to these defendants.

### 6.  Douglas Wright

Plaintiffs allege that Wright has sufficient ties to the state of Vermont to subject him to the jurisdiction of this Court.  Specifically they assert that he was involved in the underlying custody and criminal proceedings in Vermont, and that he tortiously failed to notify Vermont authorities that Lisa Miller was going to flee the country with Isabella.

It is undisputed that Wright's involvement in the custody proceedings consisted of preparing an affidavit for Miller's attorneys that they submitted to the Vermont family court.  In it he identified himself as the Pastor of Keystone Baptist Church and principal of the Keystone Christian Academy where Isabella was enrolled.  He stated that travel out of state would constitute an unexcused absence.  Wright Aff., ECF No. 79-1.  It

34

is likewise undisputed that Wright's involvement in the criminal proceedings against Kenneth Miller consisted of appearances pursuant to subpoena before the grand jury and at trial. Plaintiffs cite no authority for the theory that these facts indicate that Wright purposefully directed his activities toward the state of Vermont. The "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475 (citations and quotation marks omitted). To the extent that Wright's affidavit and testimony could be considered contacts with the forum, this contact was the result of third person activity, that of Lisa Miller's attorneys and the government attorney who subpoenaed Wright to the Kenneth Miller trial.

Plaintiffs' argument that *Calder* supplies an alternate basis for personal jurisdiction over Wright stretches *Calder*'s holding out of all recognition. *Calder* involved intentional and allegedly tortious actions by residents of Florida directly aimed at a resident of California. 465 U.S. at 790. Here Plaintiffs rely on a failure to act rather than an intentional act of wrongdoing. Assuming that Wright's failure to notify authorities that Miller intended to leave the country with Isabella involved intentional wrongdoing, the plaintiffs cannot show that Wright

35

directly aimed an intentional tortious act at Janet Jenkins in
Vermont.  Failing to notify authorities, whether those
authorities operate in Virginia or Vermont, does not constitute
the type of direct, affirmative and overt conduct necessary to
supply specific personal jurisdiction.  *See id*.

Wright's motion to dismiss, ECF No. 40, is **granted** on the
ground of lack of personal jurisdiction.  Jurisdictional
discovery is **denied.**

### C.  Reasonableness

If sufficient minimum contacts exist to justify the exercise
of general or specific personal jurisdiction, then a court must
determine "whether the assertion of personal jurisdiction
comports with 'traditional notions of fair play and substantial
justice'—that is, whether it is reasonable under the
circumstances of the particular case." *Metro. Life*, 84 F.3d at
568 (quoting *Int'l Shoe*, 326 U.S. at 316).  Five factors are
considered:

> "(1) the burden that the exercise of jurisdiction will
> impose on the defendant; (2) the interests of the forum
> state in adjudicating the case; (3) the plaintiff's
> interest in obtaining convenient and effective relief;
> (4) the interstate judicial system's interest in
> obtaining the most efficient resolution of the
> controversy; and (5) the shared interest of the states
> in furthering substantive social policies."

*Bank Brussels Lambert*, 305 F.3d at 129 (quoting *Metro. Life*, 84
F.3d at 568).  "Where a plaintiff makes the threshold showing of

the minimum contacts required for the first test, a defendant must present 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* (quoting *Metro. Life*, 84 F.3d at 568).

The Court need not reach the issue of reasonableness with respect to those defendants that have not been shown to have minimum contacts with the forum:  Liberty University, CAM, TRBC, Andrew Yoder and Douglas Wright.  Plaintiffs are permitted to obtain jurisdictional discovery from RUL, and the Court will defer the reasonableness inquiry with respect to this Defendant until discovery is complete.  The remaining Defendants, Kenneth Miller, Philip Zodhiates, Victoria Hyden and Linda Wall have not shown a compelling case that jurisdiction in this forum is unreasonable.

Without question these individual Defendants, all private citizens, will suffer a greater burden defending this suit in Vermont as opposed to their home state of Virginia.  Also without question, Plaintiffs' interest in obtaining convenient and effective relief will be served by maintaining this suit in their chosen forum and home state.  Vermont, the forum state, has a strong interest in adjudicating claims involving repeated and flagrant violations of Vermont court orders and seeking redress for injuries sustained by a Vermont resident.  The interstate judicial system's interest in an efficient resolution is not

particularly implicated by the choice of either forum.  With respect to the fifth factor, the shared interests of the states in furthering substantive social policies, it is possible that Vermont and Virginia do not share interests in certain substantive social policies, but in the absence of any record evidence or argument on this point the Court will not indulge in speculation.  Both fora undoubtedly share an interest in hindering violations of federal law.  This factor, like the fourth factor, favors neither forum.

With two factors favoring Vermont as a forum, one factor favoring Virginia as a forum, and two factors favoring neither forum, Defendants Kenneth Miller, Philip Zodhiates, Victoria Hyden and Linda Wall have not shown that Plaintiffs' choice of forum is unreasonable.

## II.  Failure to State A Claim

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although a court must accept the truth of factual allegations, and draw all reasonable inferences in a plaintiff's favor, it need not accept as true "'a legal conclusion couched as a factual allegation.'"  *Id.* (quoting *Bell Atl.*, 550 U.S. at 555); *accord*

38

*N. J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 119-120 (2d Cir. 2013).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Plausibility . . . depends on a host of considerations," including "the full factual picture presented by the complaint," and "the particular cause of action and its elements."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

### A.  Intentional Tort of Kidnapping

Plaintiffs have alleged in Count One of their Amended Complaint that Defendant Lisa Miller committed an intentional tort of kidnapping Isabella, transporting her outside the United States and holding her there in order to interfere with Jenkins' custodial rights.  They have alleged that Lisa Miller conspired with and was aided and abetted by Defendants Kenneth Miller, Timothy Miller, RUL, Philip Zodhiates, Victoria Hyden, and Linda Wall, among others.  Defendants Kenneth Miller, Hyden and Wall have moved to dismiss this count for failure to state a claim, arguing that no such cause of action exists under Vermont law.

In their responses in opposition to the motions to dismiss Plaintiffs have described this cause of action not only as an intentional tort of kidnapping, but as tortious interference with

parental rights.  In support of their claim's viability, they offer several decisions from other jurisdictions and cite to section 700 of the Restatement (Second) of Torts (1977).  Section 700 of the Restatement (Second) of Torts provides:

> One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent.

Restatement (Second) of Torts § 700 (1977).

