**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**


JANET JENKINS, for herself and as    :
next friend of ISABELLA MILLER-      :
JENKINS, a/k/a ISABELLA MILLER       :
                                     :
        Plaintiffs,                  :
                                     :
        v.                           :   Case No. 2:12-cv-184
                                     :
KENNETH L. MILLER, LISA ANN MILLER :
f/k/a LISA MILLER-JENKINS, TIMOTHY :
D. MILLER, RESPONSE UNLIMITED, INC.:
PHILIP ZODHIATES,                    :
individually and as an agent         :
for RESPONSE UNLIMITED, INC.,        :
VICTORIA HYDEN, f/k/a VICTORIA       :
ZODHIATES, individually and as an    :
Agent for RESPONSE UNLIMITED, INC.,:
LINDA M. WALL,                       :
                                     :
        Defendants.                  :


<u>**OPINION AND ORDER**</u>

*1. Procedural Background*

    Plaintiff Janet Jenkins ("Jenkins"), for herself and as

next friend of her daughter Isabella Miller-Jenkins ("Miller-

Jenkins"), brings this action against individuals and

organizations that she alleges conspired with her former same-

sex partner, Lisa Miller ("Miller") to kidnap her daughter and

transport her outside of the United States. Jenkins contends

that Miller, fearing that courts would award Jenkins full

custody over her daughter, left the country with the Defendants'

1

aid after failing to comply with a Vermont court's orders
granting Jenkins parental rights and visitation.

This Court previously granted the Defendants' request for a
stay of this civil case in light of the federal indictment of
Defendant Philip Zodhiates ("Zodhiates") and the criminal
investigation of Defendant Response Unlimited, Inc. ("RUL") on
the basis of facts closely related to the claims at issue here.
ECF No. 192. Although the Court did not explicitly specify how
long the stay would last, the Defendants' motion granted by the
Court had requested the stay "pending the resolution of the
criminal proceedings [then] pending in the United States
District Court for the Western District of New York." ECF No.
172. Moreover, the Court ordered the parties to "inform the
Court of the status of Zodhiates' criminal case within 14 days
of the conclusion of the trial, a guilty plea, or dismissal of
the charges in that case." ECF No. 192. Zodhiates was convicted
by a jury in that district on September 29, 2016, and a
sentencing hearing was initially scheduled for January 30, 2017.
The trial judge granted Zodhiates' motion to adjourn sentencing,
and sentencing is now set for March 22, 2017. Post-trial motions
have been filed and are currently pending with the Court. On
October 7, 2016, Plaintiffs filed the instant motion informing
the Court that Zodhiates' trial had concluded in a guilty

verdict, and requesting that the Court lift its prior stay of this case. ECF No. 204.

In addition, Plaintiffs have moved to join additional defendants connected to the legal representation of Jenkins' former same-sex partner, Lisa Miller ("Miller").[1] In particular, they seek to join attorneys Rena Lindevaldsen, Esq. ("Lindevaldsen") and Mathew Staver, Esq. ("Staver"), as well as Liberty Counsel, a Christian law firm with which they were affiliated when they began to represent Miller. In addition, they seek to join Liberty University, an institution that the Court had previously dismissed from the case for lack of personal jurisdiction, arguing that the evidence adduced at Zodhiates' trial and in discovery so far provides new grounds for a different jurisdictional ruling. ECF No. 204.

Finally, the Plaintiffs seek a ruling from the Court asserting that it has specific jurisdiction over Defendant Response Unlimited, Inc. ("RUL"). Defendant RUL had previously moved to dismiss the Plaintiffs' claims against it, alleging lack of personal jurisdiction. ECF No. 57. The Court

---

[1] Liberty University contends that Plaintiffs' motion is "more properly viewed as a motion to amend" governed by Federal Rule of Civil Procedure 15(a)(2), rather than Rule 21, as the Plaintiffs assert. In a letter submitted to the Court, Liberty Counsel also contends that Plaintiffs' motion should be considered a motion for leave to amend, and that it will assert jurisdictional and other defenses only if the Court grants the Plaintiffs' motion, and only once it has been properly served.

subsequently ordered the parties to proceed with jurisdictional discovery to permit it to reach a more informed decision on this question. ECF No. 115. The Plaintiffs contend that information obtained through the criminal proceedings and jurisdictional discovery suffices to show that RUL had sufficient minimum contacts with Vermont to give rise to personal jurisdiction in this forum, and request that the Court rule on this question.

For the reasons outlined below, the Court **grants** Plaintiffs' motion to lift the stay of this civil case. Moreover, the Court **grants** Plaintiffs' motion to amend the complaint so as to join Lindevaldsen, Staver, Liberty Counsel and Liberty University. Finally, the Court finds that it has jurisdiction over Defendant RUL, and thereby **denies** RUL's pending motion to dismiss on this ground.

*2. New Facts Alleged in Revised Second Amended Complaint*

Plaintiffs put forth substantial additional evidence gathered through Zodhiates' criminal proceeding and in jurisdictional discovery, both in their revised pleadings, in the recitation of facts contained in their motion and reply brief, and in supporting exhibits. These facts are laid out in greater detail in the parties' filings, and will not be recited in their entirety here. However, several incidents described in the Plaintiffs' papers are worth highlighting briefly.

4

First, the Plaintiffs allege that Defendant RUL had a business relationship with Liberty Counsel specifically related to Liberty Counsel's efforts to terminate Jenkins' contact with Miller-Jenkins and entitle Miller to obtain sole custody of Miller-Jenkins. In particular, RUL entered into an agreement with Liberty Counsel to raise funds for Liberty Counsel's work on behalf of Miller by developing and sending out materials on the case to conservative mailing lists. Around the time that these entities entered into this agreement in 2007, Zodhiates met with Staver and toured Liberty University and Liberty Counsel's premises. Although the parties dispute how long this business relationship continued, Plaintiffs allege that RUL employees continued to correspond over Miller's case well into the fall of 2009. In January of 2009, Zodhiates wrote to William Sidebottom, the director of communications for Liberty Counsel, with whom he had communicated regarding RUL's work with Liberty Counsel, to suggest that he had a "personal option" for Lisa Miller that the lawyers "should not or would not want to know about". In addition, the Plaintiffs allege in their motion that as part of its work for Liberty Counsel, RUL hosted Miller and Miller-Jenkins at its offices, where its staff prayed that Jenkins' contact with Miller-Jenkins would be stopped. Finally, Plaintiffs assert that on the day that Zodhiates drove Miller to the United States border with Canada in order to flee the

country, he wrote to other RUL employees stating that he was working from home on Liberty Counsel, and that other employees speculated that he was working on the Lisa Miller case.

Furthermore, the Plaintiffs have alleged additional facts regarding Lindevaldsen's and Staver's involvement in Miller's scheme to transport Miller-Jenkins outside of the country and avoid detection by law enforcement. Specifically, they allege that Zodhiates was in touch with Lindevaldsen via his daughter, and that he asked Lindevaldsen through his daughter when others involved in the conspiracy could go to Miller's last apartment in the United States to obtain her belongings after she left the country. In addition, Jenkins alleges that Lindevaldsen deliberately misled a Vermont family court by stating that she did not know of her clients' whereabouts, when in fact she knew that her client had fled the country. Plaintiffs also allege that, in her role as a professor at Liberty University, Lindevaldsen essentially espoused the notion that Miller should commit civil disobedience rather than comply with a Vermont court's orders granting her former same-sex partner parental rights and full custody of Miller-Jenkins. Furthermore, Plaintiffs assert that Zodhiates was in contact with both Lindevaldsen and Staver on the day that he drove Miller to the border in order to flee the country. Finally, Plaintiffs contend

that Staver was Lindevaldsen's boss and supervisor during the relevant time period, both at Liberty Counsel and Liberty University, and specifically served as co-counsel to Miller alongside Lindevaldsen in Miller's family court litigation.

## Discussion

### 1. Lifting the stay on the case

This Court has broad discretion in deciding whether to issue or extend a stay, and must exercise its "studied judgment," weigh "competing interests[,] and maintain an even balance" in doing so. *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F. 3d 83, 96-97, 99 (2d Cir. 2012) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort."). Nevertheless, staying a civil case until the conclusion of a parallel criminal prosecution "has been characterized as an extraordinary remedy," *id.* at 98, and a criminal defendant has "no absolute right to a stay of civil proceedings pending the outcome of criminal proceedings." *Guggenheim Capital, LLC v. Birnbaum,* 722 F.3d 444, 453-54 (2d Cir. 2013) (internal quotation omitted); *see also Gen. Dynamics Corp. v. Selb. Mfg. Co.*, 481 F.2d 1204, 1213 (8th Cir. 1973) (noting that protection of the rights of a defendant in a criminal case "does not mandate a complete disregard for the

rights of civil litigants). The Second Circuit has embraced a six-factor test for courts to consider as a "rough guide" in its exercise of this discretion. *Louis Vuitton*, 676 F. 3d at 99. Thus, as this Court previously noted, it should look to:

> 1) the extent to which the issues in the criminal case overlap with those presented in the civil case; 2) the status of the case, including whether the defendants have been indicted; 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the defendants; 5) the interests of the courts; and 6) the public interest.

*Id.* (citing *Trs. of Plumbers & Pipefitters Nat'l Pension Fund*, 886 F.Supp. 1134, 1139 (S.D.N.Y. 1995).