The role of defining the common law of Vermont traditionally falls to the Vermont Supreme Court.  *See Doe v. Forrest*, 2004 VT 37, ¶ 49, 853 A.2d 48, 67.  The Vermont Supreme Court has used the Restatements to define common law, recognizing "that the purpose of a Restatement is the preparation of an orderly restatement of the common law to reduce uncertainty in the law." *Id.* (quotation marks omitted); *see also id.* ¶ 22 (expressly adopting a provision of the Restatement (Second) of Agency as reflecting the common law of Vermont).  It has also declined to adopt portions of the Restatements.  *See, e.g.*, *Fromson v. State*, 2004 VT 29, ¶ 25, 848 A.2d 344, 351 (declining to adopt a cause of action for prima facie tort as set forth in Restatement (Second) of Torts § 870 under the circumstances of that case).

The Vermont Supreme Court has not had occasion to determine whether Vermont recognizes an intentional tort of kidnapping.  It has long been the law in Vermont however that a parent may

maintain an action for wrongful interference with "the custody, control, and services of [a] minor child." *Bioni v. Haselton*, 134 A. 606, 607 (Vt. 1926) (treating custody of a child as a form of property right); *accord Schuppin v. Unification Church*, 435 F. Supp. 603, 608 (D. Vt. 1977).

This Court has previously suggested that Section 700 would apply to a cause of action involving interference with the relationship between a parent and her minor child. *See Schuppin*, 435 F. Supp. at 608-09 & n.8. To be sure, as this Court has acknowledged, Vermont courts are not bound to follow the Restatements. *See id.* at 609; *accord Fromson*, 2004 VT 29, ¶ 25, 848 A.2d at 351. In this case however, section 700 merely tracks existing Vermont law.

By finding that Vermont recognizes an action for wrongful interference with a parent's custodial rights, this Court does not create a new cause of action based on the Restatement, but concludes that the law in this area has been settled for some time. Mindful of its role when sitting in diversity, *see, e.g.*, *Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 329 (2d Cir. 2005), the Court predicts that were the Vermont Supreme Court presented with the precise question today it would agree that the elements of a Vermont common law claim of custodial interference are consistent with section 700. In other words, under Vermont law, a person who abducts or otherwise compels or induces a minor

41

child to leave a parent who is legally entitled to her custody, with knowledge that the parent does not consent, is subject to liability to the parent. *Cf. Wood v. Wood*, 338 N.W.2d 123, 124-25 (Iowa 1983) ("The claim for interference with custody rights appears to have been recognized in every jurisdiction which as addressed the issue." (citing cases)).

Defendants object to what they characterize as an attempt to plead a brand new claim in a responsive brief.  They have not however argued any meaningful factual distinction between a claim of an intentional tort of kidnapping Isabella in order to interfere with Jenkins' lawful custody and a claim of tortious interference with Jenkins' parental rights, nor do they argue that the Amended Complaint fails to state a plausible claim of custodial interference.  Plaintiffs are not required to "pin [their] claim for relief to a precise legal theory," *Skinner v. Switzer*, 562 U.S. ___, 131 S. Ct. 1289, 1296 (2011), but to plead facts sufficient to show a plausible claim for relief.  *Iqbal*, 556 U.S. at 678.

Defendants' motions to dismiss Count One for failure to state a claim are therefore **denied.**  Count One may proceed as a claim of intentional interference with the custody of a minor child.

### B.  Civil RICO

Although RICO, the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. §§ 1961-1968, was enacted to assist in the fight against organized crime, its provisions extend to any person or entity who engages in a "pattern of racketeering activity," as those terms are defined in 18 U.S.C. § 1961. *See Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 320 (2d Cir. 2011). Section 1964(c) of Title 18 provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c); *see Ideal Steel Supply*, 652 F.3d at 316.

Count Two alleges that Defendant Kenneth Miller violated 18 U.S.C. § 1962(c), which provides

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

Count Three alleges that Kenneth Miller conspired with remaining Defendants Lisa Miller, Timothy Miller, RUL, Philip Zodhiates individually and as an agent of RUL, Victoria Hyden individually and as an agent of RUL, and others, to violate § 1962(c) through the same pattern of racketeering, in violation of § 1962(d), which makes it unlawful for any person to conspire to violate the provisions of § 1962(a), (b) or (c).

> To establish a civil RICO claim, a plaintiff must allege (1) conduct, (2) of an enterprise, (3) through a

43

> pattern (4) of racketeering activity, as well as injury
> to business or property as a result of the RICO
> violation.  The pattern of racketeering activity must
> consist of two or more predicate acts of racketeering.

*Lundy v. Catholic Health Sys. of Long Island*, 711 F.3d 106, 119

(2d Cir. 2013) (internal quotation marks and citation omitted).

Plaintiffs allege that the Beachy Amish-Mennonite Brotherhood is

a RICO enterprise, Am. Compl. ¶ 68, and that the predicate acts

consist of "[a]cts or threats involving kidnapping," and money

laundering and mail fraud in connection with the phony hydrangea

purchase.  *Id.* ¶ 66.

Remaining Defendants Kenneth Miller and Victoria Hyden argue

first that Plaintiffs lack standing to bring a civil RICO claim

because they cannot make out a cognizable RICO injury under 18

U.S.C. § 1964(c).  They also argue that Plaintiffs have failed to

adequately plead a violation of § 1962(c) in Count Two, and have

failed to allege a cognizable RICO conspiracy claim under 18

U.S.C. § 1962(d) in Count Three.

### 1.   RICO Injury

Section 1964(c) permits "any person injured in his business

or property" as a result of a violation of § 1962 to bring a

civil RICO suit.  In Counts Two and Three, Plaintiffs allege that

they "have suffered injury to their business or property,

including legal fees, investigative fees, court costs, and unpaid

child support obligations, and deprivation of personal property."

Am. Compl. ¶¶ 70, 73.  In response to the motions to dismiss,

Plaintiffs have specified that Jenkins closed her day care business to spend her time trying to locate her daughter, incurred legal expenses and court costs, has been unable to collect on a Virginia fine imposed against Lisa Miller, has been unable to collect child support from Lisa Miller, and that Isabella has lost property that would have belonged to her had she been living in Vermont with Jenkins.

A RICO plaintiff has standing if she has been injured in her business or property by the conduct constituting the violation. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  The injurious conduct must proximately cause the injury.  *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).  A pattern of racketeering activity or individual predicate acts proximately causes a plaintiff's injury if it is "a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23-24 (2d Cir. 1990).  Put another way, there must be a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268; *accord In re Am. Express Co. S'holder Litig.*, 39 F.3d 395, 399 (2d Cir. 1994).  A key reason for requiring a direct relation between the injury and the conduct is to "avoid[] unworkable difficulties in

ascertaining what amount of the plaintiff's injury was caused by the defendant's wrongful action as opposed to other external factors." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770 (2d Cir. 1994).

Defendants contend that the injury to Jenkins' business was proximately caused, not by the alleged predicate acts of kidnapping, money laundering and mail fraud, but by her discovery of these acts and her consequent actions. They argue further that her pecuniary losses are derivative of her personal injuries, which are insufficient to confer standing.