Here, there is no question that the issues in the criminal case, which center on Zodhiates' assistance to Miller in escaping the country with Miller-Jenkins in order to avoid complying with a Vermont court's custody orders, substantially overlap with the allegations in this civil case, as required by the first factor. In assessing the second factor, courts typically look to whether an indictment has been issued, in order to avoid giving weight to mere speculation that a criminal proceeding could result from a defendant's testimony. *See, e.g., Id.* at 1139 ("A stay of a civil case is most appropriate where a party to the civil case has already been indicted for the same conduct"); *Hicks v. City of New York*, 268 F. Supp. 2d 238, 242 (E.D.N.Y. 2003) ("[T]he strongest argument for granting a stay

is where a party is under criminal indictment"). However, the existence of an indictment itself does not weigh in favor of granting a stay where the case has already been tried. *Chartis Prop. Cas. Co. v. Huguely,* No. DKC 13-1479, 2013 WL 5634266, at *3 (D. Md. Oct. 15, 2013) ("Defendant is correct that courts are loath to stay a civil case when a criminal case is in the pre-indictment stage. But while this case is post-indictment, it is also post-trial, post-verdict, and post-sentencing, and currently on appeal. . . . Balancing the posture of the case weighs slightly against imposition of a stay.").

To be sure, as the Defendants posit here, a defendant is entitled to assert his Fifth Amendment privilege at sentencing, on appeal and at a potential re-trial. *See Mitchell v. United States,* 526 U.S. 314, 327 (1999); *United States v. Duchi,* 944 F.2d 391, 394 (8th Cir. 1991) ("the Fifth Amendment right not to testify concerning transactions for which one has been convicted continues until the time for appeal has expired or until the conviction has been affirmed on appeal"); *United States v. Kennedy*, 372 F.3d 686, 691-692 (4th Cir. 2004) ("Because any post-conviction evidence could be used against a defendant if his conviction were to be overturned, the risk of coerced self-incrimination remains until the conviction has been affirmed on appeal."). Thus, "there is no question that [the defendant's] Fifth Amendment rights are implicated" when a civil case unfolds

alongside a criminal case, even on appeal. *Sec. & Exch. Comm'n v. Braslau*, No. 14-CV-01290-ODW, 2015 WL 9591482, at *3 (C.D. Cal. Dec. 29, 2015). Nor do the Plaintiffs here contest that they are. The question "turns upon the *extent* to which his Fifth Amendment rights are implicated. *Id.* Since "[a] defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege," courts evaluate the likelihood that asserting the privilege in the civil case, and risking an adverse inference as a consequence, will hurt the defendant's case. *Louis Vuitton,* 676 F.3d at 98-100. Thus, while there is no clear standard that dictates when the constitutional privilege necessitates a stay, "a plausible constitutional argument would be presented only if, at a minimum, denying a stay would cause substantial prejudice to the defendant." *Guggenheim Capital*, 722 F.3d 453 (citing *Louis Vuitton,* 676 F.3d 100) (internal quotation omitted).

   In practice, courts evaluating a case after a defendant has been convicted have typically given less weight to the burden to a defendant of proceeding with a civil case than they would before the trial, even when the defendant may assert a Fifth Amendment privilege during the civil proceeding. For example, in *In re Terrorist Attacks on Sept. 11, 2001,* No. 03-MDL-1570-GBD-FM, 2011 WL 5913526, at *5 (S.D.N.Y. Nov. 22, 2011), the court

noted that "the status of a defendant's criminal case weighs strongly *against* granting a stay when the defendant has already been tried, convicted and sentenced." (citing *Sparkman v. Thompson,* No. 08-01-KKC, 2009 WL 1941907, at *2 (E.D.Ky. July 6, 2009)). Relying on the example from the Eastern District of Kentucky, the Southern District of New York in that case also noted that since the defendant had already challenged the government's case at trial and was able to ascertain its theories of guilt, he would be better positioned to avoid making incriminating statements if his civil case proceeded. Similarly, since the government already assembled the evidence needed for a conviction, the defendant would have "only a minimal concern that civil discovery will aid the criminal prosecution." *Id.* Finally, the court looked to the theories on which the defendant had challenged his conviction and concluded that discovery in the civil case would be unlikely to implicate the defendant's right against self-incrimination. *Id; see also Gen. Dynamics Corp.*, 481 F.2d at 1215 (pointing out that although defendants had challenged their convictions on appeal, neither had attacked the sufficiency of the evidence to support a finding of guilt).

In addition, courts weigh the likelihood that a conviction will be reversed on appeal and that a new trial will be granted in deciding whether to stay a civil case at this late stage. *Id.*

(noting that it was far from clear that the defendant's conviction in that case would be reversed by the Circuit court, or that a retrial would be granted); *Sec. & Exch. Comm'n,* 2015 WL 9591482, at *3 (denying stay of civil proceeding where "the possibility of a retrial appears remote" because the Court presiding over the defendant's trial had noted that his appeal does not raise any "substantial question of law or fact likely to result in reversal [or] an order for a new trial."); *Taylor v. Ron's Liquor Inc.,* No. C-10-00694-SI, 2011 WL 499944, at *3-4 (N.D. Cal., Feb. 8, 2011) (holding that stay was not warranted where "the possibility of a retrial appear[ed] remote" and the defendant did not "state that he [was] making any argument on appeal that would entitle him to a new trial if he won"). When the likelihood is low, courts have favored the imposition of other measures to protect a defendant's Fifth Amendment rights if they were to arise in the future. *Id.*

Here, the factors typically considered by courts at the post-conviction stage weigh against maintaining a stay once Zodhiates has been sentenced. On February 14, 2017, the court presiding over Zodhiates' criminal case denied his motion for a judgment of acquittal and motion for a new trial. A brief review of the attached post-trial briefing substantiates the Plaintiffs' view that Zodhiates' "claims of trial court error

appear weak if not entirely frivolous." As such, the likelihood
of success on appeal also appears remote. Finally, sentencing is
set to occur in two days, and will therefore likely have
concluded by the time discovery in this case gets underway.

Even if a new trial were granted pursuant to Fed. R. Crim. P.
33 or on appeal, the bases for the retrial do not appear to
implicate his Fifth Amendment rights in this civil proceeding,
but rather the rights of other Defendants. According to the
government brief, Zodhiates has requested a new trial on the
basis of (1) the Court's denial of his motion to suppress RUL
phone bills; (2) the Court's denial of his offer to introduce
specific instances of good conduct in support of his character;
(3) a legal error in the jury instructions regarding parental
rights; and (4) the Court's allegedly improper questioning of a
witness. Only the first of these grounds raises potential
conflicts for the civil litigation. If the RUL phone bills
indicating Zodhiates' location were to be excluded in a future
retrial, for example, they may be discovered from RUL through
this litigation and therefore introduced into the criminal
proceeding regardless. In fact, the only prejudice that the
Defendants point to in their response brief is a potential
prejudice to RUL that would arise if Zodhiates invoked the Fifth
Amendment rather than provided evidence that would weaken the

arguments for a finding of specific jurisdiction against RUL.
Nothing in this opinion precludes Zodhiates from pursuing this
strategy and continuing to assert the Fifth Amendment in this
civil case or at later stages of the criminal proceeding. These
forms of harm, however, do not rise to the level of a
constitutional argument because they are not being asserted on
behalf of a non-corporate defendant. *See Taylor,* 2011 WL 499944,
at *4 (finding that a stay was not warranted where the "primary
focus of the motion to stay appears to be the possible prejudice
to the *other* defendants in this civil action" and "these other
defendants are not attempting to exercise a constitutional
privilege"). To the extent that discovery of RUL phone records
would harm Zodhiates in a re-trial if an appeals court were to
reverse the trial judge's ruling on the suppression claim, this
Court could simply permit RUL to produce these documents subject
to a protective order upon a motion by the Defendants.
Plaintiffs have indicated that they are amenable to such an
order on this or other specific issues that may arise.

In addition to bearing on the second and fourth factors
(regarding the status of the case and the Defendants' interests)
of the six-factor test identified in *Louis Vuitton*, the
conclusion of the trial also touches on the Court's analysis of
the fifth factor (its own interest). Courts deciding whether to

stay a case after an indictment has been issued have noted that
doing so "will likely narrow the issues before the court, and
prevent both parties from performing unnecessarily duplicative
work." *Harris v. Nassau Cty.*, No. 13-CV-4728-NGG-RML, 2014 WL
3491286, at *4 (E.D.N.Y. July 11, 2014) (citing *Crawford & Sons,*
298 F.Supp. 2d 317, 319 (E.D.N.Y. 2004) (finding that a stay
would "avoid duplication" as a "conviction or acquittal in the
criminal action may negate or buttress some or all of the
plaintiffs' claims" and provide the parties with the benefit of
"the transcript and rulings in the criminal action") and *Trs. of
Plumbers,* 886 F.Supp. at 1140 (finding that the criminal action
"may reduce the scope of discovery in the civil case and the
evidence gathered during the criminal prosecution can later be
used in the civil action")). Having already incurred the
benefits to judicial efficiency that stem from allowing the
criminal case to go to trial before the civil case advances,
this Court's interests will weigh in favor of allowing the civil
case to proceed once Zodhiates has been sentenced.