Jenkins' claimed injuries to business or property occurred because she became involved in court proceedings and law enforcement's investigation of her daughter's disappearance. Am. Compl. ¶ 78-79. Jenkins alleges no losses, direct or indirect, from the alleged acts of money laundering and mail fraud in May 2010.

That the plaintiffs have sustained emotional and pecuniary losses the Court has no doubt. That the but-for cause of these losses is Isabella's kidnapping is accepted as true for purposes of these motions to dismiss. The issue rather is whether these losses are the type of losses which convey standing to assert a civil RICO claim. Where a plaintiff's injuries are caused not by the RICO predicate acts but by her efforts to expose or thwart those acts, courts have not found RICO standing.

46

For example, a plaintiff's damages that stemmed from the investigation of alleged RICO violations were not cognizable damages under RICO in *Hollander v. Flash Dancers Topless Club*, 340 F. Supp. 2d 453, 459-60 (S.D.N.Y. 2004), *aff'd* 173 F. App'x. 15, 18 (2d Cir. 2006) (entry order).  Injuries caused by the discovery of alleged racketeering activity and the consequences of that discovery are likewise not cognizable damages under RICO. *See In re Am. Express Co. S'holder Litig.*, 39 F.3d at 400.

The injury to Jenkins' business was not reasonably foreseeable or anticipated, nor was it proximately caused by the alleged racketeering activity as opposed to Jenkins' determination to find her daughter.  Had Lisa Miller acted entirely on her own, or had the alleged racketeering activity never been discovered, Jenkins would have incurred the same injury to her business as she tried to discover what had become of her daughter.  That Jenkins has been unable to collect on the Virginia fine assessed against Lisa Miller or on the theoretical amount of child support she might be entitled to under the changed custody order is not a direct consequence of the defendants' alleged racketeering activity.  The last item of damages, Isabella's lost-because-never-owned property had she been able to have a childhood in Vermont, is not only tangentially related to the alleged racketeering activity but entirely speculative.

Because Plaintiffs have failed to allege cognizable RICO injury, that is, an injury to business or property proximately caused by a pattern of racketeering activity or by RICO predicate acts, they lack standing to pursue their RICO claims.  Counts Two and Three of the Amended Complaint must accordingly be **dismissed.** Alternatively, Defendants are entitled to dismissal of the RICO counts because Plaintiffs have failed to plausibly allege a pattern of racketeering activity.

### 2.    Pattern of Racketeering Activity

To establish a violation of § 1962(c), a plaintiff must show:  "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima*, 473 U.S. at 496.  A pattern requires at least two acts of racketeering activity committed within a ten year period.  *See* 18 U.S.C. § 1961(5). Although two acts are necessary, two isolated acts will not constitute a pattern.  *See Sedima*, 473 U.S. at 496 n.14.  "Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise." *Id.* at 497.

Count Two alleges that Kenneth Miller committed three acts of racketeering:  aiding and abetting a kidnapping, money

laundering and mail fraud.[10]  Money laundering and mail fraud are
alleged with respect to the May 2010 transactions between
Zodhiates, Kenneth Miller, Timothy Miller and Andrew Yoder to
bring cash into Nicaragua for Lisa Miller.

To establish a pattern, a plaintiff "must show that the
racketeering predicates are related, and that they amount to or
pose a threat of continued criminal activity." *H.J. Inc. v. Nw.
Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis omitted).  The
continuity necessary to prove a pattern can be either "closed-
ended continuity" or "open-ended continuity." *DeFalco v. Bernas*,
244 F.3d 286, 320 (2d Cir. 2001); *see also H.J. Inc.*, 492 U.S. at
241 (stating that the concept refers "either to a closed period
of repeated conduct, or to past conduct that by its nature
projects into the future with a threat of repetition").

The Amended Complaint states that

> [t]he racketeering acts committed by the Defendant
> Kenneth Miller constitute a pattern of racketeering
> activity . . . in that they are related to one another
> and are continuous.  These racketeering acts are
> continuous in that they have occurred over a period
> exceeding two years, will continue into the future, and
> pose the threat of continuing for years.  The
> racketeering activities also pose of [sic] risk of
> continuation because Defendant Kenneth Miller and his
> co-conspirators have repeatedly used the Miller-Jenkins
> custody case and kidnapping as an example that other
> Christians should follow vis a vis the custody rights
> of same-sex parents.

---

[10]  Defendants do not dispute that these offenses would constitute
predicate acts of racketeering activity.  *See* 18 U.S.C. § 1961(1) (defining
racketeering activity as an act involving, inter alia, kidnapping, mail fraud
and money laundering).

Am. Compl. ¶ 67.  Defendants argue that the Amended Complaint alleges a narrow single purpose scheme that fails to satisfy either closed or open-ended continuity.

Kenneth Miller's actions as alleged do not constitute closed-ended continuity, that is, a closed period of repeated conduct "'extending over a substantial period of time.'" *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (quoting *H.J. Inc.*, 492 U.S. at 242).  The acts occurred approximately eight months apart, in September 2009 and May 2010.  Conduct occurring over a period of less than two years rarely will satisfy closed-ended continuity.  *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008).  These two acts, aiding an international parental kidnapping and money laundering/mail fraud, do not constitute "repeated conduct."

For open-ended continuity, a plaintiff "must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacrèdit*, 187 F.3d at 242.  For an ongoing enterprise that primarily exists for criminal purposes the threat of continuity is not difficult to establish.  *See id.*  Where the enterprise—here alleged to be the Beachy Amish-Mennonite Brotherhood—conducts legitimate business, "there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that

business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Id.* at 243.

Plaintiffs do not allege that the Beachy Amish-Mennonite Brotherhood is primarily a criminal enterprise, nor do they allege that kidnapping, money laundering or mail fraud are part of its regular operations. They have not argued that the nature of the alleged predicate acts of mail fraud and money laundering implies a threat of ongoing racketeering, given that the acts in this case were aimed at supplying Lisa Miller with a modest sum of money.

With respect to a threat of continued criminal activity, Plaintiffs argue that kidnapping is a continuing offense. This is of course an accurate statement of the law. *See, e.g.*, *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281 (1999). By that reasoning, one could establish a pattern of racketeering activity whenever a kidnapping victim continued to be held. There is no hint in the case law that one kidnapping where the victim continues to be held, plus one transaction involving money laundering and/or mail fraud, could constitute an open-ended pattern of racketeering activity.

Also as evidence of a threat of continued criminal activity, Plaintiffs assert generally that the Nicaraguan Brethren continue "to aid and abet Lisa Miller's criminal activity," and they specify that the Brethren released a statement admitting that

51

they extended Lisa Miller and Isabella "a helping hand" once they were in Nicaragua.  Am. Compl. ¶ 61.  Plaintiffs additionally cite public comments by individuals who do not appear to be associated with the Beachy Amish-Mennonite Brotherhood that endorse the kidnapping and suggest it should be an example of the appropriate treatment of children of same-sex parents.  *See* Pls.' Response 34-35, ECF No. 75.