Finally, the Supreme Court's ruling on same-sex partnerships
and family rights since this Court's last opinion granting a
stay touches on both the public's interest and the Plaintiffs'
interests in this litigation and weighs in favor of lifting the
stay under the third and sixth factors. In *Obergefell v. Hodges*,

135 S. Ct. 2584, 2604, 192 L. Ed. 2d 609 (2015), the Court held
that "the right to marry is a fundamental right inherent in the
liberty of the person, and under the Due Process and Equal
Protection Clauses of the Fourteenth Amendment couples of the
same-sex may not be deprived of that right and that liberty." In
doing so, the Court highlighted the importance of the
judiciary's role in protecting fundamental individual rights
even in the midst of democratic political deliberation on
contentious and sensitive issues. *Id.* at 2605-2606. Finally, the
Court made clear that legal questions that affect the stability
of same-sex families require particularly urgent action. *Id.* at
2606 ("The petitioners' stories make clear the urgency of the
issue they present to the Court. . . . April DeBoer and Jayne
Rowse now ask whether Michigan may continue to deny them the
certainty and stability all mothers desire to protect their
children, and for them and their children the childhood years
will pass all too soon."). Here, Jenkins alleges deprivations of
her rights stemming from her same-sex union by individuals who
explicitly advocated against legal respect for those rights.
Having received clear confirmation from the Supreme Court that
the Constitution protects Jenkins' rights, and that courts must
act as stewards of those rights in times of controversy, the
public and Jenkins have an interest in ensuring that these
claims are resolved expeditiously.

In short, all of the factors analyzed above weigh in favor of lifting the stay once the trial and sentencing stages of Zodhiates' criminal case have been completed. Thus, the Court orders that the stay be lifted on March 23, 2017 or on the date Zodhiatez is sentenced, whichever occurs later.[2] Zodhiates may assert the Fifth Amendment as appropriate, but must otherwise proceed with discovery in this matter after the stay is lifted.

*2. Personal Jurisdiction Over Additional Defendants*

Plaintiffs have moved to amend the complaint to add several additional Defendants connected to Miller's legal representation over the course of her custody dispute pursuant to Fed. R. Civ. P. 21. Specifically, they allege in their proposed amended pleadings that Lindevaldsen and Staver, Miller's attorneys during her custody dispute, were both personally involved in Miller's efforts to leave the country in order to avoid a Vermont court's orders, and that they acted on behalf of both Liberty University and Liberty Counsel in doing so. They also seek leave to amend their complaint to reflect the proposed addition of the parties. *See Fair Hous. Dev. Fund Corp. v. Burke*, 55 F.R.D. 414, 417 (E.D.N.Y. 1972) (complaint should be

---

[2] The Court withholds judgment on whether a protective order might be warranted at a later point to limit the potential harm of civil discovery to Zodhiates' criminal case.

amended after parties have been added for purposes of clarity or
otherwise).

Federal Rule of Civil Procedure 21 provides that "the court
may at any time, on just terms, add or drop a party." Fed. R.
Civ. P. 21. "Although Rule 21, and not Rule 15, governs the
addition of new parties to an action, the Court is guided by the
same standard of liberality afforded to motions to amend
pleadings under Rule 15." *Soler v. G & U, Inc.*, 86 F.R.D. 524,
527–28 (S.D.N.Y. 1980) (internal citation and quotation
omitted). Rule 15 provides that "the court should freely give
leave [to amend] when justice so requires." Fed.R.Civ.P.
15(a)(2); *see also Foman v. Davis,* 371 U.S. 178, 182 (1962) ("If
the underlying facts or circumstances relied upon by a plaintiff
may be a proper subject of relief, he ought to be afforded an
opportunity to test his claim on the merits"). However, courts
may deny a motion for leave to amend in light of "undue delay,
bad faith or dilatory motive on the part of the movant, repeated
failure to cure deficiencies by amendments previously allowed,
undue prejudice to the opposing party by virtue of allowance of
the amendment [or] futility of amendment." *Id.; Zerman v. E.F.
Hutton & Co.*, 628 F. Supp. 1509, 1511 (S.D.N.Y. 1986) ("the
liberal amendment principles of 15(a) do not require the court
to indulge in futile gestures"). Here, the proposed Defendants

contend that amending the complaint so as to permit Plaintiffs
to join them as defendants would be futile because the Court
lacks personal jurisdiction over them.

In addition, in response to Plaintiffs' request for a ruling
on a prior motion to dismiss Defendant RUL, RUL alleges that the
Court lacks personal jurisdiction over it as well. Plaintiffs
assert that the Court has jurisdiction to proceed on the claim
against RUL both because of RUL's own activities in connection
with Liberty Counsel, and because it can be held liable for the
acts of its agents and employees, Zodhiates and his daughter,
Victoria Hyden ("Hyden").

As this Court previously noted, its exercise of personal
jurisdiction over each Defendant must comport with the
requirements of due process. ECF No. 115; *Metro. Life Ins. Co.
v. Robertson-Ceco Corp.,* 84 F.3d 560, 567 (2d Cir. 1996).[3] "The
due process test for personal jurisdiction has two related
components: the 'minimum contacts' inquiry and the
'reasonableness' inquiry. *Id.* In evaluating whether a defendant

---

[3] In that opinion, the Court also noted that the Plaintiffs
asserted both federal question and diversity subject-matter
jurisdiction. Although in a diversity action a court must
initially determine whether a plaintiff has shown that a
defendant is amenable to process under the forum state's laws,
Vermont's long-arm statute "confers jurisdiction over
nonresident defendants to the full extent permitted by the Due
Process Clause." Vt. Stat. Ann. Tit. 12, §913(b); *Dall v.
Kaylor,* 658 A.2d 78, 79 (Vt. 1995).

has sufficient contacts with the forum state to justify the
court's exercise of personal jurisdiction, courts distinguish
between "specific" and "general" jurisdiction. "Specific
jurisdiction exists when a State exercises personal jurisdiction
over a defendant in a suit arising out of or related to the
defendant's contacts with the forum; a court's general
jurisdiction, on the other hand, is based on the defendant's
general business contacts with the forum state and permits a
court to exercise its power in a case where the subject matter
of the suit is unrelated to those contacts." *Id.* at 568 (quoting
*Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408,
414 (1984)). The Plaintiffs here do not assert that the Court
has general jurisdiction over any of the alleged Defendants, but
instead purport to show that the Defendants have established
sufficient contacts with the forum because of their activities
arising from the allegations in this suit. "Once it has been
decided that a defendant purposefully established minimum
contacts with the forum State, these contacts may be considered
in light of other factors to determine whether the assertion of
personal jurisdiction would comport with fair play and
substantial justice." *Licci ex rel. Licci v. Lebanese Canadian
Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (quoting *Burger King
Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85
L.Ed.2d 528 (1985) (internal quotation marks omitted)).

Defendants make three preliminary arguments that this Court must address before analyzing the jurisdictional claims against each particular Defendant in question. First, Defendants imply that this Court need not revisit the jurisdictional allegations against the Defendants that the Plaintiffs seek to add because it has already dismissed the same or closely connected Defendants on the ground that it lacked personal jurisdiction. Second, the Defendants contest the factual allegations made out in both the Plaintiffs' motion and in their proposed amended pleadings by submitting contrasting factual affidavits which, if taken as true, may defeat a showing of personal jurisdiction. Third, the Defendants take issue with the fact that parts of the Plaintiffs' prima facie showing of personal jurisdiction are made as factual assertions in Plaintiffs' motion rather than as a formal part of the Plaintiffs' pleadings. None of these arguments require the Court to hold in Defendants' favor.

First, Defendants assert that, because the Court previously found that it did not have personal jurisdiction over Liberty University, it need not re-evaluate this question now. Furthermore, relying on *Spiegel v. Schulmann*, 604 F.3d 72, 78 (2d Cir. 2010), they argue that an amendment to add Staver and Lindevaldsen as agents would be futile because they are essentially "another version of a defendant that the court [has]

already determined it [has] no personal jurisdiction over." To
be sure, where a Plaintiff seeks to add a previously-dismissed
defendant without adducing any evidence about her alleged
wrongdoing to suggest that the Court's analysis should differ,
courts have rejected these attempts with little additional
guidance. *See, e.g., Spiegel*, 604 F.3d at 78 (rejecting attempt
to join a defendant where "[n]either the plaintiff's third
amended complaint nor the evidence adduced during discovery
provided any basis to demonstrate that the district court would
have had personal jurisdiction over [a defendant alleged to have
committed the same wrongdoing as a previously-dismissed
defendant]."); *Goins v. Longstreet*, No. 12-CV-55, 2013 WL
869844, at *7 (W.D.Pa. Feb. 13, 2013) (dismissing a plaintiff's
attempts to revive claims against previously dismissed
defendants where plaintiff "alleges no new violations of his
civil rights"); *Zerman v. E.F. Hutton & Co.*, 628 F. Supp. 1509,
1511-1513 (S.D.N.Y. 1986) (rejecting plaintiff's attempt to
rejoin previously dismissed defendants where the allegations in
the modified complaint were little more than a rehash of the
allegations in the original complaint which were previously
rejected by the Second Circuit"); *Crenshaw v. Hamilton*, No. 08-
CV-6186, 2012 WL 1565696, at *2-3 (W.D.N.Y. Mar. 30, 2012)
(refusing to permit plaintiff to add defendants who were
"previously dismissed with prejudice" where  "the proposed

22

claims plaintiff seeks to assert against them were either previously dismissed with prejudice or are so closely related to those dismissed claims that they were logically encompassed by [the judge]'s rulings in [the] matter"). However, as explained more fully below, the Plaintiffs here provide evidence about Lindevaldsen's and Staver's allegedly tortious activity that they did not fully set forth before. Since the Court's prior ruling on the lack of personal jurisdiction over Liberty University relied on the conclusion that Lindevaldsen and Staver did not commit tortious acts over the course of their representation of Miller, the new evidence leads this Court to reconsider its prior holding.