A threat of continued criminal activity cannot reasonably be inferred where the likelihood that the enterprise will conduct similar operations in the future is largely speculative, and substantially based on the speech-making activities of individuals who are not alleged to be part of the enterprise. Plaintiffs have therefore not stated a plausible threat of continuing criminal conduct.  *See Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (internal quotation marks and citation omitted).  Accepting the factual assertions of the Amended Complaint as true, it fails to adequately allege a pattern of racketeering.

Because the Amended Complaint fails to demonstrate that Plaintiffs have civil RICO standing, and fails to adequately allege a pattern of racketeering activity, the RICO counts are

**dismissed.**

###   C.   Conspiracy to Violate Civil Rights

Count Four alleges that Lisa Miller conspired with Defendants RUL, Zodhiates, Hyden, Wall, Kenneth Miller, Timothy Miller and others to violate the civil rights of Janet Jenkins and Isabella on the basis of gender, and to prevent the courts of Vermont from securing them equal protection of their rights to a parent-child relationship under the law.  Am. Compl. ¶ 75.

The Civil Rights Act of 1871, also known as the Ku Klux Klan Act, one of several civil rights acts enacted to quell resistance to federal reconstruction after the Civil War, established among other things civil remedies for violations of federally protected rights.  *See, e.g.*, *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 370-71 (1979); *Keating v. Carey*, 706 F.2d 377, 385 (2d Cir. 1983).  Section 2 of the Act as amended, addressing conspiracies to interfere with civil rights, is codified at 42 U.S.C. § 1985.  Subsection (3) of § 1985 in pertinent part permits a civil suit for damages against "two or more persons" who conspire

> for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State . . . from giving or securing to all persons within such State . . . the equal protection of the laws.

42 U.S.C. § 1985(3).  The first clause of subsection (3) has been

called the "deprivation" clause; the second clause of subsection
(3) has been called the "hindrance" clause.  *See, e.g.*, *Bray v.
Alexandria Women's Health Clinic*, 506 U.S. 263, 278-79 (1993);
*Libertad v. Welch*, 53 F.3d 428, 446 & n.14 (1st Cir. 1995).
Count 4 claims violation of both clauses.

Remaining Defendants Kenneth Miller, Hyden and Wall seek
dismissal of Count Four because the Amended Complaint fails to
plead sufficient factual support for a conspiracy; it fails to
plead invidious, class-based animus; and it fails to plead state
action.

### 1.  Conspiracy

A "'complaint containing only conclusory, vague, or general
allegations of conspiracy to deprive a person of constitutional
rights cannot withstand a motion to dismiss.'"  *Gyadu v. Hartford
Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999) (quoting *Sommer v.
Dixon*, 709 F.2d 173, 175 (2d Cir. 1983)).  It must include "some
factual basis supporting a meeting of the minds, such that
defendants entered into an agreement, express or tacit, to
achieve the unlawful end."  *Webb v. Goord*, 340 F.3d 105, 110 (2d
Cir. 2003) (quotation marks and citation omitted).  Defendants
contend that the Amended Complaint fails to allege facts
plausibly suggesting a meeting of the minds, or that they entered
into an agreement.

Although Defendants vigorously dispute the facts alleged in

the Amended Complaint, its allegations of conspiracy are far from
vague, conclusory or general.  Specifically, as to an agreement
to assist Lisa Miller in removing Isabella from the jurisdiction
of state and federal courts, and to prevent Janet Jenkins from
exercising lawful parental rights, the Amended Complaint alleges
as follows.  Defendant Philip Zodhiates and another RUL employee
assisted Lisa Miller and Isabella to travel disguised as Amish
Mennonites from Virginia to the New York-Canada border.  Am.
Compl. ¶ 36.  Defendants Zodhiates and Hyden arranged for Lisa
Miller and Isabella to travel from Lynchburg to Waynesboro,
Virginia, in order to embark on their journey to Canada and on to
Nicaragua.  *Id.* ¶ 41.  Defendants Timothy Miller, Kenneth Miller
and Zodhiates arranged for the purchase of plane tickets, and
Kenneth Miller arranged to have Lisa Miller and Isabella picked
up on the Canadian side of the border.  *Id.* ¶ 37.  The purpose of
this activity was to "kidnap Isabella and avoid detection by
infiltrating the Beachy Amish-Mennonite Christian Brotherhood,"
*id.* ¶ 34, in order to continue to obstruct any parent-child
relationship between Janet Jenkins and Isabella and to remain
outside the jurisdiction of state and federal courts.  *See id.* at
1.  The Amended Complaint adequately alleges that Defendants Lisa
Miller, Timothy Miller, Kenneth Miller, Philip Zodhiates,
Victoria Hyden and Linda Wall agreed, tacitly or explicitly, to
further this purpose.

## 2.   The Scope of § 1985 Protection

To state a cause of action under § 1985(3)'s deprivation clause, a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. *Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 586-87 (2d Cir. 1988).

Section 1985(3) reaches not only conspiracies under color of state law, but also purely private conspiracies that have an invidiously discriminatory motive. *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) (holding that there must be "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.  The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all."). Requiring an invidiously discriminatory motive as an element of a § 1985(3) conspiracy prevents the statute from acting as a "general federal tort law" applying to all allegedly tortious conspiratorial interferences with the rights of others. *Id.*

The *Griffin* Court explicitly did not decide "whether a conspiracy motivated by invidiously discriminatory intent other

56

than racial bias would be actionable under . . . § 1985(3)." *Id.*
n.9. By 1993 the Supreme Court had yet to address the question,
and in *Bray v. Alexandria Women's Health Clinic* sidestepped the
issue when it avoided deciding whether women were a qualifying
class under § 1985(3). 506 U.S. at 269; *see also United Bhd. of
Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 835 (1983)
(declining to affirm the lower courts' holdings that § 1985(3)
provides a civil cause of action for conspiracies other than
those motivated by racial bias). *But see Novotny*, 442 U.S. at
389 n.6 (1979) (White, J. dissenting) (noting that the Court was
assuming that discrimination on a basis other than race was
actionable under § 1985(3), stating "[i]t is clear that sex
discrimination may be sufficiently invidious to come within the
prohibition of § 1985(3)").