Second, the Court need not base its jurisdictional conclusions solely on the facts alleged by Plaintiffs in their proposed amended complaint. "In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation omitted). A "plaintiff must allege specific facts on which personal jurisdiction can be based," *Moore v. Motz,* 437 F. Supp. 2d 88, 91 (D.D.C. 2006), and "cannot rely on conclusory allegations", *id.*, or "a legal conclusion couched a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673; *see also*

*Chloé v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158, 163 (2d Cir.2010) (a prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant") (internal quotation marks and brackets omitted). However, such a showing may be made through a plaintiff's "pleadings *and* affidavits." *Myers v. Bennett Law Offices,* 238 F.3d 1068, 1071  (9th Cir. 2001) (emphasis added).[4]

In addition, while courts "will not draw *argumentative* inferences in the plaintiff's favor," *In re Terrorist Attacks*, 714 F.3d at 673 (emphasis added), a "plaintiff presenting a prima facie case is entitled to have … conflicts resolved in his favor." *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 211 (5th Cir. 1999); *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993), *as amended* (May 25, 1993) ("If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima

---

[4] Courts have asserted the importance of distinguishing between a jurisdictional analysis and a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), which precludes courts from relying on facts outside the pleadings. *See Newsome v. Gallacher*, 722 F.3d 1257, 1270 (10th Cir. 2013) ("we believe it is important to keep the 12(b)(2) and 12(b)(6) analyses distinct"); *Lans v. Adduci Mastriani & Schaumberg L.L.P.*, 786 F. Supp. 2d 240, 265 (D.D.C. 2011) (noting that courts evaluating a Rule 12(b)(6) motion may not rely on facts outside the pleadings).

facie showing is sufficient notwithstanding the contrary
presentation by the moving party").

   Here, the Defendants have raised the jurisdictional argument
in opposition to the Plaintiffs' motion to join defendants and
amend the complaint pursuant to Rules 21 and 15 of the Federal
Rules of Civil Procedure, not in the context of a motion to
dismiss. However, the futility argument set forth by Defendants
essentially alleges that leave to amend and add defendants
should be denied because the Court would be required to dismiss
the proposed defendants if it did add them. Thus, to evaluate
Defendants' argument, the Court will apply the evidentiary
standards that it would be required to apply at the motion to
the dismiss stage. *See Milanese v. Rust-Oleum Corp.*, 244 F.3d
104, 110 (2d Cir. 2001) (Court will judge futility against
motion for summary judgement standard where motion for leave to
amend is filed in response to a motion for summary judgment and
opposing party alleges that it would not withstand an inevitable
summary judgment motion in the future, but will apply standard
for motion to dismiss for failure to state a claim where motion
for leave to amend is filed in response to such a motion to
dismiss and opposing party asserts that it would not withstand
such a motion in the future).  Therefore, Lindevaldsen's and
Staver's presentation of affidavits denying the factual claims

made out in the Plaintiffs' briefs will not serve to undercut
the Plaintiffs' prima facie showing of personal jurisdiction if
the facts they present otherwise demonstrate that this standard
has been met. Setting aside these preliminary arguments, the
Court assesses the jurisdictional arguments against each of the
proposed Defendants in turn.

   3. *Joinder of Rena Lindevaldsen, Esq. and Mathew Staver, Esq.*

   Plaintiffs have moved to name both of Miller's lawyers in her
custody dispute as Defendants in this civil action. Neither
Lindevaldsen nor Staver were named as Defendants earlier in this
litigation, and this Court has therefore not ruled directly on
whether it has jurisdiction over them before. However, in its
prior ruling dismissing Liberty University as a Defendant, the
Court rejected the Plaintiffs' argument that "the actions of
Lisa Miller's attorneys in litigating her case are sufficient to
give this Court jurisdiction over Liberty University." It first
found that there was no factual support for the assertion that
the attorneys had committed a tortious act in their
representation of Miller in Vermont, and later found that the
attorneys' contacts with the forum do not amount to a purposeful
availment of the privilege of doing business here. The
Defendants urge the Court to disregard many of the new factual
allegations made out by Plaintiffs and to reiterate both

conclusions. However, under the facts now alleged by the
Plaintiffs, the Court's holding would not be supported by the
principles of specific jurisdiction articulated in this Circuit.

There are two theories of specific jurisdiction which could
permit this Court to find that it has jurisdiction over
Lindevaldsen and Staver. *See Licci ex rel. Licci v. Lebanese
Canadian Bank, SAL,* 732 F.3d 161, 173 (2d Cir. 2013)
(distinguishing between the "effects test" theory and
"purposeful availment" theories of specific personal
jurisdiction). First, in *Calder v. Jones*, 465 U.S. 783, 788–89
(1984), the Supreme Court held that specific personal
jurisdiction exists even where a defendant engaged in activities
entirely outside of the state if the defendant took
"intentional, and allegedly tortious, actions … expressly aimed"
at the forum and "the brunt of the harm" was suffered in the
forum. In *Walden v. Fiore,* __ U.S. __, 134 S. Ct. 1115, 1122-23
(2014), the Court limited this "effects test" somewhat,
clarifying that a "plaintiff cannot be the only link between the
defendant and the forum."  Rather, the Court reiterated that the
jurisdictional inquiry must focus on the "relationship among the
defendant, the forum, and the litigation", asserting that "[t]he
crux of *Calder* was that the … 'effects' of the alleged [tort]
connected the defendants to [the forum], not just to the

27

plaintiff." *Id.* at 1123–24. In addition, the Court has found specific jurisdiction in cases where a defendant's suit-related conduct occurred *within* the forum. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-476 (1985) ("where the defendant deliberately has engaged in significant activities within a State or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there"). This "purposeful availment" theory therefore looks to whether the plaintiff's claims arise from the defendant's activities in the forum. *See Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 343 (2d Cir. 2016).

The new facts alleged by the Plaintiffs are sufficient to establish a prima facie showing of specific jurisdiction under the "effects" test outlined in *Calder* and *Walden*. In their amended pleadings, Plaintiffs assert that Lindevaldsen and Staver are or have been employees of Liberty University and Liberty Counsel in relation to the claims set forth therein, and that Lindevaldsen and Staver were Miller's lead attorneys in her family court case regarding Miller-Jenkins. They allege that Zodhiates suggested that he had a "personal option" for Miller in an email to a Liberty Counsel employee in early 2009 should the family courts involved find against her despite her

attorneys' efforts to prevent Jenkins from having contact with
Miller-Jenkins. Furthermore, Plaintiffs claim that Miller was
held in contempt by a Virginia court on August 25, 2009 for
failing to comply with its prior orders. According to the
pleadings, she failed to appear at the hearing imposing the
contempt sanction and instead held a press conference with
Staver and Lindevaldsen at her side. In other communications
with RUL employees, Zodhiates stated that Lindevaldsen and
Staver made representations regarding when they expected the
Vermont court would award full custody to Jenkins. The amended
pleadings further allege that Miller stated, after arriving in
Nicaragua in 2009, that Liberty Counsel had advised her that it
would be in her best interests to disappear (presumably through
her attorneys or at their instruction, although the pleadings do
not specify who at Liberty Counsel provided Miller with this
advice).

Next, the pleadings claim that Hyden delivered emails from
Zodhiates to Lindevaldsen after Miller fled the country
regarding Miller's needs. Specifically, these emails requested
donations for supplies to be sent to Miller and sought to
coordinate the removal of items from Miller's apartment.
According to the amended complaint, Lindevaldsen packed up
Miller's personal belongings directly. During this time,

Plaintiffs allege that Lindevaldsen falsely claimed that she was unable to communicate with Miller to the Vermont family court in an attempt to delay contempt proceedings aimed at locating Miller-Jenkins. As a result, Plaintiffs assert in their amended complaint that Miller was able to leave the United States in advance of September 25, 2009 and remain there past January 1, 2010 with the assistance of Lindevaldsen and others. They therefore bring claims against Lindevaldsen and Staver for the intentional tort of kidnapping and for conspiracy to violate the civil rights of Jenkins and Miller-Jenkins based on discriminatory animus against same-sex couples and against Jenkins due to sexual orientation. While all of these assertions are found in the amended pleadings themselves, the Plaintiffs provide additional support for these factual representations in their briefs and supporting attachments. This Court must disregard the contrary presentation made by the attorneys in their affidavits at this stage. *See Seetransport Wiking Trader Schiffarhtsgesellschaft,* 989 F.2d at 580.