Lower federal courts however have recognized potential §
1985(3) discrimination claims on the basis of gender, religion,
national origin, ethnicity, mental retardation, disability and
political affiliation. *See, e.g., Lake v. Arnold*, 112 F.3d 682,
686 (3d Cir. 1997) (mental retardation); *LeBlanc-Sternberg v.
Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995) (religion); *Libertad v.
Welch*, 53 F.3d 428, 449 (1st Cir. 1995) (women); *Nat'l Org. for
Women v. Operation Rescue*, 914 F.2d 582, 585 (4th Cir. 1990) (per
curiam) (gender), *rev'd on other grounds sub nom. Bray v.
Alexandria Women's Health Clinic*, 506 U.S. 263 (1993); *N.Y. State*

57

*Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1359 (2d Cir. 1989) (women); *Keating*, 706 F.2d at 388 (political affiliation); *People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 43 (2d Cir. 1982) (mental retardation), *vacated in part on other grounds*, 718 F.2d 22 (2d Cir. 1983); *Taylor v. Gilmartin*, 686 F.2d 1346, 1357–58 (10th Cir. 1982) (religion); *Padway v. Palches*, 665 F.2d 965, 969 (9th Cir. 1982) (gender); *Ward v. Connor*, 657 F.2d 45, 48 (4th Cir. 1981) (religion); *Novotny v. Great Am. Fed. Sav. & Loan Ass'n*, 584 F.2d 1235, 1241 (3d Cir. 1978) (en banc) (gender), *vacated on other grounds*, 442 U.S. 366 (1979); *Cameron v. Brock*, 473 F.2d 608, 610 (6th Cir. 1973) (political supporters); *Trautz v. Weisman*, 819 F. Supp. 282, 295 (S.D.N.Y. 1993) (disability); *see also Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 994 (6th Cir. 1994) ("A class protected by section 1985(3) must possess the characteristics of a discrete and insular minority, such as race, national origin, or gender."); *Volk v. Coler*, 845 F.2d 1422, 1434 (7th Cir. 1988) ("§ 1985(3) extends beyond conspiracies to discriminate against persons based on race to conspiracies to discriminate against persons based on sex, religion, ethnicity or political loyalty."). *But see, e.g.*, *Perez-Sanchez v. Pub. Bldg. Auth.*, 531 F.3d 104, 108 (1st Cir. 2008) (refusing to recognize a § 1985(3) claim based on political affiliation); *Wilhelm v. Cont'l Title Co.*, 720 F.2d 1173, 1176–77 (10th Cir. 1983) (holding that handicapped persons did not

constitute a class for § 1985(3) purposes).

In-depth examinations of the legislative history of § 1985(3) have suggested that Congress did not intend the section to be limited to providing a cause of action for conspiracies motivated by invidiously discriminatory racial animus, often quoting remarks from Senator George Edmunds of Vermont,[11] floor manager of the bill that became the Civil Rights Act of 1871.[12] *See, e.g.*, *Bray*, 506 U.S. at 294-96 (Souter, J., concurring in part and dissenting in part); *Keating*, 706 F.2d at 387-88; *Novotny*, 584 F.2d at 1242.  *But see Carpenters*, 463 U.S. at 836-37 (acknowledging Senator Edmunds' views, yet noting that the Court has not yet accorded them decisive weight).

In *Bray*, abortion clinics and abortion rights organizations had successfully claimed that anti-abortionists' blockading of abortion facilities violated § 1985(3).  506 U.S. at 267. Reversing the lower courts, the United States Supreme Court held that "women seeking abortion" is not a class for purposes of § 1985(3), because the term "class" "unquestionably connotes

---

[11]   Senator George Franklin Edmunds, Republican, served in the United States Senate from 1866 to 1891.  He chaired the Senate Judiciary Committee from 1872 to 1879, and from 1882 to 1891.  He was president pro tem of the Senate from 1883 to 1885.  Biographical Directory of the United States Congress, http://bioguide.congress.gov/scripts/biodisplay.pl?index=e000056 (last visited Oct. 23, 2013).

[12]   Senator Edmunds "remarked that if there were a conspiracy against a person 'because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter . . . then this section could reach it.'"  *Bray*, 506 U.S. at 296 (Souter, J., concurring in part and dissenting in part) (quoting Cong. Globe, 42d Cong., 1st Sess. 567).

something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Id.* at 269. The Court rejected the respondents' contention that they alleged class-based discrimination directed at women, observing that the record did not reflect that the anti-abortion demonstrators were motivated by animus directed specifically at women as a class, as opposed to hostility toward the practice of abortion. *Id.* at 269-70; *accord Upper Hudson Planned Parenthood, Inc. v. Doe*, 836 F. Supp. 939, 953 (N.D.N.Y. 1993), *aff'd* 29 F.3d 620 (2d Cir. 1994) (unpublished op.).

As framed then, Count Four fails to state a claim for the same reason enunciated in *Bray*: the claim is cast as a conspiracy to violate Plaintiffs' civil rights on the basis of gender. *See* Am. Compl. ¶ 75. Any invidiously discriminatory animus alleged in the Amended Complaint is not directed at women as a class.

In their oppositions to the motions to dismiss, Plaintiffs argue that their Amended Complaint also alleges that the conspiracy to violate their civil rights was motivated by discriminatory animus directed toward religion and sexual orientation. They contend that Lisa Miller's religion dictated that Isabella be shielded from homosexuality. But it is a plaintiff's, not a defendant's, membership in a protected class that enables a plaintiff to bring a § 1985(3) claim. The Amended

60

Complaint does not allege Plaintiffs' membership in any religion,
nor does it suggest that any Defendant harbored discriminatory
animus against them on the basis of their religion.

The factual allegations of the Amended Complaint however can
be read to suggest that the defendants harbored invidiously
discriminatory animus against Jenkins because of her sexual
orientation.  In *United States v. Windsor*, 133 S. Ct. 2675
(2013), the United States Supreme Court invalidated section 3 of
the Defense of Marriage Act ("DOMA") which defined "marriage" as
"a legal union between one man and one woman," and "spouse" as "a
person of the opposite sex who is a husband or a wife."  *Id.* at
2682; *see* 1 U.S.C. § 7.  One purpose and effect of the enactment
of DOMA was to prevent same-sex couples from becoming eligible
through state-sanctioned marriages or civil unions for a host of
federal rights and benefits afforded to heterosexual married
couples.  *See, e.g.*, H.R. Rep. No. 104-664, at 10-11 (1996),
*reprinted in* 1996 U.S.C.C.A.N. 2905, 2914-15.  In *Windsor*, the
surviving spouse of a same-sex couple whose marriage was
recognized in the state of their residence sued the government
for a refund of the federal estate tax levied on the estate of
her deceased spouse.  133 S. Ct. at 2683.  She sought a
declaration that section 3 violated the Equal Protection Clause
of the Fifth Amendment.  The government announced that it would
not defend DOMA's constitutionality, because, as applied to same-

61

sex couples who are legally married under state law, it regarded the section as violating the Equal Protection Clause.