In sum, the Plaintiffs plead specific facts that Lindevaldsen in particular engaged in tortious conduct to counsel Miller to leave the country, coordinate and conspire with Zodhiates and Hyden to assist her in doing so, and prevent the authorities from learning of Miller's whereabouts. It is beyond question

that the "brunt of the harm" was felt by Jenkins in Vermont, where she resides and would have lawfully brought Miller-Jenkins to reside. *Calder,* 465 U.S. at 789. Moreover, as this Court has previously noted, the actions taken by all Defendants in furtherance of this conspiracy and kidnapping were directed not only at Jenkins, a forum resident, but also at the forum itself. ECF No. 161, p. 10. Since the Vermont state courts awarded Jenkins certain rights, which she would have exercised in Vermont but for Defendants' allegedly tortious conduct, the Defendants' allegedly wrongful acts connected them "to the forum in a meaningful way." *Walden,* 134 S. Ct. at 1125. Therefore, the Plaintiffs have made out a prima facie showing of personal jurisdiction against Lindevaldsen under the "effects" theory articulated in *Calder* and *Walden.*

While Plaintiffs claim that Staver, too, engaged in tortious conduct aimed at Vermont, their allegations against Staver alone are admittedly weaker than those against Lindevaldsen. Zodhiates allegedly called a phone number used by Staver on the day that he transported Miller to the border to escape the country. In their reply brief, Plaintiffs claim that jurisdictional discovery indicating that Zodhiates was in touch with Liberty University attorneys before and after Miller fled the country supports the inference that this contact was part of an ongoing

pattern of communication between Zodhiates and the attorneys.
However, Plaintiffs do not allege that Staver and Zodhiates
actually spoke on that occasion, or describe the contents of
that conversation. Similarly, the allegation that Staver met
with Zodhiates and provided him with a tour of the law school is
not itself evidence that he engaged in tortious conduct.
Furthermore, the representations that Staver allegedly made to
the Vermont and Virginia courts after Miller left the country
are not necessarily false unless knowledge of Miller's
whereabouts is imputed to him, since Plaintiffs have failed to
put forth evidence that suggests that Staver was directly aware
of her location at that time, as they have for Lindevaldsen. Nor
did Staver's approval of the mailing produced by RUL, which was
intended to raise funds for Staver and Lindevaldsen's appeal of
a Virginia court's decision constitute tortious conduct in and
of itself. While the sum of these facts suggests that Staver was
closely connected to Zodhiates' and Lindevaldsen's strategy to
advocate for Lisa Miller's legal position, they do not
demonstrate that Staver himself participated in efforts to
assist Miller in fleeing the country.

   Moreover, the Court is not persuaded by Plaintiffs' argument
that Staver's mere representation of Miller in the Vermont
proceedings permits us to find personal jurisdiction over him

here. This Court previously rejected that argument, noting that
the Second Circuit's reading of the "purposeful availment"
theory of specific jurisdiction in *Bank Brussels Lambert v.*
*Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 128 (2d Cir. 2002)
requires more of attorneys and law firms representing clients in
a particular district. Moreover, the cases cited by Plaintiffs
in support of their assertion that an application for admission
pro hac vice makes a lawyer and her law firm subject to specific
jurisdiction are distinguishable. For example, the court's
holding to that effect in *W. Thrift & Loan Corp. v. Rucci*, No.
CIV. 11-3644 JNE/TNL, 2012 WL 1021681, at *3 (D. Minn. Mar. 27,
2012) was premised on the fact that the plaintiff's "suit
directly arises from and relates to [his attorney's]
unsuccessful attempt to become admitted pro hac vice in the
[relevant] [l]itigation." Where a pro hac vice admission, or
even the lawyer's engagement in litigation in a forum state, is
not connected to the matter at issue, courts have refused to
find personal jurisdiction solely on this basis. *See, e.g., Wolk*
*v. Teledyne Indus., Inc.,* 475 F. Supp. 2d 491, 502 (E.D. Pa.
2007); *Lans v. Adduci Mastriani & Schaumberg L.L.P.,* 786 F.
Supp. 2d 240, 275 (D.D.C. 2011) ("The … Defendants'
participation in litigation-related activities alone also does
not subject [the Defendants] to personal jurisdiction in [that
forum]"); *Medina v. Medina*, 260 F.3d 622 (5th Cir. 2001)

33

(rejecting plaintiff's argument that an attorneys' pro hac vice
representation of a client is sufficient to establish personal
jurisdiction where the representation in that forum was not
based upon the initial legal action challenged by the
plaintiff).[5]

   Nevertheless, Staver's leadership roles at both Liberty
University and Liberty Counsel implicate him in the commission
of the alleged torts for purposes of establishing jurisdiction.
First, as Dean of Liberty University School of Law, Staver was
allegedly both Hyden's and Lindevaldsen's boss and supervisor.
As General Counsel of Liberty Counsel until 2006, he was also
allegedly Lindevaldsen's boss and supervisor while she was

---

[5] Similarly, in most jurisdictions, the mere existence of an
attorney-client relationship involving representation in a
different forum, without more, does not establish personal
jurisdiction in the place where the client resides. *Flagstar
Bank, FSB v. Centerpointe Fin., Inc.*, No. 2:10-CV-14234, 2011 WL
2111982, at *4-5 (E.D. Mich. May 26, 2011) ("The situation
Plaintiff describes is very similar to those cases involving
plaintiffs who sue attorneys and law firms that represented them
in out-of-state proceedings for malpractice. In those cases,
courts in the plaintiff's home state routinely hold that they do
not have personal jurisdiction over defendant law firms simply
because the non-resident attorneys purportedly breached their
fiduciary duties to the plaintiff or committed malpractice")
(citing *Satwelle v. Farrell,* 70 F.3d 1381, 1392 (1st Cir.1995)
(finding that New Hampshire court did not have jurisdiction over
a claim by resident of that forum against law firm it hired in
California to represent it in proceeding in Florida)); *Austad
Company v. Pennie & Edmounds,* 823 F.2d 223 (8th Cir.1987)
(finding that South Dakota court did not have jurisdiction over
New York law firm hired by South Dakota resident to represent it
in a Maryland lawsuit)).

employed there. In addition, Staver appeared as Lindevaldsen's co-counsel in her representation of Lisa Miller during the family court proceedings in Vermont and Virginia, suggesting that he had a particularly strong role in supervising Lindevaldsen in this particular case.

In determining whether the activities of an employee may count towards the minimum contacts necessary to establish personal jurisdiction over his employer, the Court may consider traditional common law principles of liability. *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 55-60 (1st Cir. 2002) ("Traditional common law concepts support the conclusion that [defendants' relationship] suffices to bring the parties within the rule that permits imputation of contacts for jurisdictional purposes."). Even where an employee is acting outside of the scope of her employment, her contacts may be attributed to her employer if she was acting as the employer's agent in performing the tortious act. *See Myers v. Bennett Law Offices*, 238 F.3d 1068, 1073 (9th Cir. 2001) (rejecting the argument that employee's acts may not be considered for jurisdictional purposes since he "allegedly acted outside the scope of his employment", on the grounds that the employee had at least apparent authority to conduct those acts and that the employer subsequently ratified those acts).

It is well established that an employer may be found liable for the acts of his or her employee acting within the scope of his or her employment, and that the contacts established by the employee acting in this respect will be attributable to the employer for purposes of establishing jurisdiction. *See Myers*, 238 F.3d at 1073; *Doe v. Forrest*, 853 A.2d 48, 54 (Vt. 2004) ("Under the settled doctrine of respondeat superior, an employer or master is held vicariously liable for the tortious acts of an employee or servant committed during, or incidental to, the scope of employment") (quoting *Brueckner v. Norwich Univ.,* 730 A.2d 1086, 1090 (Vt. 1999)). Here, some of Lindevaldsen's allegedly tortious acts were clearly committed within the scope of her employment. For example, Lindevaldsen allegedly lied to the Vermont courts about her ignorance of Miller's whereabouts after Miller left the country. This statement, allegedly made in furtherance of the conspiracy to kidnap Miller-Jenkins and violate Jenkins' and Miller-Jenkins' civil rights, was clearly part of Lindevaldsen's legal representation, which Staver supervised. Under this theory alone, Lindevaldsen's tortious act could be attributable to Staver for jurisdictional purposes.

Moreover, Staver's alleged role as Lindevaldsen's supervisor, both at Liberty Counsel and at Liberty University School of Law, established an agency relationship between

Lindevaldsen and Staver. "A claim of agency requires facts establishing: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking." *Allen v. Dairy farmers of Am., Inc.,* 748 F. Supp. 323, 342 (D. Vt. 2010) (quoting *Cleveland v. Caplaw Enters*, 448 F.3d 518, 522 (2d Cir. 2006)). An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control. *In re Shulman Transp. Enters., Inc.,* 744 F.2d 293, 295 (2d Cir. 1984) (citing *Restatement (Second) of Agency* § 1(1) comment b, § 14 (1958)). Here, Lindevaldsen was conducting her representation of Miller on behalf of Liberty Counsel, but used her position at Liberty University to generate broader awareness of the case and to physically conduct some of her work. In both her role with Liberty Counsel and Liberty University, Staver was Lindevaldsen's superior. Although the Plaintiffs have not presented explicit evidence that Staver expressed that Lindevaldsen would act for him in the representation or that he would ultimately be in control of the undertaking, these elements of the agency relationship can be inferred from the respective roles of the two lawyers in both organizational settings.