The district court concluded that the provision could not withstand rational basis review, and held the provision unconstitutional. *Windsor v. United States*, 833 F. Supp. 2d 394, 402, 406 (S.D.N.Y. 2012). The Second Circuit affirmed the district court's holding that section 3 violated the Equal Protection Clause, and also concluded that review of the section required heightened scrutiny, because gays and lesbians qualify as a "quasi-suspect class." *Windsor v. United States*, 699 F.3d 169, 181-82 (2d Cir. 2012).

The Supreme Court, without expressly deciding whether section 3 was subject to rational basis or some degree of heightened scrutiny, held that the provision "is unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution. The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *Windsor*, 133 S. Ct. at 2695. It observed: "DOMA seeks to injure the very class [the State] seeks to protect. By doing so it violates basic due process and equal protection principles applicable to the Federal Government. . . . In determining whether a law is motved by an improper animus or purpose, 'discriminations of an unusual character' especially

62

require careful consideration." *Id.* at 2693 (quoting *Romer v. Evans*, 517 U.S. 620, 633 (1996)).

Although the Supreme Court avoided deciding whether gays and lesbians comprise a quasi-suspect class, triggering heightened or intermediate scrutiny of laws that single them out, at a minimum the Supreme Court acknowledged that same-sex couples constitute a class for purposes of an equal protection analysis. *See Windsor*, 133 S. Ct. at 2692; *Romer*, 517 U.S. at 631-32; *see also Obergefell v. Kasich*, No. 1:13-cv-501, 2013 WL 3814262 at *6 (S.D. Ohio, July 22, 2013) (finding no rational basis for a state law that discriminates against same-sex married couples); *Bassett v. Snyder*, No. 12-10038, ___ F. Supp. 2d ___, 2013 WL 3285111 at *23-25 (E.D. Mich. June 28, 2013) (granting preliminary injunction against enforcement of a state statute prohibiting public employers from providing medical and other benefits to cohabitants, holding that the statute displayed animus against same-sex couples and lacked a rational basis); *Garden State Equal. v. Dow*, No. M-208-13, ___ A.3d ___, 2013 WL 5687193 at *6-7 (N.J. Oct. 18, 2013) (denying stay of lower court decision holding that the State must extend the right to civil marriage to same-sex couples, noting that *Windsor* found a constitutional right to equal protection for such couples). Such a class may invoke protection against invidious discrimination, whether it comes in the form of federal legislation, *see Windsor*, 133 S. Ct.

63

at 2693; state legislation, *see Romer*, 517 U.S. at 632, or private conspiracy with a discriminatory purpose.

Plaintiffs however have not pled such a claim.  In contrast to their first count, which contained the elements of tortious interference with custodial rights although it was labeled an intentional tort of kidnapping, Count Four alleges a conspiracy to violate civil rights on the basis of gender, a claim foreclosed by *Bray*.  This claim is therefore **dismissed**.

Because it is likely that Plaintiffs will move to amend their Amended Complaint to allege discriminatory animus against same-sex couples, the Court will address Defendants' remaining argument for dismissal of this Count, that Plaintiffs have not shown state action.

### 3. Deprivation Clause Claim:  State Action

Although the language of § 1985(3), referring to deprivations of "equal protection of the laws, or of equal privileges and immunities under the laws," resembles the Fourteenth Amendment's guarantees against state abridgement of citizens' privileges and immunities and state denial of equal protection of the laws, *see* U.S. Const. amend. XIV, § 1, a deprivation of equal protection under § 1985(3) does not by its terms require state action.  *Griffin*, 403 U.S. at 101; *accord Carpenters*, 463 U.S. at 832-33.  But § 1985(3) does not provide substantive rights itself; it provides a remedy for persons

injured by a conspiracy to deprive them of "the equal protection
of the laws, or of equal privileges and immunities under the
laws." *Novotny*, 442 U.S. at 372, *accord Carpenters*, 463 U.S. at
833.  The right or rights claimed to have been infringed "must be
found elsewhere." *Id.*  Thus far, the Supreme Court has
recognized only two rights protected against private as well as
official encroachment under the deprivation clause:  the right to
be free from involuntary servitude and the right of interstate
travel. *Bray*, 506 U.S. at 278.

   The Amended Complaint does not specify the right claimed to
have been infringed.  Plaintiffs argue that they have alleged a
conspiracy to infringe upon Isabella's right to interstate travel
to spend time with both her parents, who at the time this cause
of action arose resided in different states.  Assuming that
Plaintiffs had properly alleged a conspiracy to deny Isabella the
right to interstate travel, the allegation fails to state a
claim.

   To implicate the right to interstate travel, a § 1985(3)
conspiracy must have as its "'predominant purpose . . . to impede
or prevent the exercise of the right of interstate travel, or to
oppress a person because of [her] exercise of that right.'" *Id.*
at 275 (quoting *United States v. Guest*, 383 U.S. 745, 760
(1966)).  In this case a right to interstate travel, if affected,
was affected only incidentally.  "A conspiracy is not 'for the

purpose' of denying equal protection simply because it has an effect upon a protected right.  The right must be *aimed at*; its impairment must be a conscious objective of the enterprise."  *Id.* (quotation marks and citation omitted).  Plaintiffs do not claim that the predominant purpose of the alleged conspiracy was to prevent Isabella from traveling from Virginia to Vermont.  They claim that the defendants engaged in a conspiracy to prevent Janet Jenkins from having a parent-child relationship with Isabella.  Defendants' abhorrence of this relationship and attempts to thwart it would have undoubtedly been undiminished had Jenkins and Lisa Miller resided in the same state or had Jenkins attempted to exercise her rights without the need for Isabella to travel.

Plaintiffs fail to state a claim under the deprivation clause of § 1985(3) "because they have identified no right protected against private action that has been the object of the alleged conspiracy."  *Id.* at 278.

### 4.  Hindrance Clause Claim

Plaintiffs also argue that the aim of the alleged conspiracy was to prevent or hinder the courts of Vermont from securing Plaintiffs' right to a parent-child relationship under the law, in other words that they have stated a claim under the "hindrance" clause of § 1985(3).  Case law interpreting the hindrance clause is sparse.  The Supreme Court in *Griffin* noted

66

that the second clause of § 1985(3), dealing explicitly with interference with State officials, was inherently a form of state action. *Griffin*, 403 U.S. at 99.  The Supreme Court in *Carpenters* similarly acknowledged the hindrance clause in holding that a conspiracy to infringe First Amendment rights under the deprivation clause required state involvement:  "we conclude that an alleged conspiracy to infringe First Amendment rights is not a violation of § 1985(3) unless it is proved that the state is involved in the conspiracy *or that the aim of the conspiracy is to influence the activity of the state*."  463 U.S. at 830 (emphasis supplied); *see also id*. at 833 (Where "the right claimed to have been infringed . . . restrains only official conduct, to make out their § 1985(3) case, it was necessary for respondents to prove that the state was somehow involved in *or affected by* the conspiracy.") (emphasis supplied).