Activities of a party's agent may count toward the minimum
contacts necessary to support jurisdiction if these acts fall
within the scope of the agent's authority. *See Grand Entm't
Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir.
1993); *Daynard v. Ness, Motley, Loadholt, Richardson & Poole,
P.A.*, 290 F.3d 42, 55 (1st Cir. 2002). Lindevaldsen's
representations to the Vermont courts about her knowledge of
Miller's whereabouts were clearly within the scope of her actual
authority because they were part and parcel of the activity that
she was hired to engage in. Thus, even if this conduct is not
attributable to Staver under a theory of respondeat superior, it
is otherwise attributable under a theory of agency.

Moreover, if Lindevaldsen in fact acted as Staver's agent
for purposes of the representation of Miller, the knowledge that
she had while acting within the scope of her authority would be
chargeable to Staver, regardless of whether that knowledge was
actually communicated. *Sawyer v. Crowell*, 559 A.2d 687, 690 (Vt.
1989). Thus, Lindevaldsen's alleged knowledge that Miller had
fled the country with Miller-Jenkins, which she allegedly held
while making a contrary representation to the Vermont courts,
would be attributable to Staver under common law principles.
Although Lindevaldsen was called to testify as a witness, and
did not speak in her capacity as counsel when she represented

38

that she did not know of her client's whereabouts, she made a
motion on behalf of herself and Staver to withdraw as counsel
based on the same claim of ignorance. Thus, in making this
motion and representation as Staver's agent, her alleged
knowledge of Miller's whereabouts would be attributed to him. As
a result, the misrepresentation in question would be
attributable to him as well. Finally, Plaintiffs claim that
Staver "oppos[ed] Ms. Jenkins' efforts to locate Isabella or
gain information about her kidnapping through the questioning of
witnesses in Lynchburg" through his representation in the
Virginia courts. ECF No. 216, p. 24. If Staver did so with the
attributed knowledge that Miller had in fact left the country
and was now located in Nicaragua, as Lindevaldsen is alleged to
have known, then this manner of proceeding with the case may
also have aided the conspiracy in question and could have been
premised on tortious misrepresentations. As a result, once
Lindevaldsen's knowledge is attributed to Staver, his own
conduct during his continued representation of Miller could
constitute an independent tort. This wrongful conduct, in turn,
was specifically aimed at Vermont and produced harm in this
state, thus establishing specific personal jurisdiction over
him, as well. Accordingly, the relationship between Lindevaldsen
and Staver allows this Court to find specific personal

jurisdiction over Staver, notwithstanding his secondary role in
the alleged wrongdoing.

   4. *Joinder of Liberty Counsel*

   For the same reasons, this Court finds that it has personal
jurisdiction over Liberty Counsel. By the Defendants' own
admissions, Lindevaldsen and Staver represented Miller while
they were employed by Liberty Counsel. Staver served as
President and General Counsel of Liberty Counsel between 1989
and 2006. Between 2006 and 2014, Staver served as Dean of the
law school and Professor of Law at Liberty University. According
to the Plaintiffs, he continued to represent Miller until after
she left the country, appearing pro hac vice in the Vermont
courts. Despite Staver's position at Liberty University during
that time, the Vermont family court filings attached to
Plaintiffs' and Defendants' motions indicate that Staver
represented Miller on behalf of Liberty Counsel after 2006.
Similarly, Lindevaldsen was an employee of Liberty Counsel until
2006, and thereafter began working as a Professor of Law at
Liberty University. While employed by Liberty University, she
continued to represent Lisa Miller on behalf of Liberty Counsel
as a contract attorney until after Miller left the country.
During this time, Liberty Counsel engaged in fundraising efforts

to support the work of its employees in litigating Miller's case.

Here, Staver and Lindevaldsen's representation of Miller, including their allegedly tortious statements made during the course of that representation, can be imputed to Liberty Counsel regardless of Staver and Lindevaldsen's formal employment relationship with Liberty Counsel at different moments over the course of the representation. As this Court previously noted, a corporation's presence in a forum is manifested, for jurisdictional purposes, "by activities carried on in its behalf by those who are authorized to act for it." *Int'l Shoe Co.*, 326 U.S. at 316; *See also Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir. 1993) ("Activities of a party's agent may count toward the minimum contacts necessary to support jurisdiction"); *Ochoa v. J.B. Martin and Sons Farms, Inc.*, 287 F.3d 1182, 1189 (9th Cir. 2002); *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 55-56 (1st Cir. 2002). Even if Staver and Lindevaldsen were not formally employees of Liberty Counsel towards the end of their representation, there is no question that they had actual authority to pursue this representation on Liberty Counsel's behalf. *See City of Burlington v. Zurn Idus., Inc.,* 135 F. Supp. 2d 454, 458 (a "corporation …is not bound by a contract

…executed by one of its employees, however, unless it had granted the employee the authority to enter into the contract on the corporation's behalf"). Liberty University asserts as much in its motion. ECF No. 213 ("Staver, Lindevaldsen and Miller's other Liberty Counsel attorneys entered their appearances and litigated for Miller solely in their capacities with Liberty Counsel."). Therefore, their contacts in litigating the case can be imputed to Liberty Counsel for jurisdictional purposes. Since this Court has personal jurisdiction over Lindevaldsen and Staver, it must also have personal jurisdiction over Liberty Counsel.

5. *Joinder of Liberty University*

This Court previously granted the Defendant's motion to dismiss Liberty University on the ground that the Court lacked personal jurisdiction over it. In doing so, the Court noted that there was no factual support for the assertion that Miller's attorneys committed a tortious act that caused an injury to Jenkins, and that there was no evidence suggesting that Liberty University knew of Hyden's tortious conduct. As noted above, Plaintiffs have made specific allegations that the Liberty attorneys did in fact commit significant wrongdoing during the course of their representation in the Vermont family court proceedings. In addition, Plaintiffs argue that Hyden's acts

42

should be imputed to Liberty University because her supervisors were actually aware of her tortious conduct, she served as a critical link in the chain of the conspiracy, and her conduct was in furtherance of Liberty University's business or educational goals as a Christian law school. Furthermore, Plaintiffs contend that Lindevaldsen was acting on behalf of Liberty University and not *just* Liberty Counsel while representing Miller in Vermont, asserting that she used Liberty University resources and held herself out as acting on behalf of Liberty University when she engaged in this representation. Finally, Plaintiffs contend that Liberty Counsel and Liberty University were operating as one unified entity in supporting Lindevaldsen and Staver's representation of Miller.

Plaintiffs' last argument is the most compelling, and warrants a finding of personal jurisdiction by this Court. As the First Circuit has noted, even if two entities' relationship "were to fall slightly outside of the confines of [the specific common law doctrines of partnership or joint venture by estoppel]," it is "consistent with the Due Process Clause to attribute to [one entity] the retention of, and certain interactions with, [a third party] where, as [the third party] alleges, they have led [the third party] and the public to believe they were joint venturers." *Daynard v. Ness, Motley, Loadholt, Richardson &*

*Poole, P.A.*, 290 F.3d 42, 56–57 (1st Cir. 2002); *Mansfield Heliflight, Inc. v. Heli-One Canada Inc.*, No. 2:12-CV-46, 2012 WL 4479851, at *6 (D. Vt. Sept. 28, 2012) ("The issue is not one of liability, but is instead one of attribution of contacts for jurisdictional purposes, a less stringent test than that for liability") (internal quotations omitted). In *Daynard*, when an agent of one firm had hired a defendant employee, the employee reasonably understood the agent to be acting on behalf of a joint venture between two firms, and then relied on this understanding by providing services to both firms, the contacts of each firm could be imputed to the other for jurisdictional purposes. 290 F.3d at 56–57. Similarly, this Court has also assessed how two entities hold themselves out to the public in determining whether the contacts of one entity with the forum will be imputed to the other. *Mansfield Heliflight, Inc.*, 2012 WL 4479851, at *7 (D. Vt. Sept. 28, 2012). In *Mansfield Heliflight,* this Court noted that two companies' contacts can be attributed to one another for purposes of personal jurisdiction if they are "two arms of the same business group, operate in concert with each other, and enter into agreements with each other that are nearer than arm's length." *Id.* (quoting *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litigation,* 693 F.Supp.2d 409, 420 (D.Del.2010)). In reaching its conclusion that such a close relationship was present in

44

that case, the Court looked to the company's public
representations, its descriptions of itself in press releases
and other public pronouncements and the actual conduct of the
companies with third parties during the negotiation of the
agreement which formed the basis of that matter. Finally, the
Second Circuit has noted that where there is joint control of
two business entities, one may be found to be the agent of the
other for purposes of establishing jurisdictional contacts.
*CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365–66 (2d Cir.
1986).