In *Bray*, the Supreme Court refused to consider the merits of a claim under the hindrance clause because it was not properly before the Court.  506 U.S. at 280-81.  Four dissenting Justices however would have reached the hindrance clause claim.  Justice Souter would have found that

> the act of frustrating or thwarting state officials in
> their exercise of the State's police power would amount
> simply to an extralegal way of determining how that
> state power would be exercised.  It would, in real
> terms, be the exercise of state power itself.  To the
> degree that private conspirators would arrogate the
> State's police power to themselves to thwart equal
> protection by imposing what amounts to a policy of

67

discrimination in place of the Constitution's mandate,
their action would be tantamount to state action.

*Id.* at 301-02 (Souter, J. concurring in the judgment in part and
dissenting in part); *see also id.* at 356 (O'Connor, J.
dissenting) (describing the hindrance clause as covering
"conspiracies aimed at obstructing local law enforcement")
(citing *Griffin*, 403 U.S. at 98-99).

In a pre-*Bray* decision, a Second Circuit panel held that
lack of state action did not necessarily doom a hindrance clause
claim, noting that "there would almost never be a situation in
which the State would be involved in hindering its own efforts to
secure equal protection to its citizens." *11 Cornwell Co.*, 695
F.2d at 43.

The First Circuit undertook an analysis of the hindrance
clause in *Libertad v. Welch*, 53 F.3d at 448-50.
Plaintiffs—abortion clinics, women who had attempted to obtain
services and others—sued abortion groups and individuals who
blockaded clinics under the hindrance clause of § 1985(3), among
other claims.  The *Libertad* court concluded first that a
hindrance clause claim must allege a class-based invidiously
discriminatory animus, the same as a deprivation clause claim.
*Id.* at 448.  It drew a distinction between the two clauses
however when it came to determining whether the hindrance clause
encompasses rights protected only against official encroachment.

The hindrance clause, unlike the deprivation clause,

68

implicates the *ability* of the State to ensure and
safeguard rights protected against any infringement.
When private individuals conspire for the purpose of
arresting or impeding the State's power to protect or
secure equal protection of the laws to a group of
citizens, those conspirators are supplanting the
State's conduct with their own.  It seems clear to us
that such a conspiracy is precisely the type that the
*Carpenters* Court was referring to when it discussed a
conspiracy "to influence the activity of the State" and
thereby prevent it from securing equal protection of
the laws to its citizens.  When the State's conduct is
thus arrogated, state action is clearly implicated, and
rights protected only against official infringement are
likewise implicated.

*Id*. at 450 (quoting *Carpenters*, 463 U.S. at 830).  It therefore

held that a hindrance clause claim

do[es] not require that the right allegedly infringed
be one guaranteed against private encroachment, but
need only be one guaranteed against official
encroachment. . . . The right infringed as a result of
the conspiracy must be constitutionally protected or
guaranteed, and the *purpose*, not merely the *effect* of
the conspiracy, must be to impede state officials in
their efforts to secure equal protection of the laws.

*Id*.

Whether one concludes that a hindrance clause claim is not

limited to rights protected only against official encroachment,

or that interfering with state officials necessarily implicates

state action, a claim that private citizens have conspired

against a protected class with invidiously discriminatory animus

for the purpose of preventing State authorities from securing

equal protection of the law states a valid cause of action.  *See*

*id.*  Plaintiffs may move to amend the Amended Complaint to

allege a conspiracy to prevent or hinder State authorities from securing equal protection of the laws to same-sex couples, based on invidiously discriminatory animus against gays and lesbians.

### D.   Action for Neglect to Prevent a § 1985 Conspiracy

Count Five is brought solely against Defendant Douglas Wright.  Because he is not subject to personal jurisdiction, this count is dismissed without prejudice.

### III. Improper Venue/Change of Venue

### A.   Venue

Under 28 U.S.C. § 1391(b)(2),[13] "[a] civil action may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(b)(2).  Plaintiffs assert that venue in this district is appropriate "as a substantial part of the events giving rise to the claims occurred in this district."  Am. Compl. ¶ 2.  Remaining Defendants Kenneth Miller, Philip Zodhiates, RUL, Victoria Hyden and Linda Wall assert that venue is improper in this district because none of the significant events or conduct alleged in the Amended Complaint took place in the District of Vermont.

At this stage of the litigation a plaintiff need only make a prima facie showing of venue.  As with a motion to dismiss for

---

[13]   The general venue statute was amended in 2011, and applies to cases filed after January 1, 2012.  Section 1391(b) now prescribes venue for diversity and federal question actions.

lack of personal jurisdiction, the facts alleged in the complaint
are taken as true and viewed in the light most favorable to the
plaintiff. *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355
(2d Cir. 2005).

Venue may be appropriate in more than one district, as long
as a substantial part of the underlying events took place in
those districts. *Id.* at 356. A district court must "take
seriously the adjective 'substantial'" in § 1391(b)(2), however.
*Id.* at 357. "[F]or venue to be proper, *significant* events or
omissions *material* to the plaintiff's claim must have occurred in
the district in question." *Id.* This is a stricter test than the
minimum contacts test in personal jurisdiction inquiries. *Id.*

The venue inquiry "focus[es] on relevant activities of the
defendant, not of the plaintiff." *Daniel v. Am. Bd. of Emergency
Med.*, 428 F.3d 408, 432 (2d Cir. 2005) (citing *Woodke v. Dahm*, 70
F.3d 983, 985 (8th Cir. 1995)). The Court examines first the
nature of the claims and the acts or omissions that allegedly
gave rise to the claims. *Id.* Second, it determines "whether
significant events or omissions material to those claims
occurred" in the District of Vermont. *Gulf Ins.*, 417 F.3d at 357
(emphasis omitted).

Plaintiffs argue that "a substantial part of the events
giving rise to the claims" embraces the effects of Defendants'
actions, which have been felt in this district. If this were

71

generally true, then a plaintiff's residence would almost always be a proper venue in tort cases.  The locus of the injury may be a relevant factor.  *See Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 868 (2d Cir. 1992) (holding that receipt of a collection notice is a substantial part of the events giving rise to a claim under the Fair Debt Collection Practices Act).  It is not necessarily a determinative factor.

This case however alleges that acts committed outside the District of Vermont were deliberately intended to have a tortious effect within the district.  The overall nature of the plaintiffs' claims involves a scheme to obstruct Plaintiff Jenkins' exercise of parental rights in Vermont.

Section 1391(b) contemplates that venue will be proper in more than one district.  Defendants argue correctly that venue would be proper in the Western District of Virginia, where they allegedly agreed to assist Lisa Miller in obstructing a parent-child relationship between Jenkins and Isabella, where the defendants allegedly initiated the scheme to spirit Lisa Miller and Isabella out of the country, and where the defendants allegedly engaged in various activities designed to support Lisa Miller's ability to remain outside the country.  Notwithstanding, the wrong alleged has been inflicted in the District of Vermont. The rulings of its courts have been deliberately and repeatedly flouted; and the interference with visitation orders and Jenkins'

custodial rights occurred in Vermont where visitation was intended to be exercised.