   In this case, Plaintiffs have made out a prima facie case that
Liberty Counsel and Liberty University were operating in concert
with each other and entering into agreements with each other
that are closer than arm's length. They shared common
leadership, were located in the same building, and Lindevaldsen,
when acting as an attorney for Liberty Counsel, used the
resources of Liberty University to carry out the business of her
representation of Miller. The Plaintiffs allege that Liberty
Counsel acted as a "laboratory school" to train Liberty
University students, essentially serving as a law school
clinical program. Furthermore, Lindevaldsen and Staver's
representation of Miller, ostensibly solely on behalf of Liberty
Counsel, was critical to carrying out their roles as professors

at Liberty University. Lindevaldsen wrote a book about her
representation of Miller which Plaintiffs allege was required
reading for students at the law school, and, as noted above,
designed exam questions based on this case.  In addition,
Plaintiffs allege that the entities held themselves out to the
student body and the public as being closely connected. For
example, when RUL was in the process of negotiating an agreement
with Liberty Counsel to fundraise for Miller's legal
representation, Staver gave Zodhiates a tour of the Law School
building. Ms. Lindevaldsen communicated from a Liberty
University email address and used a Liberty University phone
when she served as counsel in the Miller litigation on behalf of
Liberty Counsel.[6]

   In short, because Liberty Counsel and Liberty University
operated as a unified entity with respect to Lindevaldsen and
Staver's representation of Miller, Liberty Counsel's contacts
with Vermont may be imputed to Liberty University. Since
Lindevaldsen and Staver's contacts with Vermont must be imputed

---

[6] Plaintiffs argue that because Lindevaldsen held herself out as
acting on behalf of Liberty University, this Court should impute
her contacts to Liberty University as Liberty University's
agent. It is not clear whether Plaintiffs are asserting, through
this claim, that Lindevaldsen had apparent authority or that
Liberty University ratified her actions. The Court need not
address this argument, however, since the relationship between
the two entities that employed Lindevaldsen during the relevant
time period suffices to justify the Court's jurisdictional
holding.

to Liberty Counsel, they must be imputed to Liberty University as well. Therefore, the Court finds that it has personal jurisdiction over Liberty University for the same reasons that it has jurisdiction over Liberty Counsel.

6. *Joinder of Response Unlimited, Inc.*

Plaintiffs have requested a ruling on the Court's jurisdiction over RUL. Defendants first assert that such a ruling would be premature, because in order to demonstrate that RUL is not subject to this Court's specific jurisdiction, Zodhiates would need to respond to Plaintiffs' allegations in a manner that would waive his Fifth Amendment privilege. However, Plaintiffs can prevail on their jurisdictional claim at this point so long as they make out a prima facie showing of sufficient minimum contacts and reasonableness on the basis of their pleadings and affidavits. *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673. Even if Defendants, through Zodhiates' testimony, could present contrasting evidence, the Court must resolve those conflicts in the light most favorable to the Plaintiff. *Seetransport Wiking Trader*, 989 F.2d at 580, Therefore, if Plaintiffs assert sufficient facts to make out a prima facie case for personal jurisdiction over RUL, Defendants do not suffer any harm from Zodhiates' continued assertion of the privilege. If Zodhiates waives the privilege at a subsequent

point in this action, Defendants are free to re-assert these
jurisdictional arguments at that later stage.

Plaintiffs argue that this Court has jurisdiction both because
of the direct conduct that RUL engaged in to harm Jenkins and
because RUL is vicariously liable for the acts that Zodhiates
performed in furtherance of the conspiracy at issue. They assert
that RUL was essentially a co-conspirator in efforts to
terminate Jenkins' contact with Miller-Jenkins, and that their
attempts to finance Liberty Counsel's legal representation of
Miller are sufficient to subject RUL to jurisdiction in Vermont.

The Second Circuit has previously concluded that in certain
circumstances funders of organizations that caused harm to a
plaintiff in a forum would not be subject to personal
jurisdiction where the funding of the tortious act was indirect.
*In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 94–95
(2d Cir. 2008), *abrogated on other grounds by Samantar v.
Yousuf*, 560 U.S. 305 (2010) (finding no personal jurisdiction
over four foreign princes who donated to Muslim charities that
in turn funded al Qaeda because "providing indirect funding to
an organization that was openly hostile to the United States
does not constitute [the] type of intentional conduct" that
would give rise to personal jurisdiction under *Calder*'s effects
test). There, the Court found that even if it was foreseeable

that donating money to Muslim charities would lead to that money being re-directed to terrorist organizations, "foreseeability is not the standard for recognizing personal jurisdiction." *Id.* However, in a later, related case, the Circuit court granted jurisdictional discovery to determine whether individuals who *directly* funded terrorist organizations would be subject to personal jurisdiction. *In re Terrorist Attacks on Sept. 11, 2001,* 714 F.3d 659, 678–79 (2d Cir. 2013). In defining the range of the relevant inquiry, the court was concerned that "factual issues persist with respect to whether this support was 'expressly aimed' at the United States" because it was not clear from Plaintiffs' allegations "(1) when the alleged support was given to al Qaeda, (2) what support was given, (3) whether the support was "earmarked" for use in specific schemes or attacks not directed at the United States, or (4) specifically how these defendants were involved in the process of providing support to al Qaeda." *Id.*

Here, Plaintiffs offer evidence that the agreement between RUL and Liberty Counsel specifically concerned Miller's legal representation, and that RUL and Liberty Counsel sought to defend what they viewed as a moral and religious cause by preventing Jenkins' contact with Miller-Jenkins. The facts put forth by Plaintiffs suggest that the RUL staff was committed to

this objective at a spiritual level, inviting Miller and Miller-
Jenkins to the RUL offices to pray for them. However, the
evidence the Plaintiffs have presented does not demonstrate that
in reaching its business agreement with Liberty Counsel, RUL
intended to support Liberty Counsel's efforts to prevent that
contact through unlawful or tortious means. Rather, the mailing
produced by RUL requests donations specifically for Liberty
Counsel's appeal to the Virginia Supreme Court, in which Miller
sought to have Virginia's recognition of the Vermont court
orders overturned. The letter also seems to acknowledge that
when faced with the Virginia lower court decision, "Lisa had no
choice but to comply with the Vermont courts." Thus, the intent
of this arrangement, as expressed in the documents produced by
the Plaintiff, was to support Miller's lawful effort to appeal
the lower court decision, assuming that the consequence of not
doing so would be personally and spiritually difficult, but
legally required. As a result, RUL's direct business engagement
and financial support for Liberty Counsel does not appear to be
intended to be used specifically for Liberty Counsel's tortious
conduct. Even if it was foreseeable that such support would be
used in a tortious manner, foreseeability alone would not give
rise to personal jurisdiction. *See In re Terrorist Attacks on
Sept. 11, 2001*, 538 F.3d at 95.[7]  Since Plaintiffs have not made

---

[7] In addition, efforts to finance Miller's legal representation

a prima facie showing that RUL provided support for Liberty
Counsel in order to support intentionally tortious or unlawful
conduct, this business engagement alone cannot give rise to
personal jurisdiction over RUL.[8]

Nevertheless, Zodhiates' contacts with the forum may be
imputed to RUL because he acted as RUL's agent when he committed
the tortious acts that gave rise to personal jurisdiction over
him. In addition to the facts that the Court previously
identified as relevant to its personal jurisdiction holding over
RUL, Plaintiffs have put forth additional allegations about
Zodhiates' tortious conduct. Specifically, they contend that
Zodhiates sent an email to a Liberty Counsel's employee, Mr.
Sidebottom, suggesting that he had a "personal option" for
Miller if she found herself without additional legal recourse.

do not give rise to personal jurisdiction under a purposeful
availment theory because RUL *itself* did not create contact with
the Vermont forum through the litigation. *Waldman v. Palestine
Liberation Org.,* 835 F.3d 317, 335 (2d Cir. 2016) ("The
relationship between the defendant and the forum must arise out
of contacts that the defendant *himself*' creates with the forum")
(internal quotation omitted).

[8] Moreover, in the absence of a showing that the two business
entities were conspiring with each other to prevent Jenkins'
contact with her daughter through unlawful means by signing this
agreement, Plaintiffs' citations to cases providing that one co-
conspirator's minimum contacts with a forum may be imputed to
another are inapposite. These cases become relevant only because
Plaintiffs have made out a showing that Zodhiates' actions may
be imputed to RUL for jurisdictional purposes. As discussed
below, however, this legal conclusion would suffice to find
jurisdiction, so no analysis of RUL's potential role as a co-
conspirator is necessary.

He also allegedly coordinated with Lindevaldsen regarding the timing of Miller's departure and about providing support for Miller after she left the country. In its prior jurisdictional decision, this Court held that there was sparse evidence regarding whether Zodhiates was acting as RUL's agent in undertaking these acts, and granted jurisdictional discovery specifically on this ground.

As the Court noted in that decision, a corporation's presence in a forum may be manifested "by activities carried on in its behalf by those who are authorized to act for it. *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945); *see also Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir. 1993) ("Activities of a party's agent may count toward the minimum contacts necessary to support jurisdiction"); *Ochoa v. J.B. Martin and Sons Farms, Inc.*, 287 F.3d 1182, 1189 (9th Cir. 2002); *Daynard*, 290 F.3d at 55-56 (1st Cir. 2002). Defendant RUL looks to Vermont law to argue that when evaluating whether actions by an individual can be imputed to a corporate entity, courts must assess whether the actions are within the scope of the person's employment, and actions that cannot "properly be seen as intending to advance the employer's interests" are outside the scope of employment. *Doe v. Forrest*, 853 A.2d 48, 55 (Vt. 2004).

It contends that since RUL is "not engaged in the business of transporting people or third-party luggage," Zodhiates' actions cannot be imputed to RUL.