Plaintiffs need not demonstrate that their choice of venue is the best forum; they need only demonstrate a prima facie case that their choice is permissible under the statute. *See Bates*, 980 F.2d at 867.  This they have done.  The motions to dismiss for improper venue are **denied.**

**B.   Change of Venue**

Defendants Kenneth Miller and Victoria Hyden seek in the alternative a change of venue to the Western District of Virginia pursuant to 28 U.S.C. § 1404(a).  For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.  28 U.S.C. § 1404(a).  All parties have not consented to transfer.  The parties do not dispute that the action could originally have been brought in the Western District of Virginia.[14]

Factors to be weighed in a motion to transfer venue include: "'(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of

---

[14]  Plaintiffs do not concede that personal jurisdiction could be maintained over all defendants who have not moved for a change of venue.

parties, (5) the locus of operative facts, (6) the availability
of process to compel attendance of unwilling witnesses, [and] (7)
the relative means of the parties.'" *D.H. Blair & Co. v.
Gottdiener*, 462 F.3d 95, 106-07 (2d Cir. 2006) (quoting *Albert
Fadem Trust v. Duke Energy Corp.*, 214 F. Supp. 2d 341, 343
(S.D.N.Y. 2002)).  The plaintiffs' choice of forum is given great
weight, *id.* at 107, and defendants must make "'a strong case for
transfer.'" *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
599 F.3d 102, 114 (2d Cir. 2010) (quoting *Filmline (Cross-
Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 521
(2d Cir. 1989)).

Defendants argue that factors two through five all weigh in
favor of changing venue.  Several defendants live or may be found
in Virginia.  Lisa Miller was a resident of Virginia before she
disappeared, and much of the planning and activity related to her
disappearance took place in Virginia.  Defendants would likely
find it more convenient for the case to be tried in Virginia.
Plaintiffs prefer that the case be litigated in Vermont.  Other
than the parties, however, the defendants have not identified any
witnesses located in Virginia who would be inconvenienced by
trial in Vermont.  Likewise, concerning location of documents and
access to sources of proof, the defendants have not identified
evidence or other relevant material that is particularly
available or accessible in Virginia rather than Vermont.  With

74

respect to weighing the convenience of witnesses, parties and access to proof, the balance does not strongly favor a transfer to the Western District of Virginia.

Defendants identify the "locus of operative facts" as the details of the abduction scheme, which was hatched and initiated in Virginia.  Plaintiffs identify their claims as arising from events in Vermont, Virginia and elsewhere, and attach significance to the facts that set the stage for Lisa Miller's disappearance:  the civil union in Vermont, the adjudication of the dissolution of the civil union in Vermont, and the determination of parental rights and responsibilities in Vermont. They argue, and the Court agrees, that this factor is at least neutral.  The fifth factor therefore does not strongly favor a transfer to the Western District of Virginia.

Concerning the sixth factor, Defendants suggest that witnesses "are likely to reside in Virginia" and the Western District of Virginia will be better able to compel attendance of unwilling witnesses at trial, referring to the limitations on a district court's subpoena power.  Refiled Mot. for Change of Venue 6, ECF No. 67; see Fed. R. Civ. P. 45(b)(2).  Absent identification of the witnesses and some indication of their unwillingness to testify in Vermont, the Court cannot find that this factor strongly favors transfer.

The seventh factor, the relative means of the parties, is

neutral and therefore does not favor transfer.  Defendant Hyden,
for example, would sustain a substantial burden to defend this
lawsuit in Vermont.  Hyden Aff. ¶ 17, ECF No. 66-3.  Plaintiff
Jenkins would sustain a substantial burden to prosecute this
lawsuit in Virginia.  Jenkins Aff. ¶ 1, ECF No. 76-13.

Overall, the weight of the factors does not point decisively
to changing venue.  Defendants have therefore not sustained their
burden of showing a strong case for transfer.  Accordingly,
Defendants' motions to transfer venue are **denied.**

### Conclusion

Defendant Douglas Wright's Motion to Dismiss the Complaint
for Lack of Personal Jurisdiction and Failure to State a Claim
Upon Which Relief Can Be Granted, ECF No. 40, is **granted** for lack
of personal jurisdiction**.**  Defendant Wright is **dismissed** from the
case, and Count Five of the Amended Complaint is **dismissed.**
Defendant Andrew Yoder's Motion to Dismiss for Lack of Personal
Jurisdiction and Failure to State a Claim, ECF No. 62, is **granted**
for lack of personal jurisdiction, and Defendant Yoder is
**dismissed** from the case.  The Motion to Dismiss Claims Against
Defendant Christian Aid Ministries, Inc. for Failure to State a
Claim upon Which Relief Can Be Granted and for Lack of Personal
Jurisdiction, ECF No. 63, is **granted** for lack of personal
jurisdiction, and Defendant CAM is **dismissed** from the case.

Defendant Kenneth Miller's Motion to Dismiss or, in the

Alternative, to Change Venue, ECF No. 56, is **granted in part and denied in part.** The Motion to Dismiss by Defendant Linda M. Wall for Lack of Personal Jurisdiction, Improper Venue, and/or Failure to State a Claim Upon Which Relief Can Be Granted, ECF No. 109, is **granted in part and denied in part.** The Re-Filed Motion to Dismiss for Lack of Personal Jurisdiction, Lack of Venue, and Failure to State a Claim on Behalf of Defendants Liberty University, Inc., Thomas Road Baptist Church, Inc. and Victoria Hyden**,** ECF No. 66, is **granted in part and denied in part.** Defendants Liberty University and TRBC are **dismissed** for lack of personal jurisdiction.

Counts Two and Three, alleging civil RICO violations, are **dismissed** against all defendants for failure to state a claim. Count Four, alleging a conspiracy to violate civil rights, is **dismissed**, with leave to move to amend within sixty days of the date of this decision.

The Motion to Dismiss of Defendants Philip Zodhiates and Response Unlimited, Inc. for Lack of Personal Jurisdiction and Improper Venue, ECF No. 57, is **denied in part and denied in part as premature.** Plaintiffs shall have sixty days from the date of this decision to conduct jurisdictional discovery with respect to Defendant RUL.

The Re-Filed Motion for Change of Venue on Behalf of Defendants Liberty University, Inc., Thomas Road Baptist Church,

77

Inc. and Victoria Hyden, ECF No. 67, is **denied.**


      Dated at Burlington, in the District of Vermont, this 24th

day of October, 2013.

                                    /s/ William K. Sessions III
                                    William K. Sessions III
                                    United States District Court Judge