Plaintiffs assert that "it appears that RUL's entire staff knew of and supported the effort to interfere with Ms. Jenkins' rights in Vermont and that the staff also were aware of the company's role in those efforts." In addition, they argue that Zodhiates' email stating that he was working for RUL on Liberty Counsel on the day that he aided Lisa Miller in fleeing the country is "contemporaneous evidence …that he was engaged in RUL's work on behalf of Liberty Counsel" at that time. Finally, they argue that since it is "undisputed that RUL's business objective was to raise money to support Liberty Counsel and Lisa Miller's efforts to nullify Ms. Jenkins' parental rights in Vermont," Zodhiates was acting within the scope of those business objectives when he conspired to nullify Jenkins' parental rights and the Vermont orders through "other acts that were outside the law."

Since Zodhiates was RUL's employee during the time in question, there was undoubtedly an agency relationship between Zodhiates and RUL. In general, a principal is liable for an agent's acts if the agent has authority to bind the principle, and an agent's contacts are attributable to the principle if the

actions taken to establish those contacts were within the scope
of the agent's authority. *See Daynard*, 290 F.3d at 55; *Myers*,
238 F.3d 1073. Here, the facts suggest that Zodhiates entered
into an agreement with Miller's counsel to support Miller's
escape, after suggesting this possibility to another Liberty
Counsel employee. The jurisdictional question thus turns on
whether Zodhiates had authority to enter into this agreement.

An agent's authority to act for a principle may be actual or
apparent. Apparent authority relies on a showing that the person
engaging with the agent believed that the agent was acting on
behalf of the principle. *Myers*, 238 F.3d at 1073. The evidence
set forth by Plaintiffs suggests that Liberty Counsel understood
that Zodhiates was acting on behalf of RUL when he was engaged
with Liberty Counsel on the lawful fundraising effort. However,
Plaintiffs have not alleged facts to show that Lindevaldsen or
Staver believed that Zodhiates was acting on behalf of RUL when
he agreed to support Miller in her efforts to flee the country.
Therefore, they have not shown that Zodhiates had apparent
authority to undertake the tortious acts which formed the basis
of the jurisdictional finding over him.

Alternatively, an agent's actions may be imputed to the
principle if he has actual authority, which may be either
express or implied. *City of Burlington*, 135 F. Supp. 2d 458.

"Implied authority is actual authority circumstantially proven
from the facts and circumstances attending the transaction in
question. Such authority may be implied or inferred from the
words used, from customs and from the relations of the parties."
*Id.* (internal quotations omitted). In this case, RUL and Liberty
Counsel had previously entered into an agreement to support
Miller's legal claims in opposition to the Vermont court's
orders. Although this agreement was not, on its face, intended
to support Miller's unlawful failure to comply with the court
orders, the general purpose was to support her position in the
litigation. As part of that relationship, Zodhiates regularly
communicated with Sidebottom about matters related to Miller on
behalf of RUL. This pattern of communication leads to the
inference that Zodhiates had implied actual authority to act on
RUL's behalf when he again emailed Sidebottom about the
possibility of an alternative option. In addition, Zodhiates'
emails to RUL employees saying that he was working from home on
Liberty Counsel when he drove Miller and Miller-Jenkins to the
border, and the employees' apparent understanding that this
could mean that Zodhiates was working on the Miller case, also
constitutes circumstantial evidence that RUL impliedly
authorized Zodhiates to act on its behalf in regard to this
matter.[9]

---

[9] Even if this Court were to apply the Vermont common law

In addition, numerous courts of appeals have held that an agent's actions may be attributed to the principle for purposes of personal jurisdiction where the principle later ratifies this conduct. *Stolle Machinery Co., LLC v. RAM Precision Industries*, 605 Fed. Appx. 473, 481 (6th Cir. 2015); *Daynard*, 290 F.3d at 55-60 (citing *Myers*, 238 F.3d at 1073; *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.,* 65 F.3d 1427, 1433 (8th Cir.1995)). However, the RUL employees' receipt of Zodhiates' email and apparent failure to challenge him on his work for "Liberty Counsel from home" is unlikely to constitute ratification.  It is not clear that the RUL employees effectively accepted Zodhiates' acts, because Plaintiffs have not shown that Zodhiates ever made clear to them exactly what he was doing when he was working on the Lisa Miller case. *See Wessels, Arnold &* Henderson, 65 F.3d at 1433 ("[A] principal cannot accept the benefits of the agent's unauthorized conduct and then deny liability based on the fact that the conduct was

---

standards for respondeat superior rather than a more general agency analysis, this case is distinguishable from others in which an employee's tortious activity was not considered to be "in furtherance of the [employer's] business". *Lewis v. Bellows Falls Congregation of Jehovah's Witnesses*, 95 F. Supp. 3d 762, 766 (D. Vt. 2015) (quoting *Doe v. Norwich Roman Catholic Diocesan Corp.,* 268 F.Supp.2d 139, 142 (D.Conn.2003)). While the agreement between RUL and Liberty Counsel does not itself evidence an intent to perform unlawful acts to that effect, Zodhiates' actions were consistent with RUL's general objective of preventing Jenkins' contact with her daughter.

unauthorized" for purposes of establishing jurisdictional contacts); *Daynard*, 290 F.3d at 57 ("The sole requirement for ratification is a manifestation of assent or other conduct indicative of consent by the principal") (internal quotation omitted). Moreover, the employees took no action to support or follow through on Zodhiates' efforts, or otherwise indicate through their conduct that they were assenting to Zodhiates' unlawful activities.

In short, Zodhiates' contacts with Vermont can be imputed to RUL because Zodhiates had implied actual authority to act on RUL's behalf in suggesting the unlawful "option" for Miller to a Liberty Counsel employee, in allegedly communicating with Lindevaldsen to coordinate Miller's departure and to support her once she was abroad. Since the Court has already found that Zodhiates had sufficient jurisdictional contacts because he engaged in similarly wrongful conduct, RUL also has the necessary minimum contacts to establish personal jurisdiction.

7. *Reasonableness*

Having found that sufficient minimum contacts exist to justify the exercise of specific personal jurisdiction over the relevant Defendants, the Court must determine whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice." *Metro. Life Ins.,* 84 F.3d at 568

(quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)). This inquiry requires courts to "evaluate the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985) (citing *World-Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S. 286, 292 (1980)). The reasonableness and minimum contacts inquiries are interrelated: "depending upon the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry." *Metro. Life Ins.,* 84 F.3d at 568. That is, "an especially strong showing of reasonableness may serve to fortify a borderline showing of minimum contacts." *Id.* at 560 (quoting *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994)); *see also Burger King Corp.*, 471 U.S. at 477 ("These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required.").

This Court has already found that Defendants Kenneth Miller, Zodhiates, Hyden and Linda Wall have not shown a compelling case that jurisdiction in this forum is unreasonable. Applying the same rationale articulated by the Court in that decision, the Court now finds that exercising jurisdiction over Defendants Lindevaldsen, Staver, Liberty University, Liberty Counsel and RUL would be similarly reasonable. To be sure, Lindevaldsen and Staver would suffer some difficulty in defending this suit in Vermont instead of their home states. However, since both attorneys have represented a client in this state before, the difficulty posed by the forum appears readily surmountable. Similarly, Liberty University and Liberty Counsel, while burdened somewhat by this choice of forum, have previously permitted their agents and employees to act on their behalf in this state. RUL's difficulty, like that of Zodhiates, is admittedly somewhat more cumbersome. However, this difficulty must be balanced against Plaintiffs' interest in obtaining convenient and effective relief, which will best be served by maintaining this suit in their chosen forum. In addition, Vermont has a strong interest in adjudicating claims involving a clear disregard for its own courts' orders, particularly those concerning fundamental rights which have recently been upheld by the Supreme Court on constitutional grounds. The Supreme Court's decision in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) also

accentuates the states' shared interest in furthering the
substantive social policy of protecting the rights of parents in
same-sex relationships. This factor weighs in favor of
permitting the matter to proceed in Vermont, where the court
orders regarding Jenkins' parental rights were issued. In short,
the factors to be evaluated at this stage largely weigh in favor
of finding personal jurisdiction against all Defendants. To the
extent that the showing of minimum contacts by the
organizational Defendants is considered to be weaker because of
their indirect nature, this "especially strong showing of
reasonableness" strengthens the Court's exercise of personal
jurisdiction. *See Metro. Life Ins.,* 84 F.3d at 560.

**CONCLUSION**

For the foregoing reasons, the Court **grants** the Plaintiffs'
motion to amend the complaint so as to join Lindevaldsen,
Staver, Liberty Counsel and Liberty University. ECF No. 204.
Similarly, the Court holds that it has personal jurisdiction
over RUL, and therefore **denies** Defendant RUL's prior motion to
dismiss on that ground. ECF No. 57. Finally, the Court **grants**
the Plaintiffs' motion to lift the stay of this civil case, and
orders that the stay be lifted on March 23, 2017 or on the date
of Zodhiates' sentencing, whichever is later. ECF No. 204.
Moreover, the Court notes that nothing in this order is intended

to prevent Zodhiates or other Defendants from asserting their

Fifth Amendment rights in this civil proceeding.

Dated at Burlington, in the District of Vermont, this 20th

day of March, 2017.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge