| | | |
|---|---|---|
| JANET JENKINS, for herself and as next friend of ISABELLA MILLER-JENKINS, a/k/a ISABELLA MILLER | : : : : | |
| Plaintiffs, | : : | |
| v. | : : | Case No. 2:12-cv-184 |
| KENNETH L. MILLER, LISA ANN MILLER f/k/a LISA MILLER-JENKINS, TIMOTHY D. MILLER, RESPONSE UNLIMITED, INC. for itself and as an agent of LIBERTY COUNSEL, LLC and LIBERTY UNIVERSITY, PHILIP ZODHIATES, individually and as an agent for RESPONSE UNLIMITED, INC., VICTORIA HYDEN, f/k/a VICTORIA ZODHIATES, individually and as an Agent for RESPONSE UNLIMITED, INC., And LIBERTY UNIVERSITY, LINDA M. WALL, RENA M. LINDEVALDSEN, Individually and as an agent of LIBERTY COUNSEL, LLC AND LIBERTY UNIVERSITY, MATHEW D. STAVER, Individually and as an agent of LIBERTY COUNSEL, LLC AND LIBERTY UNIVERSITY, LIBERTY COUNSEL, LLC, AND LIBERTY UNIVERSITY | : : : : : : : : : : : : : : : : : : : : : | |
| Defendants. | : : | |

## OPINION AND ORDER

### I.    Background

Plaintiff Janet Jenkins ("Jenkins"), for herself and as

next friend of her daughter Isabella Miller-Jenkins

("Isabella"), brings this action against individuals and organizations that she alleges conspired with her former same-sex partner, Lisa Miller ("Miller") to kidnap and transport her daughter outside of the United States. After Philip Zodhiates, a Defendant in this civil case, was indicted in the Western District of New York on the basis of facts closely related to the claims at issue here, this Court granted Defendants' motion to stay this civil case pending the resolution of that criminal proceeding. ECF 192. On March 20, 2017, after Zodhiates was tried and convicted, the Court issued an order granting Plaintiffs' motion to lift the stay of the civil case on the date of Zodhiates' sentencing or March 23, 2017, whichever occurred later. ECF 220. Zodhiates was sentenced at a hearing on March 22, 2017, and judgment was entered in his criminal case the following day. *See United States v. Philip Zodhiates*, Case No. 1:14-cr-175-rja-jjm, ECF 183. Plaintiffs filed a revised second amended complaint ("amended complaint") in this case on May 4, 2017, bringing two claims against all Defendants. ECF 223.

Count One of Plaintiffs' complaint, entitled "intentional tort of kidnapping," alleges that Lisa Miller intentionally kidnapped Isabella in order to interfere with Jenkins' lawful custody of her between the dates of September 25, 2009 and September 27, 2009. In addition, Plaintiffs allege in that count

that Miller held Isabella in Nicaragua to interfere with Jenkins' lawful custody of Isabella between January 1, 2010 and the present, and to thwart the equal protection afforded Plaintiffs under Vermont law. Finally, Count One alleges that Miller conspired with, and was aided and abetted by, Philip Zodhiates ("Zodhiates") and Victoria Hyden ("Hyden"),[1] both individually and as agents or officers of Response Unlimited, Inc. ("RUL"), as well as RUL, Liberty Counsel, LLC, Liberty University, Kenneth Miller, Timothy Miller, Linda Wall ("Wall"), and (both individually and as agents of both Liberty University and Liberty Counsel) Rena Lindevaldsen ("Lindevaldsen") and Mathew Staver ("Staver").

Count Two of the complaint, entitled "Conspiracy to Violate Civil Rights," alleges that Lisa Miller conspired with Liberty University, Liberty Counsel, RUL, Zodhiates, individually and as an agent or officer of RUL, Hyden, individually and as an agent or officer of RUL and Liberty University, Kenneth Miller, Timothy Miller, Wall, Lindevaldsen and Staver, individually and as agents of Liberty Counsel and Liberty University, to violate Plaintiffs' civil rights based on discriminatory animus against same-sex couples and against Jenkins due to sexual orientation,

---

[1] Victoria Hyden, Zodhiates' daughter, was formerly known as Victoria Zodhiates. The complaint refers to her by both names interchangeably. The Court will refer to her as Hyden and to her father as Zodhiates throughout this order.

to prevent the courts of Vermont and Virginia from securing to
them equal protection of the law, and to prevent or hinder state
authorities from securing equal protection of the law to same-
sex couples. Plaintiffs seek damages for Jenkins' alleged
extreme emotional distress and loss of her daughter's
companionship, legal fees and lost business resulting from the
obligations that arose in pursuing a legal remedy for the loss
of her daughter. They also seek damages for Isabella's emotional
distress arising from her abduction, her loss of emotional and
financial support from her mother, as well as the loss of child
support payments, educational, medical and dental care, and the
support of her extended family, all of which is alleged to
result in an injury to Isabella's property and future business
and employment.

Defendants Wall, as well as Liberty Counsel, Staver and
Lindevaldsen, subsequently filed two, separate special motions
to strike Plaintiffs' claims on the basis of 12 V.S.A. § 1041,
Vermont's "anti-SLAPP" statute. ECF 239, 243.[2] In addition, Wall,
Liberty Counsel, Staver and Lindevaldsen, Liberty University,
and Zodhiates, Hyden and RUL filed four, separate motions to

---

[2] That statute creates a mechanism whereby individuals who are sued for
conduct "arising from [their] exercise, in connection with a public issue, of
the right to freedom of speech or to petition the government for redress of
grievances under the U.S. or Vermont Constitution" may bring an early motion
to strike that action. These types of lawsuits have been labeled "strategic
lawsuits against public participation," or "SLAPP."

dismiss Plaintiffs' amended complaint. ECF 227, 228, 237, 238,
240, 242. Defendants assert that Plaintiffs' amended complaint
fails because: (1) this Court lacks personal jurisdiction over
some or all of them, (2) venue is improper in Vermont; (3) the
complaint fails to state a claim upon which relief can be
granted, since Plaintiffs have not sufficiently pled the
elements of a claim for custodial interference, conspiracy or
aiding and abetting under Vermont law, the elements of a Section
1985 conspiracy claim or, where relevant, facts establishing
vicarious liability; (4) as applied to some Defendants in this
case, Section 1985 violates the First Amendment of the U.S.
Constitution; and (5) Plaintiffs' claims against some Defendants
are time-barred by the relevant statutes of limitation. *Id.* For
the foregoing reasons, the Court grants Defendants' motions only
with respect to Isabella's claim under Count One, Liberty
University's vicarious liability under both counts for Staver's
acts, and for lack of personal jurisdiction over Staver. The
Court otherwise denies Defendants' motions to dismiss and
motions to strike.

## II.  Factual allegations

*i.  Allegations in the amended complaint*

Isabella Miller-Jenkins is the daughter of Lisa Miller and
Janet Jenkins. Although Lisa Miller moved to Virginia with

5

Isabella when she was seventeen months old, courts in Virginia and Vermont ruled that the family court of Rutland, Vermont has exclusive and continuing jurisdiction over custody determinations regarding Isabella. After petitioning for the dissolution of her civil union with Jenkins in 2004, Miller "asserted the belief that homosexuality was sinful and that Isabella should be shielded from exposure to the 'lifestyle.'" ECF 223, p. 4. She began to deny court-ordered parent-child contact between Isabella and Jenkins in 2004, and was found in contempt that year. In 2004, Lisa Miller was accepted for representation by "lawyers working at Liberty University and its related law firm, Liberty Counsel, LLC." *Id.* at 5.

In 2007, the Rutland family court awarded Lisa Miller legal and physical parental rights and responsibilities over Isabella, and ordered that Jenkins be entitled to custody during holidays, vacations and some weekends. Lisa Miller initially complied with these orders in 2007. However, in 2008, after Virginia and Vermont courts affirmed Jenkins' parental rights, she defied the visitation orders and began to threaten future acts of custodial interference. By June 2008, Lisa Miller "decided and agreed" with her friend Linda Wall, a member of her church, that she should flee with Isabella. In May of 2009, Jenkins filed a Motion to Modify Parental Rights and Responsibilities in the

Vermont family court, requesting that the court transfer custody of Isabella to her due to Lisa's continued interference with court ordered visitation. By late summer of 2009, Lisa Miller and her "co-conspirators had devised a plan to kidnap Isabella and avoid detection by infiltrating the Beachy Amish-Mennonite Christian Brotherhood ("Brotherhood") to enable her abduction of Isabella." *Id.* at 6. On September 4, 2009, after Lisa Miller was held in contempt of the Vermont court's orders by a Virginia court, the Vermont family court issued an interim order requiring contact between Jenkins and Isabella from September 25 to 27 of that year. On September 21, 2009, however, Philip Zodhiates and at least one other RUL employee transported Lisa Miller and Isabella to the Canadian border. The day before, Zodhiates and his daughter had communicated with Lisa's father to assist in arranging for her transportation. Disguised as Amish-Mennonites, Miller and her daughter crossed the border at the Rainbow Bridge in a taxi on September 22, 2009. There, at Kenneth Miller's request, a member of the Brotherhood transported Lisa Miller and Isabella to the Toronto airport, where they boarded a flight to Nicaragua.

Timothy Miller, another member of the Brotherhood who had purchased Lisa and Isabella's plane tickets, met Lisa and her child in Nicaragua. Isabella and Lisa Miller lived among the

Beachy Amish-Mennonite community in Nicaragua thereafter in order to avoid detection by United States authorities. In November of 2009, Rena Lindevaldsen and Linda Wall packed up Lisa Miller's personal belongings in two bags. Zodhiates picked these up and arranged to send them to Nicaragua through his son's school teacher, who was traveling there and who delivered the bags to Timothy Miller. Victoria Hyden also facilitated Lisa Miller's communication with Rena Lindevaldsen after that point "in an attempt to help her duck service of contempt and enforcement pleadings filed by Janet Jenkins." *Id.* at 8.

Needless to say, Lisa Miller did not return Isabella for the court-ordered visitation between September 25 and 27, 2009. On November 20, 2009, the Vermont family court issued an order transferring legal and physical parental rights and responsibilities for Isabella to Jenkins beginning on January 1, 2010. When Jenkins arranged for a welfare check in December of that year, police found that nobody was home. Jenkins informed the Vermont family court that Lisa Miller seemed to be missing on December 18, 2009.

The amended complaint alleges that certain defendants took action to assist Lisa Miller even after she left the country. For example, on the day that the Vermont court ordered a transfer of custody, Kenneth Miller called Lisa Miller's pastor

in Virginia to seek assistance in disposing of Lisa Miller's belongings. Moreover, since December 2009, Staver and Lindevaldsen have maintained that they did not know of their client's location after she allegedly stopped communicating with them and disappeared, making representations to this effect to courts in Vermont and Virginia. The amended complaint asserts that these statements were "demonstrably false" and that the lawyers "misled courts in two states to delay contempt proceedings aimed at locating Isabella." *Id.* at 10-11. The pleading also states that Staver and Lindevaldsen "knew the identities of certain co-conspirators and solicited donations and retrieved items to support the crime." *Id.* at 11. Furthermore, in 2010, Zodhiates allegedly transferred cash through Kenneth Miller to Andrew Yoder, who would in turn deliver it to Timothy Miller. Likewise, Wall sought donations for Lisa Miller after January 2010. Finally, Lisa Miller received additional assistance, including employment, from Timothy Miller since she began living with the Brotherhood in 2009.

In addition to this course of events, the amended complaint alleges facts tending to show that the co-defendants in this case agreed with and supported Lisa Miller's conduct, as well as the ethical and religious motivations behind her decisions. As

noted above, the complaint makes conclusory statements that "Wall and Lisa Miller decided and agreed as early as June of 2008 that Lisa Miller should flee with Isabella," and that "Lisa Miller and her co-conspirators had devised a plan to kidnap Isabella and avoid detection by infiltrating the Beachy Amish-Mennonite Christian Brotherhood ... to enable her abduction of Isabella." *Id.* at 5-6. Moreover, Lindevaldsen allegedly wrote a book about Lisa Miller's legal battle, which was required reading for Liberty University School of Law's incoming students. Staver and Lindevaldsen held press conferences with Lisa after the Virginia court held her in contempt and fined her for missed contact between Jenkins and Isabella. Wall organized a coalition with an online social media presence to endorse Lisa's objectives and provide support for her cause both before and after she left the United States. Wall endorsed Miller's decision to flee with Isabella on television in 2010, and suggested that she would take similar actions with regard to other children from same-sex families. She also instructed law enforcement via phone that they should not search for Lisa Miller, and advised the public on Facebook that they should not disclose Lisa and Isabella's whereabouts if they found them. Finally, the complaint alleges that Lisa Miller stated in the months following her flight to Nicaragua that Liberty Counsel

had advised her that it would be in her best interests to
disappear.

*ii. Factual representations in Defendants' affidavits*

Defendants Lindevaldsen, Staver and Liberty Counsel's
motion to strike makes extensive cross-references to the
arguments raised in their motions to dismiss, which in turn rely
on factual representations set forth in these defendants'
affidavits. ECF 238-1. Likewise, Defendant Wall's motion to
strike references publically available, online sources to
further detail the nature of Wall's advocacy for Lisa Miller, as
well as her own affidavit.

In her affidavit, Wall denied ever telling or suggesting to
Lisa Miller that she disobey any court orders, or that Lisa
Miller ever told her that she was intending to or would leave
the United States in order to avoid enforcement of court orders.
ECF 109-1. Instead, Wall represented that she solicited
donations during the 2008-2009 school year to help Lisa Miller
"defray her travel costs to Vermont related to child custody
issues concerning Isabella." *Id.* at 3. However, Wall stated that
she has not communicated with Lisa Miller since September of
2009, and that she has not asked people to donate money to Lisa
Miller subsequent to June 2009. *Id.* Nor, according to Wall, did
she herself give or ask others to give money or anything else of

value to Lisa Miller for the purpose of aiding Lisa Miller to leave the United States. Likewise, Wall asserts that she has not given money or anything of value to anyone other than Lisa Miller for the benefit of Lisa or Isabella since the two left the United States.

In addition, Wall denied any associations with the Thomas Road Baptist Church in Lynchburg, Virginia alleged in the complaint, and denied knowing or having contact with Timothy Miller, Andrew Yoder, Philip Zodhiates, or Victoria Hyden. She denied knowing or communicating with Kenneth Miller, except to send him a card of encouragement when he was in jail in Vermont awaiting trial on criminal charges. Finally, Wall stated that she was never the administrator or webmaster of the Protect Isabella Coalition website and never added content to that website.

Lindevaldsen denied many facts asserted in the amended complaint in her affidavits. ECF 213-2, 54-5. In particular, Lindevaldsen stated that she never encouraged Lisa Miller or any of the other named defendants to not allow Isabella to have contact with Janet Jenkins, and that she never counseled Lisa Miller to disobey court orders or to flee from the state, the country or beyond the reach of any court or law enforcement. Nor did she have knowledge of anyone else that counseled, encouraged

or assisted her in fleeing, or have prior knowledge that Lisa Miller would flee. Rather, according to Lindevaldsen, Lisa Miller stopped all communication with her in September 2009. Lindevaldsen also denied receiving any email from Victoria Hyden or discussing Lisa Miller with Hyden. Likewise, she asserted that she did not receive a call from Zodhiates on September 22, 2009, after he allegedly drove Lisa Miller and Isabella to the Canadian border, or speak to him about the legality of removing Isabella from the country. Finally, Lindevaldsen denied speaking with Wall by telephone on November 12, 2009 about removing Lisa Miller's belongings from her apartment, and represented that she never visited Lisa Miller's apartment and never packed up her personal belongings in November 2009 or at any other time.

Similarly, Staver submitted an affidavit denying most of the facts concerning his involvement in Isabella's alleged kidnapping in the amended complaint. ECF 213-1. Staver asserted that he had no prior knowledge of Lisa Miller's intent or plan to leave the country or knowledge of anyone who may have assisted or participated in her departure, and that he did not counsel or suggest to Lisa Miller or others that she should "disappear." Rather, he asserted that he always counseled her to obey all court orders. In this sense, he argued that he never "misled courts" to "delay contempt proceedings aimed at locating

Isabella," as the amended complaint states. Staver stated that he was not aware of any email or other communication in which Zodhiates mentioned a "personal option" for Lisa Miller to Mr. Sidebottom, who was then employed by Liberty Counsel. He also represented that he never received a call from Zodhiates or anyone associated with him on September 22, 2009, and that he does not know of anyone who received such a call. Nor did he ever discuss disobeying any court order or the legality of removing Isabella from the country with Zodhiates. Finally, he denies ever having any communications with Victoria Hyden regarding Lisa Miller or anything relating to her.

### III. Standard of Review

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679.

Defendants in this case have challenged the facts alleged in the amended complaint through signed affidavits. Although these may be considered for purposes of a motion to strike and motions to dismiss pursuant to other provisions of Rule 12 of the Federal Rules of Civil Procedure, the Court may not consider them for purposes of Defendants' motions to dismiss for failure to state a claim. *See* 12 V.S.A. § 1041 (for purposes of a motion to strike, "the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based."); *Seemann v. U.S. Postal Serv.*, No. 2:11-CV-206, 2012 WL 1999847, at *1 (D. Vt. June 4, 2012) ("In deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), however, the Court **may** resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits.") (emphasis in original) (citation omitted); *Orkins v. Dumas*, No. 1:09-CV-00237-JGM, 2010 WL 4063167, at *1 (D. Vt. Oct. 15, 2010) ("When deciding a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court's function is not to weigh the evidence that might be presented at trial but merely to determine whether the [pleading] itself is legally sufficient.") (internal citation omitted).

However, "a pleading that offers labels and conclusions or
a formulaic recitation of the elements of a cause of action will
not do." *Iqbal*, 566 U.S. at 678 (internal quotation omitted).
Thus, in considering a motion to dismiss, a court may proceed by
first "identifying pleadings that, because they are no more than
conclusions, are not entitled to the assumption of truth," and
then determining whether the remaining, well-pleaded factual
allegations, would plausibly give rise to an entitlement to
relief. *Id.*[3]

## IV. Discussion

**A.    Motion to Dismiss Count One**

*i.    Introduction*

In three separate motions, Defendants Zodhiates, Hyden and
RUL, Linda Wall, and Liberty Counsel, Staver and Lindevaldsen
(hereinafter "Liberty Counsel Defendants," because of their
joint motion) move to dismiss Count One of Plaintiffs' amended
complaint, which alleges "the intentional tort of kidnapping,"
as well as conspiracy and aiding and abetting in the tort. This
Court previously addressed the validity of the same claim,
concluding that although the Vermont Supreme Court had not yet

---

[3] "In considering a motion to dismiss for failure to state a claim pursuant to
Rule 12(b)(6), a district court may consider the facts alleged in the
complaint, documents attached to the complaint as exhibits, and documents
incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104, 111 (2d Cir. 2010) (internal quotation omitted).

had occasion to determine whether an intentional tort of
kidnapping would be recognized in the state, that court would
likely agree that a claim of custodial interference consistent
with Section 700 of the Restatement (Second) of Torts would be
viable here.

As with their other challenges, Defendants' arguments
against Plaintiffs' kidnapping count overlap. First, Defendants
Liberty Counsel, Staver and Lindevaldsen contend that "this
Court's previous prediction that Vermont courts would adopt a
Section 700 claim was and remains incorrect." ECF 240, p. 80.
Linda Wall sets forth a similar argument, alleging that "at a
minimum, given the uncertainty of Vermont's willingness to
recognize such a cause of action, this Court should certify the
question to the Vermont Supreme Court rather than hastily
prognosticate its validity." ECF 242-1, p. 4. Next, the Liberty
Counsel Defendants argue that even if such a claim existed,
Jenkins cannot bring that claim against a custodial parent with
superior custodial rights, and as such cannot recover for
conduct occurring prior to January 1, 2010. They contend that
Jenkins failed to plead that any of them engaged in wrongful
conduct after that time, an omission which they claim
"irreparably destroys her custodial interference claim against
these defendants." ECF 240, p. 90. Wall sets forth an identical

argument, citing her own affidavit for the notion that she, also, was innocent of wrongful conduct occurring after January 1, 2010. Zodhiates, Hyden and RUL reiterate this argument in their motion, although they do not limit their assertion in time.

Moreover, Wall argues that Jenkins' kidnapping claim on behalf of Isabella fails because that action would attach only to a parent, not a minor child. Likewise, the Liberty Counsel Defendants contend that Isabella has no standing to pursue a custodial interference claim.

In addition, Defendants assert that the pleadings fail to sufficiently satisfy the elements of conspiracy or aiding and abetting, independently of whether Plaintiffs could make out a claim for custodial interference. Zodhiates, Hyden and RUL argue that while this Court previously determined that Plaintiffs could raise a claim for custodial interference under Vermont law, it "did not address the issue of whether it was possible to have a conspiracy to interfere with custodial rights." ECF 227, p. 10. They contend that such a claim, to the extent it exists in Vermont, requires Defendants to have done something causing damage to Plaintiffs which is "unlawful in itself," and that, since Lisa Miller's actions were not unlawful, the conspiracy claim cannot stand. ECF 227, p. 10. The Liberty Counsel

Defendants make the same argument as applied to their own conduct, and also assert that Jenkins has failed to plead the existence of an agreement that involves them. Finally, they argue that Jenkins has failed to state a claim for aiding and abetting, because she failed to plead that (1) these Defendants committed any tortious act as part of a common design or agreement; (2) they knew of Lisa Miller's alleged actions or provided substantial assistance to Lisa Miller for her alleged actions; and (3) these Defendants' actions separately constituted tortious activity. The Court will address each of these arguments in turn.

*ii. Analysis*

1. *Existence of custodial interference claim*

In ruling upon the validity of Plaintiffs' kidnapping claim in October of 2013, this Court previously stated that "it has long been the law in Vermont ... that a parent may maintain an action for wrongful interference with 'the custody, control, and services of [a] minor child.'" *See* ECF 115, p. 40-41 (citing *Biondi v. Haselton,* 134 A. 606 (Vt. 1926); *Schuppin v. Unification Church*, 435 F. Supp. 603, 608 (D. Vt. 1977)). In this sense, the Court found that Section 700 of the Restatement merely tracked settled Vermont law, and predicted that the

Vermont Supreme Court would agree were it presented with the same question.

To challenge the continued validity of this holding, Liberty Counsel Defendants point to three out-of-state cases in which other states' courts declined to recognize a custodial interference claim. *See* ECF 240, pp. 81-83 (citing *Zaharias v. Gammill*, 844 P.2d 137 (Okl. 1992); *Larson v. Dunn*, 460 N.W.2d 39 (Minn. 1990); *Whitehorse v. Critchfield*, 494 N.E.2d 743 (Ill. App. Ct. 1986)). In each of these cases, state courts highlighted the need to reduce litigation between parents with unequal custody over their children in order to protect those children's best interests. Defendants argue that since Vermont law also recognizes that "the best interest of the children should be paramount," and have noted that hostile custody battles could harm children, "it is more likely that Vermont Courts would reject creation of such a new tort based on the same premises as Illinois, Minnesota and Oklahoma." *Id.* at 84. However, Defendants' argument ignores the line of state court decisions that have adopted the tort by pointing to the very same policy considerations as those that were upheld in *Zaharias, Larson* and *Whitehorse*. For example, in the more recent case of *Stone v. Wall*, 734 So. 2d 1038, 1046-47 (Fla. 1999), the Florida Supreme Court examined the best interests of the child

as a competing policy consideration, ultimately holding that
this factor weighed in favor of recognizing the tort. The Court
found that "[i]t is obviously in the best interests of children
to be returned promptly to their legal custodians," and that
child kidnapping "has the potential for causing far greater harm
to the children than litigation." *Id.* Given the directly
opposite interpretations of how the best interest of the child
standard would weigh on this determination, the mere fact that
Vermont has upheld this standard in other contexts does not in
itself counsel against recognizing the tort of interference with
parental rights.

Next, Defendants also argue that Vermont's recognition of
certain causes of action for custodial parents in these
circumstances militates against the expansion of that legal
arsenal. As in other states, Vermont's criminal statutes
proscribe kidnapping and custodial interference. *See* 13 V.S.A.
§§ 2405; 2451. The existence of alternative legal remedies,
however, could weigh either against or in favor of recognizing
the tort. In the three cases Defendants point to, state courts
took note of alternative remedies, both civil and criminal,
which might be available to parents in these circumstances as
reason not to adopt the tort. *See Zaharias v. Gammill,* 844 P.2d
at 138-140 (noting that "Oklahoma already recognizes a cause of

action in the parent or legal guardian of a child for the abduction or enticement of that child," and thus that "the tort of interference with custodial relations would not enhance the scheme of family law in Oklahoma."); *Larson v. Dunn*, 460 N.W.2d at 46 (Minn. 1990) ("The law in Minnesota already provides redress for a custodial parent in such a situation.").

However, other states have embraced a contrary logic. In *Stone v. Wall*, for example, the Supreme Court of Florida reasoned that since the tort of intentional interference did not conflict with alternative legal remedies, such remedies did not preclude the court from recognizing the tort. *See Stone v. Wall*, 734 So.2d at 1044-1045. Similarly, in *Kessel v. Leavitt*, the Supreme Court of West Virginia found that the criminal proscription against interfering with custodial rights provided a rationale to recognize that tort, implying that the criminal provision embodied an expression of the state's public policy against such conduct. 511 S.E.2d 720, 764 (W. Va. 1998) (citing *In D & D Fuller CATV Construction, Inc. v. Pace*, 780 P.2d 520 (Colo. 1989) (en banc) as an example of a state basing its adoption of the tort of interference with parental or custodial relationships, in part, upon the fact that it had also criminalized custodial interference). Thus, while under one line of cases the criminal proscription of this conduct in Vermont

would undercut the need to create a separate civil cause of action, another line of jurisprudence suggests that the criminal provisions create policy rationale for the interference tort. In short, the relevance of alternative legal remedies, if any, is far from clear-cut. As such, the Court finds no reason to alter its prior conclusion on this question.

In addition, Wall requests that, should the Court decline to find that no such tort exists in the state of Vermont, it should at least certify this question to the Vermont Supreme Court. She points out that the Supreme Court *may* answer a question of Vermont law certified to it by a federal court if the answer might determine an issue in pending litigation and there is no clear and controlling Vermont precedent. *See* Vt. R. App. 14. Although that is the standard the Vermont Supreme Court would deploy to determine whether it would accept the request to answer a question certified to it, this Court's decision to certify in the first place is guided by Second Circuit precedent. In *State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 505 (2d Cir. 2004), the court explained that it has "deemed certification appropriate where state law is not clear and state courts have had little opportunity to interpret it, where an unsettled question of state law raises important issues of public policy, where the question is likely to recur, and

where the result may significantly impact a highly regulated industry." Here, a significant number of state courts have interpreted this question, and the tort draws on common law roots that have been recognized in this state for some time. *See Stone v. Wall*, 734 So. 2d 1038, 1041–43 (Fla. 1999) (noting that the tort "has its roots in English common law, descended from a writ giving the father an action for the abduction of his heir," and that the "majority of states considering the question have recognized a cause of action for intentional interference with the custodial parent-child relationship."); *Wood v.* Wood, 338 N.W. 123, 124–25 (Iowa 1983) (en banc) ("The claim for interference with custody rights appears to have been recognized in every jurisdiction which has addressed the issue."); *Bioni v. Haselton,* 134 A. 606, 607 (Vt. 1926) (treating custody of a child as a form of property right). Moreover, while the tort certainly raises an important issue, the public policy of the state of Vermont on this matter has been expressed through its criminal statutes. Finally, although custody conflicts are common, the particular facts of this case are rare and egregious. Thus, the question of whether a tort remedy would apply to circumstances such as these is unlikely to recur. In light of these factors, certification is not warranted here. As such, the Court will not disturb its prior holding that tortious

interference with parental rights constitutes a cause of action
cognizable in this state.

2.   *Temporal Scope of Custodial Interference Claim*

Next, Defendants argue that even if the tort is recognized,
Plaintiffs have failed to allege facts that satisfy its elements
in this case. The comments to Section 700 of the Restatement
(Second) of Torts, on which the custodial interference tort is
based, provides that "[w]hen the parents are by law jointly
entitled to the custody and earnings of the child, no action can
be brought against one of the parents who abducts or induces the
child to leave the other." Restatement (Second) of Torts § 700,
cmt. c. Defendants cite to numerous state court decisions from
outside of Vermont in which parents were required to demonstrate
superior custody rights in order to establish a claim for
tortious interference. *See* ECF 240, pp. 67-69; *see, e.g., Stone*,
734 So.2d at 1042 ("[t]he elements of the cause of action
include that the plaintiff had superior custody rights to the
child and that the defendant intentionally interfered with those
rights."); *Wolf v. Wolf*, 690 N.W.2d 887, 892 (Iowa 2005)
(finding that "primary physical care" was sufficient to

establish superior custody rights within the meaning of Section 700, even where parents had joint legal custody of the child).[4]

Here, Plaintiffs have alleged that Lisa Miller interfered with Jenkins' parental rights on two occasions: between September 25 and 27, 2009, and between January 1, 2010 and the present time. During the first interval, the amended complaint alleges that Jenkins was entitled to contact with Isabella pursuant to an Interim Order issued by the Vermont Family Court on September 4, 2009, while Jenkins' motion to transfer custody was pending. Thus, the contact that Isabella and Jenkins missed on those dates was not part of a regular visitation schedule, but rather a temporary decision made before the Family Court rendered its ultimate custody determination. During the second interval, the amended complaint alleges that Jenkins was entitled to legal and physical parental rights and responsibilities for Isabella.

The Court need not decide, at this stage, whether the Interim Order granting Jenkins contact between September 25 and 27, 2009 is sufficient to establish her superior custody rights

---

[4] However, only two cases cited by Defendants specifically held that interference with a parent's visitation rights was insufficient to establish superior custody rights for purposes of the tort during the time that that parent should have had physical custody of the child. *See Cosner v. Ridinger,* 882 P.2d 1243 (Wyo. 1994); *McGrady v. Rosenbaum*, 62 Misc. 2d 182, 188 (N.Y. Sup. Ct. 1970).

on those dates.[5] Even if the Court were to assume, for the sake

of argument, that Jenkins could not assert a claim of tortious

interference against Lisa Miller for her deprivation of contact

with Isabella in September of 2009, there is no basis to hold

that the remaining defendants' acts cannot have taken place

during this time. Plaintiffs have not alleged a claim of

tortious interference directly against these Defendants, but

rather assert claims of aiding and abetting Lisa Miller in the

commission of that tort and conspiracy to commit that tort.

Thus, so long as Defendants took actions in furtherance of

interfering with Jenkins' parental rights after she was granted

full custody, there is no per se rule requiring the overt acts

or assistance to have taken place during or after the commission

of the actual tort.

In this case, the amended complaint alleges facts

supporting the inference that the Defendants' acts in

furtherance of the abduction of Isabella were undertaken with

the expectation that Jenkins would soon have superior custody

---

[5] Nevertheless, it is worth noting that, where a parent has abducted a child
and removed her from the country so as to prevent the other parent from
having equal contact with the child, some courts have recognized a claim for
interference against a third party who conspires with the parent. *See
Rosefield v. Rosefield*, 34 Cal. Rptr. 479, 482–83 (Ct. App. 1963) ("If,
however, one parent makes away with the offspring, removes it effectually
from judicial control, conceals it, and leaves the other parent utterly
bereft of the means of enjoying any of the privileges of parenthood, it is
folly to say that the decamping parent is merely exercising his 'equal right'
to the custody of the child. There is no equality about it.").

rights over Isabella. In fact, all of the alleged assistance took place after Jenkins filed her Motion to Modify Parental Rights and Responsibilities on May 27, 2009. The plan to "kidnap Isabella and avoid detection by infiltrating the Beachy Amish-Mennonite Christian Brotherhood ... to enable [Lisa Miller's] abduction of Isabella" was allegedly devised thereafter, by the late summer of 2009. ECF 223, p. 6. Additional facts permit the Court to infer that this plan was devised in order to avoid the consequences of Jenkins' pending motion. For example, Zodhiates sent an email implying that he and the Liberty lawyers were aware that Lisa Miller would soon lose custody of Isabella, and Lisa Miller held a press conference when she was fined for contempt of the family court orders along with her conspirators. Thus, the facts alleged sufficiently establish that Defendants participated in a conspiracy, and aided and abetted Lisa Miller, to interfere with Jenkins' superior custody rights after January 1, 2010.

Even if Defendants had only taken acts to deprive Jenkins of her custodial rights while Lisa Miller also had custody of Isabella, the case law Defendants cite does not clearly establish that this conduct would be permissible. First, Defendants' rely on *Marshak v. Marshak*, 629 A.2d 964 (Ct. 1993), in which the Connecticut Supreme Court determined that third

parties who had supported a father in abducting his four
children to a different country while the father and mother had
equal custody over the children could not be held liable for the
tort of child abduction. That conclusion, however, was
subsequently questioned in the context of a criminal case of
child abduction. *See State v. Vakilzaden*, 742 A.2d 767, 771
(1999) ("Quite simply, the legal premise underlying our holding
in *Marshak* was faulty. We were wrong to conclude that a joint
custodian could never, under any scenario, be liable for
custodial interference."). Moreover, in assessing the civil
claim against the third party who assisted the father prior to
his losing custody, the Court in *Marshak* relied on the fact that
no claim for civil conspiracy existed in Connecticut. Thus, "the
cause of action is for damages caused by acts committed pursuant
to a formed conspiracy rather than by the conspiracy itself."
*Marshak*, 628 A.2d at 972 (citing *Cole v. Associated Construction
Co.*, 141 Conn. 49, 54 (1954)). The requirement that the third
party's act have occurred at a time when the abduction would
have been unlawful, therefore, stemmed from the law concerning
civil conspiracies in Connecticut. *Id.* ("Without an independent
basis for finding illegality in the defendant's actions in
allegedly conspiring with and aiding [the father] prior to … the
date of the order awarding custody to the [mother], and in the
absence of a specific finding that the defendant conspired with

or aided [the father] subsequent to that date, the [mother]
cannot prevail on her claim against this defendant."). Thus,
*Marshak* does not provide a basis to require that all of
Defendants' acts in this case have occurred after full custody
was transferred to Jenkins. Nor do Defendants' other references
provide authority for such a claim. *See Finn v. Lipman*, 526 A.2d
1380, 1381-82 (Me. 1987) (holding that no action for tortious
interference lay where third party did not have direct contact
with children, so as to interfere with their father's rights
while serving as an attorney for the children's mother in the
relevant divorce proceeding); *D & D Fuller CATV Const. Inc. v.
Pace*, 780 P.2d 520 (Colo. 1989) (holding that court could
exercise jurisdiction over custodial interference claim against
third parties). Accordingly, the mere fact that some of
Defendants' alleged actions to assist Lisa Miller may have taken
place before January 1, 2010 does not provide a basis for
dismissing Plaintiffs' claim.

3.   *Isabella's claim for kidnapping*

     Next, Defendants also argue that Jenkins' claim as next
friend of Isabella must fail as a matter of law because the
claim for custodial interference attaches only to a parent with
custody. On this question, Defendants are correct. Vermont Rule
of Civil Procedure 17(b) provides that a representative (or a

next friend or guardian ad litem, in the event that no
representative has been appointed) may sue on behalf of an
infant. The real party in interest in these circumstances would
therefore be the infant. *See* Vt. R. Civ. P. 17(a) ("Every action
shall be prosecuted in the name of the real party in
interest."). However, § 700 of the Restatement (Second) of Torts
provides that an individual who interferes with a parent's
custody "is subject to liability to the parent." Since Isabella
was not a parent, and did not have custody, she cannot make out
this claim herself.[6] Accordingly, the Court must dismiss Jenkins'
claim on behalf of Isabella under count one of the amended
complaint.

4.  *Conspiracy*

Aside from challenging the elements of the underlying tort
of interference with Jenkins' custody, which Plaintiffs have
alleged only against Lisa Miller, Defendants also assert that
Jenkins has failed to state a claim for conspiracy against them.
In a non-precedential order issued by a three-judge panel, the
Vermont Supreme Court has called into question whether such a
cause of action should continue to exist in this state. *See*
*Davis v. Vile*, No. 2002-465, 2003 WL 25746021, at *3 (Vt. Mar.

---

[6] Plaintiffs' reference to the Vermont Supreme Court's discussion of the
victims of the crime of custodial interference is unpersuasive, since it does
not address who the real party in interest would be in a civil context.

2003) (deciding whether superior court properly dismissed a civil conspiracy claim by "[a]ssuming that there continues to be an independent cause of action for the tort of civil conspiracy," but collecting cases from other jurisdictions in which civil conspiracy is only considered as a basis for imposing damages rather than a separate cause of action). However, numerous cases from this Court have recognized such a cause of action nonetheless. *See, e.g., Saunders v. Morton*, No. 5:09-CV-125, 2011 WL 1135132, at *9–11 (D. Vt. Feb. 17, 2011); *Mansfield Heliflight, Inc. v. Freestream Aircraft USA, Ltd.*, No. 2:16-CV-28, 2016 WL 7176586, at *15–16 (D. Vt. Dec. 7, 2016); *Dernier v. U.S. Bank Nat'l Ass'n for CSMC Mortg.-Backed Pass-Through Certificates, Series 2006-3*, No. 2:16-CV-000230, 2017 WL 2483799, at *6 (D. Vt. June 8, 2017). Following these decisions, the Court predicts that in certain circumstances, a cause of action for civil conspiracy may be recognized in Vermont.

Under Vermont law, "the crime of conspiracy consists in a combination of two or more persons to effect an illegal purpose, either by legal or illegal means, or to effect a legal purpose by illegal means. For a civil action, the plaintiff must be damaged by something done in furtherance of the agreement, and the thing done must be something unlawful in itself. There can be no recovery unless illegal means were employed." *Akerley v.*

*N. Country Stone, Inc.*, 620 F. Supp. 2d 591, 600 (D. Vt. 2009)

(internal quotations and alterations omitted). Thus, at a

minimum, Defendants must have reached an agreement. In this

case, the amended complaint alleges that this agreement was for

the purpose of interfering with Jenkins' parental rights between

September 25 and 27, 2009 and as of January 1, 2010. In

addition, the act done in furtherance of that end by each

defendant held liable for the conspiracy must be "unlawful in

itself."

Liberty Counsel Defendants first argue that Plaintiffs have

failed to allege the requisite agreement in the amended

complaint. They contend that any allegations of agreement are

vague and conclusory, and do not involve them.[7] However, the

complaint sets forth facts that, taken together, establish that

Defendants agreed to this common goal. For example, paragraph 29

states that RUL "was working in conjunction with the lawyers at

Liberty Counsel to raise funds in support of the effort to

terminate [Jenkins'] contact with her daughter, Isabella," and

states that as part of this work, Zodhiates offered Liberty

Counsel a "personal option" for Lisa Miller in the event that

her legal fight failed. ECF 223, p. 6. The allegation that

Liberty Counsel lawyers were "working in conjunction" with

---

[7] Defendants also include extensive citations to their own affidavits denying
the facts in the complaint. For purposes of determining whether the complaint
fails to state a claim, the Court must ignore those affidavits at this stage.

others to interfere with Jenkins' custody by legal or illegal means would itself suffice to establish the requisite agreement. Moreover, paragraph 34 alleges, in a more conclusive fashion, that by "late summer of 2009, Lisa Miller and her co-conspirators had devised a plan to kidnap Isabella and avoid detection by infiltrating the Beachy Amish-Mennonite Christian Brotherhood ("Brotherhood") to enable her abduction of Isabella." *Id.* Although that paragraph does not clearly delineate who those co-conspirators were, Plaintiffs' later claims make clear that these co-conspirators include the Liberty Counsel Defendants. Given these specific and conclusory factual claims, Plaintiffs have satisfied their burden of alleging agreement with respect to the Liberty Counsel Defendants.

Next, Liberty Counsel Defendants also assert that the conspiracy claim must fail because there is no underlying act liability: that is, no liability for the alleged underlying tort. However, as noted above, Defendants cannot show that Plaintiffs have failed to state an underlying claim for tortious interference.[8] Even if the Court were to construe this challenge as asserting that the means that Defendants employed in furtherance of the agreement were not unlawful, that argument would also fail. Plaintiffs have alleged that Lindevaldsen aided

---

[8] For this reason, Defendants Zodhiates, Hyden and RUL's challenge to the sufficiency of the conspiracy claim must fail as well.

Lisa Miller by packing her belongings after she fled, as part of a scheme to abduct Isabella "in such a way as to avoid detection by United States authorities." *Id.* at 7. They have also alleged that Lindevaldsen and Staver lied to state courts about their knowledge of Isabella and Lisa Miller's whereabouts. Aside from whether these actions could themselves constitute a component of the tort of intentional interference with Jenkins' custody, there is no question that they would also violate other provisions of Vermont law if proven to be true. *See, e.g.,* 13 V.S.A. § 2904 (false swearing). Accordingly, Plaintiffs have pleaded sufficient facts to allege a conspiracy claim against the Liberty Counsel Defendants.

Separately, Wall also asserts that Plaintiffs have failed to state a claim of conspiracy against her. She does not, however, lay out a specific argument as to why the facts alleged in the amended complaint about her conduct fail to meet the elements of that claim. In fact, the amended complaint plainly alleges an agreement, stating that Linda Wall discussed Lisa Miller's plans for preventing Jenkins' contact with Isabella and agreed to support her in fleeing the country with Isabella. It also alleges that Linda Wall raised funds to support the kidnapping and packed Lisa Miller's belongings as part of a scheme to allow Miller to flee without being detected by U.S.

authorities. Given the criminal nature of Lisa Miller and Zodhiates' conduct, the Court has no trouble finding that Wall's conduct constituted an unlawful means in furtherance of that agreement. Accordingly, Plaintiffs have sufficiently pleaded a claim of conspiracy against Wall, as well.

5. *Aiding and abetting*

Finally, Defendants assert that Plaintiffs have failed to state a claim for aiding and abetting. However, Liberty Counsel Defendants identify an incorrect standard to determine whether a party can be held liable for aiding and abetting in the commission of a tort. According to the very case they cite, *Montgomery v. Devoid*, 915 A.2d 270 (Vt. 2006), aiding and abetting another in the commission of a tort requires a plaintiff to show "(1) the existence of a primary violation; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." *Id.* at 278 (citing *Calcutti v. SBU, Inc.,* 273 F.Supp.2d 488, 493 (S.D.N.Y.2003)). "Closely intertwined with the concept of 'substantial assistance' is the principle of proximate cause." *Id.* In that case, the Vermont Supreme Court cited the standard discussed by Defendants, drawing from the Restatement (Second) of Torts § 876, in addressing whether a joint tortfeasor should be held

36

liable for the entirety of harm caused to a plaintiff or only for a portion of it. Thus, the court noted that "[a] person is subject to liability for harm resulting to a third person from the tortious conduct of another if the person: (1) commits a tortious act as part of a common design with the other; (2) gives substantial assistance to the other knowing that the other's conduct is a breach of duty; or (3) gives substantial assistance to the other to accomplish a tortious result while also acting in a manner that is a breach of duty to the third person. " *Id.* at 281 (citing Restatement (Second) of Torts § 876 (1979)).

Regardless of which standard one applies, Defendants' argument in this case is unavailing. Defendants contend that Plaintiffs have failed to plead that they provided substantial assistance to Miller. However, the amended complaint alleges that Defendants made misrepresentations to state courts in order to delay contempt proceedings aimed at locating Isabella. If, as the amended complaint alleges, Liberty Counsel's lawyers in fact knew of Lisa Miller's plan to flee with Isabella, a truthful statement would have likely aided law enforcement in preventing the kidnapping. As such, the misrepresentation constitutes substantial assistance. Moreover, the assistance the lawyers provided by lying about their knowledge of Lisa Miller's

whereabouts was done with knowledge of Lisa Miller's duty to turn over physical custody of Isabella pursuant to the family court's Interim Order, as well as Jenkins' pending motion to transfer custody of Isabella. Moreover, as discussed above, Plaintiffs have alleged that Liberty Counsel lawyers acted pursuant to an agreement to prevent Jenkins' contact with Isabella. Thus, whether one applies the standard in *Calcutti* or the first prong of § 876 of the Restatement (Second) of Torts, Plaintiffs have sufficiently plead a claim for aiding and abetting Lisa Miller's tortious interference with Jenkins' custody. As such, the Court denies Defendants' motions challenging Count One of Plaintiffs' amended complaint for failure to state a claim.

**B. Motions to Dismiss Count Two**

*i. Introduction*

In four separate motions, Defendants also move to dismiss the Plaintiffs' claim of conspiracy to violate civil rights (Count Two) for failure to state a claim. *See* ECF 242, pgs. 5-6; ECF 237, pgs. 15-17; ECF 227, pgs. 11-20; ECF 240, pgs. 100-114. Wall asserts that, as applied to her, Plaintiffs' claim fails to allege facts concerning her state of mind with sufficient specificity, fails to assert that she committed a tort, and fails to sufficiently allege that Defendants acted with the

force required to make out a claim under 42 U.S.C. § 1985. ECF 242, pgs. 5-6. Liberty University claims that this count fails as applied to it because Plaintiffs have failed to allege that the harm they suffered was caused by a policy or custom of the University, and that as such, they cannot be held liable under a theory of vicarious liability. ECF 237, pgs. 15-17. Defendants Zodhiates, Hyden and RUL also argue that Plaintiffs have failed to establish that they acted with such a degree of force as would interfere with the capabilities of state law enforcement, which they contend is required under § 1985. Moreover, they argue that that the Plaintiffs have failed to allege facts that they acted with animus, or even that go to their states of mind.

Finally, these Defendants argue that because sexual orientation and same-sex couples were not a protected class at the time that the events at issue took place, applying § 1985 to penalize their conduct would violate retroactivity norms. Defendants Liberty Counsel, Staver and Lindevaldsen rely on their own affidavits to argue that, as a result, Plaintiffs cannot allege facts that establish a meeting of minds sufficient to support a conspiracy claim. Moreover, they assert that Jenkins cannot prevail on her § 1985 claim because she is not a member of a protected class, since she is not in a same-sex marriage. Likewise, they argue that Jenkins, on behalf of

Isabella, cannot prevail on her § 1985 claim because the complaint does not allege that Defendants acted with discriminatory animus against Isabella, either on the basis of sexual orientation or membership in a same-sex couple. Finally, they argue that since Plaintiffs claim that their equal protection rights have been infringed upon, and since the right to equal protection is protected only against state encroachment, Plaintiffs must allege state action. Having failed to allege participation by the state in the alleged wrongdoing, Defendants contend, Plaintiffs cannot prevail on this claim. The Court reviews these arguments in turn. For the reasons discussed below, Defendants' challenges to Count Two of Plaintiffs' amended complaint are denied.

*ii. Analysis*

Plaintiffs bring Count Two of their amended complaint pursuant to Section 2 of the Civil Rights Act of 1871, also known as the Klu Klux Klan Act. That provision, codified at 42 U.S.C. § 1985(3), permits a civil suit for damages against "two or more persons" who conspire "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State ... from

giving or securing to all persons within such State ... the equal protection of the laws." *Id.* The first section is known as the "deprivation" clause, while the second is known as the "hindrance" clause. *See Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 278–79, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). Plaintiffs bring their claim pursuant to the latter clause.

*1.   Force requirement*

Defendants Zodhiates, Hyden and RUL, along with Linda Wall and Liberty Counsel, Staver and Lindevaldsen by reference argue that Plaintiffs have failed to allege that they acted with the force required under Section 1985. They review the Supreme Court's construction of the Ku Klux Klan Act's legislative history in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 300 (1993) to argue that, in order to be actionable, a conspiracy must entail action "with enough force, of whatever sort, to overwhelm the capacity of legal authority to act evenhandedly in administering the law." Here, these Defendants claim, "the allegations suggest, at best, that some of the Defendants sought to evade law enforcement," but that the law enforcement system was equipped to handle the type of wrongdoing at issue by issuing sanctions. Holding otherwise, they argue,

"will turn routine non-compliance with state custody orders into federal cases." ECF 227, p. 16.

Even if this Court assumes, for the sake of discussion, that *Bray* requires such a showing of force, however, Plaintiffs have not failed to allege it in this case. Contrary to Defendants' suggestion, this is precisely the type of case where the forceful nature of the action at issue –kidnapping of a child and assisting in her physical transportation overseas in order to escape the jurisdiction of state courts- overwhelmed law enforcement capacity.  Moreover, the particular defendants who raised this claim –especially Zodhiates and Hyden –were directly involved in Isabella's removal to Canada and then to Nicaragua. Accordingly, to the extent that § 1985 requires a Plaintiff to allege force, Plaintiffs have clearly done so in this case.

## 2.  *State action requirement*

Defendants Liberty Counsel, Staver and Lindevaldsen also contend that Plaintiffs have failed to allege the requisite state action to support her claim under either the hindrance clause or the deprivation clause of § 1985. In this Court's first order on a number of defendants' motions to dismiss, the Court addressed whether the deprivation clause required state action. *See* ECF 115, p. 64. In particular, the Court noted that

the Supreme Court had recognized only two rights protected
against private as well as official encroachment under the
deprivation clause: the right to be free form involuntary
servitude and the right to interstate travel. ECF 115, p. 65
(citing *Bray*, 506 U.S. at 278). The first of these rights is
clearly not implicated by the facts alleged in this case. And
since Plaintiffs had failed to allege a conspiracy that was
aimed primarily at impeding or preventing the exercise of
interstate travel, the Court found that neither right was
implicated. Accordingly, the Court concluded that Plaintiffs had
failed to state a claim under the deprivation clause of Section
1985. Since Plaintiffs' amended complaint does not now allege
facts to suggest that the purpose of the conspiracy was to
interfere with their right to interstate travel, it does not
substantially alter the facts relevant to this analysis.
Accordingly, if the Plaintiffs had only alleged a claim under
the deprivation clause of § 1985, the § 1985 count would fail.

However, Plaintiffs have brought a claim under the
hindrance clause of § 1985, asserting that the Defendants
conspired "to prevent the courts of Vermont and Virginia from
securing to them the equal protection of the law, and to prevent
or hinder State authorities from securing the equal protection
of the law to same-sex couples." ECF 223, p. 13. In addressing a

hindrance clause claim in its earlier order, this Court declined to decide whether a hindrance clause claim is limited to rights protected only against official encroachment, or whether interfering with state officials necessarily implicates the state action that would be required to make out a hindrance clause claim. Rather, this Court concluded that a claim that private citizens have conspired against a protected class with invidiously discriminatory animus for the purpose of preventing State authorities from securing equal protection of the law states a valid cause of action under either of these standards. *See* ECF 115, p. 69.

Once again, Defendants now challenge this Court's conclusion on that question. The argue that the Supreme Court in *Bray* decided this question to the contrary, and that "the majority of circuits to address this issue have concluded ... that the Hindrance Clause requires state action for rights whose infringement is protected only against official encroachment." ECF 240, p. 128. However, a renewed look at *Bray* and the authorities cited by the parties contrasts bluntly with Defendants' conclusion.

In *Bray*, a majority of the Supreme Court declined to address whether Plaintiffs had established a claim under the "hindrance" clause. *Bray,* 506 U.S. at 279 ("The 'hindrance'-

clause issue is not fairly included within the questions on which petitioners sought certiorari."). Rather, Justice Scalia, writing for the majority, noted that the question of whether a hindrance clause claim would be viable in the context of that case was "far from" an easy one. *Id.* at 281. In dicta, Scalia concluded that, on the facts of that case, the claim would fail "unless the 'hindrance' clause applies to a private conspiracy aimed at the rights that are constitutionally protected only against official (as opposed to private) encroachment." *Id.* at 282-83. Although he expressed disagreement with Justice Souter's analysis of this question in dissent, and with Justice O'Connor's contrary conclusion on the matter without analysis, he did not provide an independent interpretation of whether the hindrance clause would apply in those circumstances. Justice Souter, in contrast, would have resolved that issue in favor of Plaintiffs alleging a private conspiracy aimed at depriving them of their constitutionally-protected rights. *Id.* at 340 ("A conspiracy that seeks to interfere with law enforcement officers' performance of their duties entails sufficient involvement with the State to implicate the federally protected right ... and to give rise to a cause of action under § 1985(3).").

Moreover, contrary to what Defendants allege, circuit authority does not weigh in favor of finding that state actors must actually be involved in a conspiracy in order for that party to state a claim under the hindrance clause. In fact, in a pre-*Bray* decision, the Second Circuit reached the opposite conclusion, holding that plaintiffs could state a claim under the hindrance clause for a conspiracy by private actors to hinder the state's ability to enforce their Fourteenth Amendment rights through the means chosen by the state to do so. *See People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 43 (2d Cir. 1982), *vacated sub nom. People of State of N.Y. by Abrams v. 11 Cornwell Co.,* 718 F.2d 22 (2d Cir. 1983) ("In short, we think that both the nature of 11 Cornwell's conduct and the class basis of the discrimination complained of are sufficient to make out a colorable claim that 11 Cornwell prevented or hindered the State from providing the mentally retarded with "equal protection of the laws" within the meaning of section 1985(3)."). Although Scalia's opinion in *Bray* called this holding into question, it did not overrule it. Nor has the Second Circuit subsequently overturned that basic conclusion in *Abrams.* Accordingly, the Court will apply this rule of decision to the matter at hand.

Moreover, Defendants' references to other Courts of
Appeals' decisions and District Court authorities in this
circuit are unavailing because these cases either dealt with
claims brought under the deprivation clause or did not
distinguish between the requirements of the hindrance and
deprivation clauses. For example, the Tenth Circuit in *Tilton v.
Richardson*, 6 F.3d 683, 687 (10th Cir. 1993) rejected the
plaintiff's argument that he could state a valid cause of action
because his complaint alleged a "private conspiracy aimed at
influencing State conduct." It did so, however, in the context
of discussing a deprivation clause claim, and never held, as
Defendants contend, that "the Hindrance Clause also requires
state action." ECF 240, p. 129. Likewise, *Brown v. Phillip
Morris, Inc.* and *Ramirez v. City of Wichita* also dealt with a
deprivation clause claim. *See Brown v. Phillip,* 250 F.3d 789,
805 (3d Cir. 2001) ("[Plaintiffs] assert the deprivation of a
different type of rights: those of property and contract.");
*Ramirez v. City of Wichita*, 78 F.3d 597 (10th Cir. 1996) ("Mr.
Ramirez has failed to demonstrate any deprivation of his equal
protection or equal privileges and immunities."). Finally, the
Third Circuit in *Magnum v. Archdiocese of Philadelphia*, 253 F.
App'x 224, 229-31 (3rd Cir. 2007) upheld the dismissal of the
plaintiffs' § 1985 claim on the ground that they had not pleaded
a violation of any right protected against private encroachment,

but did not acknowledge a distinction between the hindrance clause and the deprivation clause, or specifically address the state action requirement.

Moreover, some of the authorities Defendants cite acknowledge that state action is not always required to state a claim under § 1985. For example, in *Sanders v. Prentice-Hall,* the Sixth Circuit expressly acknowledged that "Section 1985 does not explicitly require state action," that it "can reach private conduct designed to interfere with certain civil rights," and that a conspiracy may violate § 1985 if "the aim of the conspiracy is to influence the activity of the state." 178 F.3d 1296 (6th Cir. 1999). Likewise, in *Stevens v. Tillman*, the Seventh Circuit recognized that § 1985(3) would reach "racially-motivated conspiracies to deprive persons of rights secured only against governmental action ... provided the defendants are either state actors *or* seeking to influence the state to act in a prohibited way." 855 F.2d 394, 405 (7th Cir. 1988) (emphasis added). Ultimately, however, the court ruled that the claim failed because state actors were not, in fact, influenced as the plaintiff alleged, and therefore the plaintiff "did not suffer injury at official hands." *Id.*[9]

---

[9] Finally, Defendants reference one Ninth Circuit case that relied on an outdated citation of the elements of a § 1985(3) cause of action. *Hoffman v. Halden*, 268 F.2d 280 (9th Cir. 1959), *overruled by Cohen v. Norris*, 300 F.2d

Finally, those authorities that have recognized a hindrance clause claim without requiring actual state involvement in a conspiracy have provided a compelling rationale for doing so. For example, the Second Circuit acknowledged in *Abrams* that "there would almost never be a situation in which the State would be involved in hindering its own efforts to secure equal protection to its citizens." *Abrams*, 695 F.2d at 43. As a result, requiring such state action would undercut the hindrance clause altogether. Moreover, as the First Circuit reasoned in *Libertad*, hindering a state effort to provide equal protection itself clearly implicates state action. *Libertad v. Welch*, 53 F.3d 428 (1st Cir. 1995). Therefore, eliminating the state action requirement in the hindrance clause context would not unreasonably expand the scope of liability under § 1985(3). In light of these reasons, and given the dearth of compelling authority to the contrary, the Court finds that the participation of state actors is unnecessary to state a claim under the hindrance clause.

*3.    Discriminatory animus*

---

24 (9th Cir. 1962). Even there, where the court required a showing that "the acts complained of were done under color of state law or authority," the court acknowledged that "private discrimination is not inequality before the law *unless* there is some manipulation of the law or its agencies to give sanction or sanctuary for doing so." *Id.* at 291.

To state a claim under § 1985(3), Plaintiffs must also allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102 (1971). In *Bray*, the majority noted that "the 'hindrance' clause would seem to require the same ... animus that the 'deprivation' clause requires." 506 U.S. at 281. Justice Souter similarly agreed that an animus requirement would apply, but concluded that "class-based animus can be inferred if the conspirators' conduct burdens an activity engaged in predominantly by members of the class." *Id.* at 342. Thus, the parties in this case do not dispute that Plaintiffs must allege animus in order to make out a claim, and this Court has previously held that such animus may be based on a protected status other than race. ECF 115, pp. 56-58.

The Liberty Defendants contend, however, that Plaintiffs' claim must fail because "any alleged discrimination on the basis of [Jenkins'] purported sexual orientation is not protected under Section 1985." ECF 240, p. 123. In particular, they argue that the Supreme Court's two most recent cases addressing the rights of gays and lesbians –*United States v. Windsor*, 133 S. Ct. 2675 (2013) and *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) –did not recognize homosexuals as a suspect or quasi-suspect

class, or apply strict or intermediate scrutiny to their equal protection claims. As such, they argue, this Court should follow authorities pre-dating these cases (some by more than thirty years), which refused to recognize homosexuals as a class for purposes of § 1985. Plaintiffs respond that Defendants' citations to pre-*Windsor* case law is either completely misleading (in that the cases do not hold what Defendants claim they do) or have been called into question by the Supreme Court's recent jurisprudence.

The Court agrees, and will focus its analysis on the state of the law as it stands after *Windsor* and *Obergefell.* First, although the animus required to state a claim under Section 1985 is connected to the scope of constitutional protection a group is afforded, the two are far from synonymous. Rather than require that, to be protected by § 1985(3), a group be recognized as a suspect or quasi-suspect class for constitutional purposes, or that discrimination against that class be subject to strict or intermediate scrutiny, the Second Circuit has merely asked whether conspiracies against that class would be "inherently invidious, and repugnant to the notion of equality of rights for all citizens." *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1359 (2d Cir. 1989).[10] In

---

[10] Defendants' citation to authorities from other circuits in reply does not override the approach enunciated by the Second Circuit.

doing so, it held that "§ 1985(3) is necessarily tied to
evolving notions of equality and citizenship." *Id.* Thus, the
mere fact that the Supreme Court in *Windsor* and *Obergefell* did
not specify which level of scrutiny it would use, or expressly
categorize gays and lesbians as members of a suspect or quasi-
suspect class, does not itself preclude a finding that gays and
lesbians constitute a class for purposes of § 1985(3).

Rather, more significant to this Court's understanding of
the scope of § 1985(3) protection is the Supreme Court's
thorough, recent discussion of the forms of discrimination to
which gays, lesbians and members of their family have been
subjected in the past. *See Obergefell,* 135 S. Ct. at 2598. The
Court found that historically, "many persons did not deem
homosexuals to have dignity in their own distinct identity. A
truthful declaration by same-sex couples of what was in their
hearts had to remain unspoken." *Id.* The "legal question of same-
sex marriage" therefore arose against this backdrop of
discrimination against gays and lesbians on the basis of their
sexual orientation. *Id.* The Court ultimately grounded its
ruling, holding that states could not deny homosexuals the right
to marry, on both the Due Process Clause and the Equal
Protection Clause of the Fourteenth Amendment. Both the
protection of fundamental rights and of equal protection inhere

in the individual person. Thus, in its discussion of the fundamental right to marry, the Court first emphasized that "the right to personal choice regarding marriage is inherent in the concept of individual autonomy." *Id.* at 2599. Moreover, denying that right to personal choice on the basis of sexual orientation "has the effect of teaching that gays and lesbians are unequal in important respects. It demeans gays and lesbians for the State to lock them out of a central institution of the Nation's society." *Id.* at 2602. The resulting subordination of individuals on the basis of their sexual orientation was thus central to the Court's equal protection analysis. *Id.* at 2604 ("Especially against a long history of disapproval of their relationships, this denial to same-sex couples of the right to marry works a grave and continuing harm. The imposition of this disability on gays and lesbians serves to disrespect and subordinate them."). In short, while this Court previously acknowledged the protection that *Windsor* provides to same sex couples, the Supreme Court's decision in *Obergefell* clearly establishes that the constitutional protection afforded to gays and lesbians arises from their historic subordination as a class, and that it attaches to them as individuals. As such, Jenkins' allegation that Defendants conspired to violate her civil rights based on discriminatory animus due to her sexual orientation states a valid claim under § 1985(3).

Defendants also contend that because Jenkins and Lisa Miller never married, Jenkins cannot allege that Defendants acted against her with discriminatory animus against same-sex couples. In their view, *Obergefell* "only addressed protections related to a class of individuals joined in same-sex marriages." ECF 240, p. 125. As explained above, however, membership in a same-sex marriage was not, in fact, the basis of protection the Court afforded this historically subordinated group. Rather, it was the long history of discrimination against homosexuals due to their sexual orientation, along with the particular infringement of their dignity that exclusion from marriage would impose, that motivated the Court's holding. Moreover, even if formalistic membership in a same-sex couple were the source of the Court's constitutional protection, Jenkins has alleged that the animus against her arose as a consequence of her same-sex partnership. Had Jenkins not been partnered with Lisa Miller, and had that coupling not been between members of the same sex, the animus Jenkins alleges here would not have arisen. Accordingly, the Court is not persuaded that the mere fact that Jenkins and Lisa Miller were never married strips Jenkins of protection under § 1985(3).

Finally, Defendants also contend that Jenkins' claim as next friend of Isabella fails because Jenkins has not alleged

animus directed at Isabella. Once again, Defendants incorporate

a lengthy string-cite without substantive discussion of the

relevant authorities. And yet again, Defendants' references are

largely off base.[11] The only case that is directly pertinent to

the argument Defendants attempt to make, non-precedential

authority from the Eastern District of Pennsylvania, is readily

distinguishable from the case at hand. *See Hardmon v. Lehigh*

*County*, 613 F. Supp. 649, 653 (E.D. Pa. 1985). To be sure, the

court in that case explained that "[a]s presently worded, this

allegation does not state a cause of action pursuant to §§ 1985

---

[11] For example, in *Magnum v. Archdiocese of Philadelphia*, 253 F. App'x 224 (3d
Cir. 2007), the Court of Appeals found that minority itself was not a basis
of invidious discrimination, and animus on that basis could not give rise to
a § 1985 claim. But Plaintiffs here make no such claim to begin with, and
instead argue that Isabella was injured by a conspiracy motivated by animus
against same-sex couples and on the basis of sexual orientation. Similarly,
in *Nieves-Ramos v. Gonzalez-De-Rodriguez*, 737 F. Supp. 727, 729 (D.P.R.
1990), plaintiffs "made no allegation which even inferentially indicate[d]
that any defendant was motivated by any class-based, invidiously
discriminatory animus." The status of one plaintiff as a minor was entirely
beside the point. Likewise, the Court in *Koenig v. Snead*, 757 F. Supp. 41, 44
(D. Ore. 1991) dismissed the plaintiffs' § 1985 claims in a short paragraph,
noting simply that "nowhere in his complaint does [the plaintiff] allege that
the acts of the defendants were motivated by the kind of invidiously
discriminatory animus required to state a claim under 42 U.S.C. § 1985(3)."
The same is true of the decision in *L.Q.A. By & Through Arrington v.
Eberhart*. 920 F. Supp. 1208, 1229 (M.D. Ala. 1996) (noting that "the
plaintiff has not only failed to present any evidence of a racial or class
based 'individual discriminatory animus behind the conspirator's actions,'
but the plaintiff has even failed to allege such."). Likewise, the Court in
*Allison v. Shabazz*, No. C 14-04813 JSW, 2016 WL 2957121, at *6 (N.D. Cal. May
23, 2016) found that Plaintiff could not base her claim of animus on the two
social categories she raised (female protective parents and victims of
domestic violence). Although these cases did involve children, the Courts did
not rely on either the children's minor status or the fact that the children
were not the direct targets of animus that otherwise motivated the
conspiracy.  They are thus inapposite to the point Defendants attempt to make
in their brief.

... because it does not allege a conspiracy directed at plaintiff's minor." *Id.* at 653. It clarified, however, that "a necessary element of a conspiracy for purposes of a § 1985 action is that the conspirator act knowingly and willfully and with the intent to deprive the plaintiff of equal protection of the laws." *Id.* Since the defendants in that case did not know of the existence of the minor, they could not have acted knowingly and willfully to deprive her of those rights. Here, Plaintiffs allege that Defendants acted knowingly and willfully to deprive Isabella of contact with her mother, out of animus against same-sex couples.

Regardless of the lack of support in the authorities Defendants reference, Plaintiffs contend that their argument fails for two additional reasons. First, they argue that Isabella need not allege membership in a protected class to claim that she was injured by a conspiracy motivated by class-based animus, citing the plain language of the statute and a single decision from the District of Minnesota. In fact, § 1985 does not expressly require that the person injured by a conspiracy be a member of the class suffering the animus that motivated a conspiracy. For all practical purposes, however, the cases in which the identity of the person injured and the form of discrimination motivating the conspiracy differ are likely to

be rare. The hindrance clause itself applies to conspiracies that aim to hinder authorities from "giving or securing to *all persons* within such State or Territory the equal protection of the laws." 42 U.S.C. § 1985(3). Thus, it is not limited to those that infringe only on the rights of a certain class of people. In addition, the provision allowing an individual to bring suit is not limited to those individuals who are members of the class against which defendants have targeted their animus. Rather, any "party so injured or deprived" may bring an action against those who do or cause to be done "any act in furtherance of the object of such conspiracy." *Id.* However, the authorities extending liability in this manner are limited, and not binding on this Court. Despite Plaintiffs' argument to the contrary, *Arias* allowed the § 1985 claim to proceed without any substantive discussion of whether the object of animus must match the plaintiffs' identity, and without citing any authority for the notion that it need not. *See Arias v. U.S. Immigration & Customs Enf't Div. of Dep't of Homeland Sec.,* No. CIV. 07-1959 ADMJSM, 2008 WL 1827604, at *15 (D. Minn. Apr. 23, 2008) (finding that allegation that "conspirators were motivated by the fact that almost all Plaintiffs are Latinos" was sufficient to defeat a motion to dismiss the § 1985(3) claim).

Instead, Isabella's claim survives because she, too, was directly targeted by the alleged "inherently invidious" conduct of Defendants. *New York State Nat. Org. for Women,* 886 F.2d at 1359. In *Obergefell*, the Supreme Court recognized that children of gays and lesbians also suffer the brunt of discrimination that deprives their families of equal recognition, security and respect. 135 S. Ct. at 2600 (same-sex couples' "children suffer the stigma of knowing their families are somehow lesser."). Although the posture of that case did not prompt the question of whether their rights, also, would be infringed by virtue of their parents being denied the right to marry, the Court's discussion clearly included these children among the victims of anti-homosexual bias. In this sense, Isabella, too, is a member of a subordinated group deserving of protection under § 1985(3). As such, both Plaintiffs have properly alleged the animus required to state a claim under that provision.

*4.   Retroactivity*

Defendants Zodhiates, Hyden and RUL also argue that "the recent advances in the law concerning sexual orientation and same-sex couples make enforcing Section 1985 against Defendants unfair." ECF 227, p. 17. While their argument is difficult to decipher fully, they first appear to contend that "the rules for legislative retroactivity should govern this case" because

Congress made a "definitive statement in passing [the Defense of Marriage Act ("DOMA")]" that Defendants apparently relied upon. *Id.* at 19. Second, they suggest that the Court should recognize a type of protection from conspiracy claims under § 1985 similar to the qualified immunity doctrine applicable to 42 U.S.C. § 1983 claims. They provide no support for this argument other than to suggest that holding otherwise would chill the right to freedom of association.

Defendants' argument is unavailing. First, the Supreme Court's interpretation of federal law is applicable in all cases open on direct review, as in this one. *See Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993). Even if this case were not open, the change in law at issue here concerned constitutional rights, and as such should be given retroactive effect. *Id.* Finally, the Supreme Court has limited the reach of qualified immunity because the "set of special federal policy considerations" it reflects are specific to Section 1983 litigation. *See Reynoldsville Casket Co v. Hyde*, 514 U.S. 749, 758 (1995). Accordingly, the Court must apply the Supreme Court's current understanding of the Constitutional protections afforded to gays, lesbians and their families to this case.

5.    *Agreement/ meeting of the minds*

Liberty Counsel Defendants also argue that Plaintiffs failed to plead specific facts that demonstrate they reached an agreement to engage in the conspiracy at issue. According to them, these alleged deficiencies are "incurable" because they did not engage in such conduct. ECF 240, p. 120-21 (citing Defendant's factual affidavits). They also generally claim that Plaintiffs have failed to plead specific facts to allege a conspiracy, but do not specify which elements of conspiracy, beyond agreement, Plaintiffs have failed to adequately plead.

To make out a claim of conspiracy under Section 1985, Plaintiffs must plead "an agreement between two or more individuals where one acts in further[ance] of the objection [sic] of the conspiracy and each member has knowledge of the nature and scope of the agreement." *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 339 (E.D.N.Y. 2010), *aff'd,* 417 F. App'x 96 (2d Cir. 2011); *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 337-38 (S.D.N.Y. 1999), *aff'd sub nom. Dove v. O'Hare*, 210 F.3d 354 (2d Cir. 2000). A conspiracy "need not be shown by proof of an explicit agreement but can be established by showing that the 'parties have a tacit understanding to carry out the prohibited conduct.' " *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1995) (quoting *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988)). In the context of a Section 1985 claim,

the Seventh Circuit has noted that "[t]he very nature of a conspiracy obscures most, if not all, information about the alleged conspirators' agreement; circumstantial evidence of the conspiracy, particularly regarding the overt acts performed in furtherance of the conspiracy, is all that is ordinarily obtainable before discovery and trial. This is particularly true where, as here, much of the information regarding ... the formation of the conspiracy [is] in the hands of the defendant." *Quinones v. Szorc*, 771 F.2d 289, 291 (7th Cir. 1985).

Here, Plaintiffs have pled sufficient facts that the all Defendants had such a "tacit understanding" to carry out the kidnapping of Isabella, and that each one committed acts in furtherance of that purpose. In particular, this Court has already held that the prior complaint, which contained less specific facts than those at hand, "adequately allege[d] that Defendants Lisa Miller, Timothy Miller, Kenneth Miller, Philip Zodhiates, Victoria Hyden and Linda Wall agreed, tacitly or explicitly, to further" the purpose of the conspiracy. ECF 115, p. 55. The new allegations in the amended complaint, which incorporate evidence obtained from Zodhiates' criminal trial, further supports this conclusion. For example, based on this evidence, Plaintiffs now allege that Victoria Hyden delivered emails from her father so as to coordinate the removal of items

from Lisa Miller's apartment in order to assist her in secretively leaving the country with Isabella. Wall allegedly packed those items. Thereafter, Hyden allegedly used her position at Liberty University to facilitate Lisa Miller's communication with her lawyer. These additional facts provide circumstantial evidence that these Defendants agreed to facilitate Lisa Miller's kidnapping of Isabella, and took overt acts to do so.

Similarly, the amended complaint sufficiently alleges that Defendants Lindevaldsen and Staver reached either a tacit or explicit agreement with Lisa Miller to support her in leaving the country with Isabella, and committed overt acts to do so. In particular, the amended complaint alleges that Lindevaldsen packed Lisa Miller's belongings, that she continued to communicate with Lisa Miller after she left the country through Victoria Hyden, and that she misled the Vermont family court by stating that she did not have reason to believe that Lisa Miller was not home. Staver, Lindavaldsen's employer, also allegedly misled courts to delay contempt proceedings. In addition, both Staver and Lindevaldsen allegedly advised Lisa Miller that "it would be in her best interests to disappear." ECF 223, p. 8.[12]

---

[12] Since Plaintiffs' claims against Liberty Counsel and Liberty University rest on theories of vicarious liability or agency, Lindevaldsen and Staver's actions and mental state constitute the relevant conduct for purposes of establishing their liability under Section 1985.

Thus, the extent and severity of the alleged misconduct allow
the Court to infer that Liberty Counsel Defendants also reached
a tacit or explicit agreement to support Lisa Miller in
kidnapping Isabella, and that they committed overt acts in
furtherance of that goal. Thus, Plaintiffs have adequately
alleged that Defendants engaged in a conspiracy to violate their
rights under § 1985.

6.   *Applicability of Monell to Liberty University*

In addition to arguing that Liberty University cannot
generally be held liable for the alleged tortious acts of its
employees, Liberty University contends that the *Monell* doctrine,
applicable to municipal corporations in the context of Section
1983 claims, should also apply to bar the claim against it under
Section 1985. *See Monell v. Department of Social Services of
City of New York*, 436 U.S. 658 (1978). However, Liberty
University cites no binding authority applying the *Monell*
doctrine to private institutional defendants. In fact, the
District Court decisions from this Circuit cited in Liberty
University's brief have expressly refrained from deciding this
question. For example, in *Litras v. PVM Int'l Corp.,* No. 11-CV-
5695 JFB AKT, 2013 WL 4118482, at *9 (E.D.N.Y. Aug. 15, 2013),
the Eastern District of New York rejected the defendants'
argument that the plaintiff had failed to sufficiently allege a

meeting of the minds to make out a conspiracy claim under Section 1985. The liability of the corporate defendant was not raised at this stage, and the court merely noted in a footnote that "courts within this Circuit have used the standard to evaluate the sufficiency of a Section 1985 claim brought against a private corporation for purposes of surviving a motion to dismiss." *Id.* However, the case the *Litras* court cited for that proposition also expressly failed to reach that question. *See Bowen v. Rubin,* 385 F. Supp. 2d 168, 181, n. 8 (E.D.N.Y. 2005)("[E]ven if applying *Monell* to private entities is warranted with respect to Section 1983 claims, which require action under color of state law, it is unclear that the same holds true for claims brought under Section 1985(3), which encompasses wholly *private* conspiracies to engage in invidiously discriminatory conduct. However, since both plaintiffs and defendants argue within the framework of the *Monell* "official policy or custom" standard, and since, as shown below, there are genuine issues of material fact with respect to whether defendants had a policy or custom that subjects them to liability under the *Monell* standard, I decline to reach this issue.") (internal quotation omitted).

Moreover, although Defendant is correct that the Second Circuit has extended the *Monell* doctrine to claims brought

against municipalities under § 1985, and that the *Monell* doctrine applies to Section 1983 claims against private employers, the Court is not persuaded that this doctrine would apply to claims against private employers. *See Zherka v. City of New York,* 459 F. App'x 10, 12 (2d Cir. 2012) ("municipal liability under § 1985(3) must also be predicated on an "official custom or policy" of the municipality") (citing *Owens v. Haas,* 601 F.2d 1242, 1247 (2d Cir. 1979)); *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408-09 (2d Cir. 1990) ("Private employers are not liable under § 1983 for the constitutional torts of their employees, unless the plaintiff proves that action pursuant to official policy of some nature caused a constitutional tort.") (internal quotations omitted). In extending the *Monell* doctrine to private employers under § 1983, the Second Circuit relied on a Fourth Circuit case that held the same. *Rojas*, 924 F.2d at 408 (citing *Powell v. Shopco Laurel Co.,* 678 F.2d 504, 506 (4th Cir.1982)). The Fourth Circuit based its conclusion on the applicability of *Monell*'s underlying rationale to a private employer. *Powell,* 678 F.2d at 506 ("No element of the Court's ratio decidendi lends support for distinguishing the case of a private corporation."). That rationale was two-fold: first, it was premised on the language of the section 1983 statute itself, and second, it was based on the particular policy considerations that must be taken into

account with public actors. However, while policy considerations specific to public action might be equally applicable in the context of § 1983, where even private actors must be acting under color of state law, they are not applicable in the context of § 1985, where private actors are not subject to that additional requirement. The Ninth Circuit underscored this difference in concluding that *Monell* should not extend to § 1985 claims against private employers. *See Scott v*. Ross, 140 F.3d 1275 (9th Cir. 1998). Thus, the reasoning of the very decisions Liberty University cites does not support extending the *Monell* doctrine in the manner that Defendant advocates. Accordingly, the Court declines to stretch the law in this manner, and will apply traditional principles of respondeat superior to the private conspiracy at issue in Plaintiffs' § 1985 claim.

## C. Liberty University's Vicarious Liability

### i. *Introduction*

Liberty University raises two additional challenges to Plaintiffs' claims of vicarious liability for the acts of its employees. ECF 237. In particular, it contends that (1) it cannot be held vicariously liable for its employees' actions in connection with the events Plaintiffs allege because the complaint "neither alleges nor allows any plausible inference that any of these employees acted within the scope of their

employment with the University in the alleged events," and (2) Plaintiffs may not hold Liberty University liable for the acts of those with whom its employees conspired because "such an attenuated chain of responsibility does not comport with the purpose underlying vicarious liability." *Id.* at 3. Plaintiffs contend that Liberty University employees committed tortious acts during or incidental to the scope of their employment, such that the University can be held liable for those acts.

*ii. Analysis*

The Vermont Supreme Court has held that "[u]nder the settled doctrine of respondeat superior, an employer or master is held vicariously liable for the tortious acts of an employee or servant committed during, or incidental to, the scope of employment." *See Brueckner v. Norwich Univ.*, 169 Vt. 118, 122–23 (1999) (citing *Anderson v. Toombs,* 119 Vt. 40, 44–45 (1955); *Poplaski v. Lamphere,* 152 Vt. 251, 257 (1989)). "To be within the scope of employment, conduct must be of the same general nature as, or incidental to, the authorized conduct. Conduct of the servant falls within the scope of employment if: (a) it is of the kind the servant is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) in a case in which the force is intentionally

used by the servant against another, it is not unexpectable by the master. Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master." *Id.* at 123 (citing Restatement (Second) of Agency §§ 228(1), 228(2), 229(1) (1958)).

Here, Plaintiffs have shown that some of Lindevaldsen's allegedly tortious conduct was committed within the scope of her employment. First, although Lindevaldsen was not employed primarily to litigate family court cases for the University, the Court can reasonably infer from the facts alleged that her work in representing Lisa Miller was at least incidental to her job at Liberty University. She allegedly wrote a book about this representation and used that book as a teaching tool, assigning the book as required reading for all incoming students at the law school. In this sense, her overall representation furthered the purpose of the law school. Moreover, she allegedly communicated with her client while her client was abroad through a Liberty University employee, who delivered messages to her while she was at Liberty University. Thus, at least some of this representation was within the time and space limits of Lindevaldsen's employment at the University. Finally, the

tortious conduct (especially her misrepresentations to courts
and her alleged advice to Lisa Miller to flee the country) was
not unexpectable by the University because it was part and
parcel of her representation of Lisa Miller. Given these facts,
Plaintiffs have sufficiently alleged that Lindevaldsen's
tortious conduct was within the scope of her employment at
Liberty University.

In addition, the Vermont Supreme Court has "expressly
adopt[ed] [§ 219(2)(d) of the Restatement (Second) of Agency] as
applicable in assessing whether an employer has vicarious
liability for the tortious conduct of an employee when that
conduct falls outside the scope of his or her employment." *Doe
v. Forrest*, 176 Vt. 476, 486 (2004). Section 219(2) provides
that "a master is not subject to liability for the torts of his
servants acting outside the scope of their employment, unless:
...(d) *the servant purported to act or to speak on behalf of the
principal and there was reliance upon apparent authority, or he
was aided in accomplishing the tort by the existence of the
agency relation.*" *Id.* at 485.[13] In interpreting the last clause
of this section, the Vermont Supreme Court has highlighted the

---

[13] Although neither party raises this potential basis for vicarious liability,
the Court finds that the second provision —permitting vicarious liability for
acts outside of an employee's scope of employment where the employee was
aided in accomplishing the tort by the existence of the agency relationship
with his employer —may also be at issue here, and therefore considers the
issue of its own initiative.

importance of analyzing the power that a particular employment relationship bestows on a defendant with respect to the injured party, as well as the need to create an "incentive for vigilance by those in a position to prevent" the injury from happening. *Id.*

Here, the amended complaint alleges that some of Lindevaldsen's tortious conduct was committed with the help of Victoria Hyden, and vice versa. Each acted using the authority and resources she had as an employee of Liberty University. Thus, even if each woman's tortious conduct were considered to be outside of the scope of each one's employment, the employment relationship certainly aided in their accomplishment of the tortious acts in question. As such, Liberty University can still be held vicariously liable for this conduct.

Staver's alleged acts, on the other hand, are insufficient to give rise to vicarious liability under either of the theories outlined above. First, the Plaintiffs have not alleged specific facts that Staver's role in representing Lisa Miller was as intertwined with his teaching and administrative roles at the University as it was in Lindevaldsen's case. Therefore, even if he also committed tortious acts as part of his representation of Lisa Miller, that representation is not clearly incidental to his work at the University. Nor is it clear that his

representation of Lisa Miller furthered the University's
educational goals as much as Lindevaldsen's, who wrote a book on
the basis of that representation that served to educate Liberty
University students. Moreover, the complaint does not allege
that Staver abused his position at Liberty University to further
the goals of the conspiracy by, for example, using Liberty
University resources to communicate with Lisa Miller in an
undetected manner. For these reasons, Liberty University cannot
be held vicariously liable for Staver's acts.

Finally, Liberty University's concern that it may be held
liable for the torts of unaffiliated third parties is not
warranted in this case. It argues that "[w]here the employee's
liability is itself based on the actions of a third party in
which the employee did not directly participate, the employer
cannot be made the insurer of the third party's conduct through
vicarious liability." ECF 237, p. 13. Here, however, Liberty
University's liability for Lindevaldsen and Hyden's tortious
conduct in furtherance of the conspiracy will attach only
insofar as they directly participated in that unlawful endeavor.
While the Court appreciates the University's concern for
protecting the principles that underlie vicarious liability, the
preoccupation is unnecessary in the case at hand.  Accordingly,

Liberty University's motion to dismiss due to lack of vicarious liability cannot succeed.

**D.    *Timeliness***

*i.    Custodial interference claim*

Liberty Counsel Defendants also challenge Plaintiffs' claim for custodial interference and § 1985(3) claim as untimely. In particular, they contend that Plaintiffs' custodial interference claim is subject to Vermont's three-year statute of limitations for personal injury actions, and that Jenkins' action accrued when she gained knowledge that Isabella was kidnapped in December of 2009. Since Plaintiffs' first complaint, filed in 2012, did not name Liberty Counsel, Staver and Lindevaldsen as Defendants, Defendants contend that Plaintiffs missed the deadline to bring an action against them. Plaintiffs argue that their custodial interference claim is timely because (1) the relation back doctrine applies to Liberty Counsel defendants, because they knew or should have known that they were proper defendants at the time of initial filing; (2) the interference with Jenkins' custody of Isabella is a continuing tort.

The parties do not dispute that Plaintiffs' custodial interference claims are governed by Vermont's three-year statute of limitations for personal injury actions. *See Eaton v. Prior*,

58 A.3d 200, 204 (Vt. 2012) (applying three-year statute of limitations to emotional distress claim); 12 V.S.A. § 512 ("Actions for the following causes shall be commenced within three years after the cause of action accrues, and not after: ... (4) Except as otherwise provided in this chapter, injuries to the person suffered by the act or default of another person, provided that the cause of action shall be deemed to accrue as of the date of the discovery of the injury"). Rather, they dispute when it accrued. The Vermont Supreme Court has held that "[a]n action accrues so as to trigger the statute of limitations 'when a plaintiff discovers or reasonably should discover the injury, its cause, and the existence of a cause of action.'" *Eaton*, 58 A.3d at 204 (citing *Lillicrap v. Martin,* 591 A.2d 41, 47 (1989); *Earle v. State,* 743 A.2d 1101, 1108 (1999) (observing that limitation period "begins to run when a plaintiff had information, or should have obtained information, sufficient to put a reasonable person on notice that a particular defendant may have been liable for the plaintiff's injuries" (quotation omitted)).

However, even if Jenkins effectively discovered that Lisa Miller had fled with Isabella in December 2009, a reasonable person in her position would *not* have been on notice that the Liberty Counsel Defendants played the role that they did at that

time. In fact, both Staver and Lindevaldsen sought to withdraw
their representation of Lisa Miller on grounds that they did not
know where she was, and Lindevaldsen directly represented to the
Vermont courts that she was unaware of Lisa Miller's
whereabouts. If Plaintiffs' allegations are assumed to be true,
these deliberate attempts to mislead the courts would also have
misled a reasonable person about the cause of Jenkins' injury,
as well as Staver and Lindevaldsen's potential liability for
Plaintiffs' injuries. Indeed, this Court initially found that
Plaintiffs had not set forth sufficiently credible facts that
Lisa Miller's attorneys had engaged in tortious conduct at all.
*See* ECF 115, p. 29. Moreover, Staver and Lindevaldsen submitted
affidavits at earlier stages of this litigation representing
that they did not engage in tortious conduct. It was only after
Zodhiates' criminal trial for Isabella's kidnapping in 2016 that
the basis for the specific facts of Lindevaldsen's tortious
conduct became known to Jenkins. In particular, they became
aware that Hyden and Zodhiates exchanged emails that implied
Lindevaldsen's direct engagement in assisting Lisa Miller in
fleeing the country. They also heard testimony from a witness
suggesting that Liberty Counsel lawyers had advised Lisa Miller
to flee with Isabella. Thus, only after acquiring these facts
would a reasonable person have been put on notice that the
Liberty Counsel Defendants may have been liable for the

conspiracy to intentionally interfere with Jenkins' parental

rights. Since the amended complaint was filed less than three

years after that point, Plaintiffs' claim is not time-barred. In

light of this conclusion, the Court need not address whether

custodial interference is a continuing tort, or whether the

relation-back doctrine applies to this claim.[14]

*ii. § 1985 claim*

In addition, Defendants argue that Plaintiffs' § 1985

claims are likewise time barred. They argue that because § 1985

claims are subject to the statute of limitations that state

courts would apply in an analogous state action, the statute of

limitations for personal injury actions should apply to this

claim, as well. Moreover, the cause of action accrued, they

argue, at the time of the discriminatory act, which they then

---

[14] While the Court need not reach this issue, it is not persuaded that the
Supreme Court's holding in *Krupski v. Costa Crociere S.P.A.*, 560 U.S. 538,
549 (2010) would apply to the instant case, since it does not merely change
"the party or the naming of the party against whom a claim is asserted," or
involve "a mistake concerning the proper party's identity." Fed. R. Civ. P.
15(c)(1)(C). Nevertheless, the claims against the new defendants clearly
arise out of the same occurrence set out in the original pleading –that is,
the removal of Isabella from the country in order to preclude Jenkins from
having contact with her. Thus, the relation-back doctrine may apply pursuant
to Fed. R. Civ. P. 15(c)(1)(B). The Second Circuit has noted that, as in
claims brought under Rule 15(c)(1)(C), "the central inquiry is whether
adequate notice of the matters raised in the amended pleading has been given
to the opposing party within the statute of limitations by the general fact
situation alleged in the original pleading." *Slayton v. Am. Exp. Co.*, 460
F.3d 215, 228 (2d Cir. 2006), *as amended* (Oct. 3, 2006) (internal quotation
omitted). Given that Lindevaldsen, Staver, Liberty Counsel and Liberty
University were all closely connected to Lisa Miller's case prior to this
point, and that Lindevaldsen and Staver submitted affidavits concerning their
conduct in relation to this case when Liberty University was initially named
a defendant, Defendants are hard-pressed to show that they failed to get
adequate notice of this matter.

equate to "the date at which [Jenkins] obtained notice of the alleged act." ECF 240, p. 17.

Even under Defendants' own understanding of the law, however, this argument fails. First, it is true that a Section 1985 action "is subject to the statute of limitations the state courts would apply in an analogous state action." *Meyer v. Frank*, 550 F.2d 726, 728 (2d Cir. 1977). Likewise, Defendants are correct that for claims brought under Section 1983, "accrual is a matter of federal law." *Pearl v. City of Long Beach*, 296 F.3d 76, 80 n.2 (2d Cir. 2002). In transferring this rule to the context of Section 1985, however, Defendants face an obstacle that their logic fails to overcome. Specifically, under federal law, a cause of action arises when a plaintiff knows or has reason to know of his or her injury. *See Keating v. Carey,* 706 F.2d 377, 382 (2d Cir. 1983). However, Defendants contend that "[i]n analyzing the timing of accrual in the context of discrimination claims, the Supreme Court has instructed that the proper focus is on the time of the *discriminatory act,* not the point at which the *consequences* of the act become painful." *Morse v. Univ. of Vermont*, 973 F.2d 122, 125 (2d Cir. 1992).[15] In *Chardon v. Fernandez,* the decision upon which *Morse* relied, the Court concluded that a Section 1983 action accrued at the moment

---

[15] *Morse* dealt with a claim brought by a "handicapped person" for violation of the Rehabilitation Act of 1973, but relied on precedent involving Section 1983 claims. *Id.* at 122.

employees were notified of an allegedly discriminatory decision to terminate them at a future point, even though time elapsed before they actually lost their jobs. In the context of Section 1985, however, it is less clear exactly what constitutes the "discriminatory" act. It is quite possible that a defendant could commit an overt act as part of a conspiracy that bears fruit much later, hindering the state's ability to provide equal protection under the law at some point down the road. Thus, holding that each overt act committed by a defendant in furtherance of a conspiracy constitutes the relevant discriminatory act would run contrary to the more general principle that a cause of action accrues only when a plaintiff knows or has reason to know of his or her injury. *See Keating,* 706 F.2d at 382. Instead, because the similarity between Section 1983 and 1985 arises from the potential violation of an individual's constitutional rights, it is the hindrance of the state's ability to "giv[e] or secur[e] to all persons ... the equal protection of the law" that constitutes the relevant discriminatory act triggering accrual of the cause of action. 42 U.S.C. § 1985. Here, that hindrance came in the form of removing Isabella from the state's jurisdiction, and continuing to hold her abroad to prevent the state from enforcing Jenkins' rights under the law. Thus, although the Court need not reach the question of whether custodial interference is a continuing tort,

the continuing nature of the hindrance of equal protection by the state extends the accrual date in this case to the present moment. Accordingly, Plaintiffs' Section 1985 claim is not time-barred, either.

**E.    Venue**

Defendants Lindevaldsen, Staver, Liberty Counsel, Liberty University and Wall also move to dismiss due to improper venue under Federal Rule of Civil Procedure 12(b)(3). This Court has already ruled, on the basis of allegations made in an earlier complaint, that venue is proper in Vermont. ECF 115, p. 70-73. Wall nevertheless incorporates by reference the arguments she made in the earlier motion this Court rejected. ECF 242-1 (citing ECF 109). Liberty University contends that venue is improper here because "no events or omissions *material* to Plaintiffs' claims took place in Vermont." ECF 237. It moves to dismiss on this ground or, in the alternative, to transfer this case to the Western District of Virginia, but provides no argument in support of this latter request. Lindevaldsen, Staver and Liberty Counsel also sustain that venue does not lie here because "the only connection between Vermont and this case is Plaintiff's residence," "most of the witnesses, documents and other information necessary to litigate Jenkins' claims are located outside of Vermont," Vermont is an inconvenient venue

for all parties except Jenkins, the operative events are alleged to have occurred "entirely outside of Vermont," and the relative means of the parties does not weigh in favor of finding venue in Vermont. ECF 240, pp. 72-79. Although these factors are relevant to whether the Court should transfer venue, these Defendants do not expressly move for such a transfer.

In its prior order, this Court explicitly addressed whether significant events or omissions material to Plaintiffs' claims occurred in this District. ECF 115, pp. 72-74. It found that such events or omissions had occurred here because the rulings of the Vermont courts were deliberately and repeatedly flouted, and the interference with visitation orders and Jenkins' custodial rights occurred in Vermont. *Id.* 73-74. In doing so, the Court implicitly found that the relevant acts and omissions, for purposes of Plaintiffs' claims, constitute not only the particular tortious conduct of each Defendant, but also the interaction between that conduct and the orders of the Vermont court, whose ability to protect Jenkins' parental rights was hindered or interfered with as a result of the conspiracy. Defendants agree that 28 U.S.C. § 1391 permits a civil action to be brought "in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." However, they argue for a different interpretation of what

constitutes the relevant "events or omissions" in this case, suggesting that only the overt acts each defendant took to participate in the conspiracy should be evaluated. Moreover, Liberty University argues that, "neither the Second Circuit nor any other federal appellate court has found that extra-territorial acts intended to have a tortious effect within a district can be the basis for a venue selection." ECF 237, p. 44 (citing *Steen v. Murray,* 770 F.3d 698, 703 (8th Cir. 2014) (court's focus in a venue analysis "must be on relevant activities of the defendant in the forum state, not on the effect of those activities on the plaintiff in the forum state."))[16]

However, as Defendant itself implicitly acknowledges, that analysis is incorrect in the context of civil rights cases, where a potential deprivation of a party's constitutional rights is involved. *See, e.g. Farmland Dairies v. McGuire,* 771 F. Supp. 80, 82 (S.D.N.Y. 1991) (finding that a substantial part of the events occurred where state law was actually applied to the plaintiff's conduct). In this case, Plaintiffs' Section 1985 claim requires a showing that the conspiracy aimed to hinder the state from providing equal protection, and that some injury

---

[16] Because Defendants challenge the basic logic of the Court's legal analysis on this question, the Court will simply address Defendants' argument rather than rely on the law of the case, as Plaintiffs suggest. *See* ECF 261, p. 45-46.

occurred because of that hindrance. Therefore, since the inhibition of Vermont's ability to protect Jenkins' rights is a key component of the § 1985 claim, that effect *on the state of Vermont* must be part of the "events" considered for purposes of establishing proper venue. Thus, the Court does not rest its analysis on the effect of Defendants' conduct on the Plaintiff, as Defendants suggest, but rather on the repercussions of their acts on the state's ability to protect Jenkins' rights. Accordingly, since the hindrance of the equal protection guaranty occurred primarily in Vermont, venue is proper in this District.

Next, Defendants' poorly-supported motions to transfer venue (to the extent that they have made such motions) fail for similar reasons. In considering a motion to transfer venue, Courts are guided by "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106-07 (2d Cir. 2006). "District courts have broad discretion in making determinations of convenience" in this context. *Id.* at 106. This

Court has already considered and rejected a motion to transfer venue to the Western District of Virginia, analyzing precisely the factors outlined above. The only aspect of this Court's analysis that has been called into question by Defendants' motions concerns the impact of this choice of venue on potential witnesses under the third and sixth factors. This Court previously found that "defendants have not identified any witnesses located in Virginia who would be inconvenienced in Vermont." ECF 115, p. 74. At this stage, Defendants contend that "Jenkins' [complaint] reveals the names of many prospective witnesses and further reveals that, other than Jenkins herself, none of those individuals reside in Vermont." ECF 240, p. 75. In particular, they list Ruth and Claude Jenkins, Deborah Thurman, members of Lisa Miller's church in Virginia, individuals who were targeted by Hyden's fundraising efforts, and Lindevaldsen, all of whom are allegedly located in Virginia. It is equally plausible, however, that witnesses with knowledge of the family court proceeding, Lisa Miller's noncompliance with visitation and the damages Jenkins suffered will be located in Vermont. Therefore, while this factor does weigh slightly more heavily in favor of transferring venue, it is not wholly one-sided.

Moreover, in the Court's earlier order on venue, it also dismissed Plaintiffs' Section 1985 claim. As explained above,

the inclusion of this newly pleaded claim at this stage makes
the events in Vermont all the more central to this matter. Thus,
even if the convenience of the witnesses tips the scale slightly
in favor of transferring venue to Virginia, the shift in the
locus of operative facts for purposes of the newly pleaded claim
rebuts this effect. Accordingly, the Court adheres to its
earlier conclusion on this question, and denies Defendants'
motions to transfer venue to the Western District of Virginia.

**F.    Jurisdiction**

In addition, Defendants Liberty University, Liberty
Counsel, Lindevaldsen, Staver and Wall also move to dismiss the
complaint for lack of personal jurisdiction under Fed. R. Civ.
P. 12(b)(2). They challenge the underlying rationale of this
Court's earlier determination that the Plaintiffs' proposed
amendment to the complaint would not be futile because the Court
may exercise personal jurisdiction over Defendants. ECF 220. In
addition, Linda Wall requests that the Court revisit its 2013
decision holding that the Court may exercise personal
jurisdiction over her. ECF 115.

Plaintiffs first contend that this Court should deny these
motions because the law of the case "commands that when a court
has ruled on an issue, that decision should generally be adhered
to by that court in subsequent stages in the same case unless

cogent and compelling reasons militate otherwise." ECF 261, p. 31 (citing *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009)). A court "may depart from the law of the case for "cogent" or "compelling" reasons including an intervening change in law, availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Johnson*, 564 F.3d at 99–100. Importantly, however, the Second Circuit has noted that, "the law of the case doctrine does not rigidly bind a court to its former decisions, but is only addressed to its good sense." *Id.* at 99 (internal quotation omitted).

This Court has clearly already ruled on whether it has personal jurisdiction over Wall. ECF 115. Wall does not dispute the substance of this Court's prior analysis in any way, but merely reincorporates by reference the arguments she already made, and which this Court already rejected. As such, the Court has no trouble rejecting her arguments for the same reasons as it articulated previously.

The application of the law of the case doctrine to the issues raised by the remaining defendants is less clear-cut. In particular, this Court framed its earlier ruling on personal jurisdiction in light of the question presented at that stage: namely, whether allowing Plaintiffs to amend the complaint in the manner they proposed would be futile. That question is no

longer before the Court. However, the substance of the analysis in relation to that question largely overlaps with the issue raised by Defendants here: whether the Court has personal jurisdiction over them. Thus, given the extensive consideration it has already given to that issue, the Court will center this discussion on the Defendants' assertions that aspects of the Court's prior analysis were in error.

First, Defendants contend that the Court erred by failing to give greater consideration to Hyden, Lindevaldsen and Staver's factual affidavits. In particular, Liberty University asserts that allegations in the complaint must only be taken as true in the context of a Rule 12(b)(2) motion to the extent they are uncontroverted by the defendants' affidavits. Since Defendants' affidavits flatly deny all the tortious conduct Plaintiffs allege, Defendants contend that the Court should have weighed that evidence in undertaking its jurisdictional analysis. Liberty University relies on a misleading excerpt from *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993), *as amended* (May 25, 1993), in which the Second Circuit noted that "[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." However, Defendants omit the legal

rule the circuit court enunciated immediately following that statement, holding that "[i]f the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Id.* This Court previously articulated a parallel standard, finding that in ruling on a motion to dismiss under Rule 12(b)(2) on the basis of affidavits, the court "assumes the truth of the plaintiffs' factual allegations for purposes of the motion and 'construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor.'" ECF 115, p. 16 (citing *Dorcester Fin. Sec., Inc. v. Banco BRJ, S.A.,* 722 F.3d 81, 85 (2d Cir. 2013)); *see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) ("In evaluating whether the requisite showing has been made, we construe the pleadings and any supporting materials in the light most favorable to the plaintiffs."). Here, the Court correctly resolved the direct conflict between Plaintiffs' allegations and supporting materials and Defendants' affidavits in Plaintiffs' favor, refusing to give weight to Defendants' denials. Thus, the Court is satisfied that it relied on the appropriate factual basis in its prior analysis of specific jurisdiction.

In addition, Liberty University challenges this Court's reliance on *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,* 290 F.3d 42 (1st Cir. 2002) and *Mansfield Heliflight, Inc. v. Heli-One Canada Inc.,* No 2:12-CV-46, 2012 WL 4479851 (D. Vt. Sept. 28, 2012) to establish personal jurisdiction over Liberty University due to its close connection to Liberty Counsel with respect to the Lisa Miller case. It argues that *Daynard* and *Mansfield Heliflight* are distinguishable because these cases "effectively rested on principles of estoppel" and "involved an element of reliance by the plaintiffs." *Id.* at 39. In sharp language, they also accuse the Court of improperly relying on the Christian character of both organizations to casually overlook their separate corporate forms.[17][18]

First, in reaching its conclusion on personal jurisdiction, this Court did not intend to resolve whether Liberty Counsel and Liberty University would be considered a joint venture under state law, or whether they acted as one unified entity for all purposes. Rather, the goal of the Court's analysis was to

---

[17] Defendants also suggest that the use of the word "Liberty" in each institution's name may have confused the court's jurisdictional analysis. It did not, as the Court did not rely on the linguistic similarity in the organizations' names in reaching its conclusion.

[18] In addition, Liberty University asserts that the Court cannot exercise personal jurisdiction over it based on the tortious conduct of its employees in this matter. However, the Court did not rely on this theory of jurisdiction in its earlier order, and need not do so here. *See* ECF 220.

address whether the jurisdictional contacts arising from Lindevaldsen and Staver's tortious conduct directed at Vermont could be imputed to Liberty University because of the intertwined nature of Liberty University and Liberty Counsel's engagement on this matter in particular. *See, e.g., Mansfield Heliflight, Inc. v. Heli-One Canada Inc.*, 2012 WL 4479851, at *8, n. 9 ("The question presented, precisely stated, is whether the actions of Heli-One Norway *in this case* can be attributed to Heli-One Canada, not whether the two companies are effectively one (and thus merged) for the purposes of jurisdictional analysis."). Moreover, the Court explicitly noted that the question of attribution of contacts for jurisdictional purposes was subject to "a less stringent test than that for liability" under a joint venture theory. *See Mansfield Heliflight, Inc.*, 2012 WL 4479851, at *6. It is in this context that the shared mission and views of the organizations' employees with respect to same-sex couples' rights, as well as those employees' use Liberty University resources for purposes of litigating Lisa Miller's case in Vermont, become relevant.

In addition, contrary to Liberty University's suggestion, *Mansfield Heliflight* and *Daynard* did not establish that the jurisdictional contacts of two organizations that are closely connected with respect to particular, tortious conduct at issue

in a case would be attributed to both only if the plaintiff

actually relied on the shared nature of that conduct. Rather,

the gravamen of those decisions was the connection between the

two entities with respect to the wrongdoing at issue in those

cases. In *Mansfield Heliflight*, a breach of contract and torts

case, this Court emphasized that the plaintiff engaged with

representatives from both entities at issue when it negotiated

the relevant contract. 2012 WL 4479851, at *8. It did not

suggest or require that the plaintiff rely on both companies'

participation when it agreed to the contract, or that the

plaintiff's understanding that both companies were involved was

somehow detrimental. Likewise, in *Daynard*, the First Circuit

reviewed the elements of joint venture and agency by estoppel,

but clarified that "[e]ven if the defendants' relationship were

to fall slightly outside of the confines of these specific

doctrines, the question before us is whether a sufficient

relationship exists under the Due Process Clause to permit the

exercise of jurisdiction, not whether a partnership, joint

venture, or other particular agency relationship between the two

defendants exists." *Daynard*, 290 F.3d at 56–57. Although the

Court in that case did take note of the fact that the Plaintiff

had relied on his communications with both organizations, it

ultimately rested its conclusion on the fact that an officer of

one organization ratified the others' representation that the

plaintiff would be hired on behalf of both firms. *Id.* at 60.
Thus, true to its word, the Court's analysis fell outside the
confines of the estoppel doctrine, relying principally on the
joint conduct of the defendant organizations.

In this case, Defendant Liberty University has moved to
dismiss without the benefit of discovery. Thus, Plaintiffs need
only make out a prima facie case of personal jurisdiction, and
it is plausible that further development of the record could
clarify that, in fact, Liberty University and Liberty Counsel
did not act in tandem for purposes of this case at all. However,
at this point, Plaintiffs have set forth sufficient facts to
permit the Court to infer that these two entities were operating
in a closely connected manner with regard to the representation
of Lisa Miller, that the representation furthered the
University's educational ends and was used for educational
purposes, and that third parties (including Jenkins and her
counsel) understood Liberty University to be providing support
to the litigation.[19] Although the Court may revisit this question

---

[19] In its prior order, the Court pointed to the following facts in this
regard: Liberty University and Liberty Counsel "shared common leadership,
were located in the same building, and Lindevaldsen, when acting as an
attorney for Liberty Counsel, used the resources of Liberty University to
carry out the business of her representation of Miller. The Plaintiffs allege
that Liberty Counsel acted as a "laboratory school" to train Liberty
University students, essentially serving as a law school clinical program.
Furthermore, Lindevaldsen and Staver's representation of Miller, ostensibly
solely on behalf of Liberty Counsel, was critical to carrying out their roles
as professors at Liberty University. Lindevaldsen wrote a book about her
representation of Miller which Plaintiffs allege was required reading for

if a different factual showing is made at a later stage, these facts are sufficient to attribute Liberty Counsel's contacts to Liberty University with regard to the matter at issue in this case.

Finally, Liberty Counsel, Lindevaldsen and Staver re-iterate many of the arguments they previously made, without specifically engaging with the Court's prior analysis of these issues. By and large, the Court has already considered and rejected these arguments. However, these Defendants make an additional contention that provides reason to reverse the Court's prior conclusion concerning its jurisdiction over Staver. Specifically, Defendants argue that this Court cannot exercise personal jurisdiction over Staver as a consequence of his agency relationship with Lindevaldsen, which arose from his position as her boss at Liberty Counsel and Liberty University. Lindevaldsen's alleged contacts with this forum, they contend, must be imputed to Liberty Counsel only, rather than to Staver.

---

students at the law school, and, as noted above, designed exam questions based on this case. In addition, Plaintiffs allege that the entities held themselves out to the student body and the public as being closely connected. For example, when RUL was in the process of negotiating an agreement with Liberty Counsel to fundraise for Miller's legal representation, Staver gave Zodhiates a tour of the Law School building. Ms. Lindevaldsen communicated from a Liberty University email address and used a Liberty University phone when she served as counsel in the Miller litigation on behalf of Liberty Counsel.˝

As Defendants note, the Restatement (Third) of Agency §
1.01 establishes that, generally, supervisors should be
considered co-agents, rather than principles, of the employees
they supervise. No court appears to have considered whether a
co-agency relationship is sufficient to attribute an employee's
jurisdictional contacts, and Defendants' suggestion to the
contrary is misleading.[20] Nevertheless, general agency principles
may be applied to establish personal jurisdiction. *See, e.g.,*
*Myers v. Bennett Law Offices,* 238 F.3d 1068, 1073 (9th Cir.
2001). Moreover, the Second Circuit has relied on the
Restatement of Agency to establish those principles in other
contexts. *See, e.g., Johnson v. Priceline.com, Inc.*, 711 F.3d
271, 277 (2d Cir. 2013). Under the Restatement's guidance, then,

---

[20] The authorities Defendants cite in this regard do not support this
proposition, but rather apply general agency principles to the personal
jurisdiction analysis. *See Carreras v. PMG Collins, LLC*, 660 F.3d 549, 556
(1st Cir. 2011)(analyzing whether individual was an agent of a corporation
but holding that "the record is hopelessly murky on the matter of agency,"
without addressing whether that individual would be an agent of a higher
officer in the corporation); *United Elec., Radio & Mach. Workers of Am. v.
163 Pleasant St. Corp.*, 960 F.2d 1080, 1090 (1st Cir. 1992) (assuming, for
the sake of argument, that employee's conduct was attributable to one
corporation, but primarily discussing the attribution of contacts from that
corporation to another); *Doe v. Forrest*, 853 A. 2d 48 (Vt. 2004) (failing to
discuss either liability of an individual supervisor for an employee's acts
or sufficiency of contacts for personal jurisdiction); *Brueckner v. Norwich
Univ.*, 730 A.2d 1086 (Vt. 1999) (same); *Myers v. Bennett Law Offices*, 238
F.3d 1068, 1073 (9th Cir. 2001) (failing to discuss whether supervisor could
have an agency relationship with subordinate employee); *Mason v. Sallyport
Glob. Holdings, Inc.*, 987 F. Supp. 2d 707, 711 (E.D. Va. 2013) (failing to
discuss supervisory status, but concluding merely that a company's "contacts
cannot be imputed to [an employee with supervisory status] simply because he
is an employee of" the company); *Grynberg v. BP P.L.C.*, 855 F. Supp. 2d 625,
645 (S.D. Tex. 2012), *aff'd*, 527 F. App'x 278 (5th Cir. 2013) (same); *Corbo
v. Laessig*, No. 2:10-CV-316-GMN-LRL, 2012 WL 1068271, at *5 (D. Nev. Mar. 28,
2012) (same, discussing fiduciary shield doctrine); *Siegel v. Holson Co.*, 768
F. Supp. 444, 446 (S.D.N.Y. 1991) (same).

Staver must be considered Lindevaldsen's co-agent rather than principle, and her tortious acts therefore cannot be imputed to him for jurisdictional purposes.

This Court determined previously that the "allegations against Staver alone are admittedly weaker than those against Lindevaldsen," and that Plaintiffs' allegations "do not demonstrate that Staver himself participated in efforts to assist Miller in fleeing the country." ECF 220, pp. 31, 32. The Court was also "not persuaded by Plaintiffs' argument that Staver's mere representation of Miller in the Vermont proceedings permits us to find personal jurisdiction over him here." *Id*., pp. 32-33. The Court nonetheless granted leave to amend to add Staver as a party based upon agency principles. In light of Defendants' more thorough briefing of this question at the instant stage, the Court is now persuaded that it cannot exercise jurisdiction over Staver.

**G.   First Amendment challenges**

*i.   Introduction*

Defendants Zodhiates, Hyden and RUL, as well as Wall, also moved to dismiss Plaintiffs' Section 1985(3) and intentional interference claims on grounds that they violate the First Amendment. In particular, Defendants Zodhiates, Hyden and RUL

contend that these claims are unconstitutionally overbroad and vague, and punish speech without a demonstration that it poses a clear and present danger.[21] Defendant Linda Wall references her special motion to strike, which contends generally that her requests for donations and her advocacy on behalf of Lisa Miller were protected by the First Amendment. ECF 242; 243-1.

Defendants raise their free speech arguments in the context of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)[22]. ECF 227. Thus, the Court must apply the standard of review discussed above for such motions. In particular, the Court must accept as true all of Plaintiffs' well-pleaded factual allegations and draw inferences from those allegations in the light most favorable to the Plaintiffs. *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005). Therefore, the Court must disregard Defendants' citations to their own affidavits for purposes of these motions, as well.

*ii. Analysis*

---

[21] These Defendants' arguments are directed primarily at the Section 1983 claim. They merely allege, in passing, that the same overbreadth, vagueness and "clear and present danger" challenges arise with respect to Plaintiffs' state law claims. Given the lack of an argument on the latter claim, the Court will center its discussion of these issues on Defendants' arguments concerning Section 1985.

[22] Although Defendants Zodhiates, Hyden and RUL do not identify the grounds for their motion, the Court will interpret their argument that Section 1985 violates the First Amendment as raising a defense that the complaint fails to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).

1.  *Overbreadth*

Defendants first assert that Section 1983 is
unconstitutionally overbroad because the amended complaint
"imputes to all Defendants a variety of activities *protected* by
the First Amendment." ECF 227, p. 4 (emphasis added). This
argument, however, severely distorts the overbreadth doctrine.
In *Broadrick v. Oklahoma*, the Supreme Court permitted
individuals whose own conduct was *not* protected by the First
Amendment to bring a facial challenge to a statute where "the
statute's very existence may cause others not before the court
to refrain from constitutionally protected speech or
expression." 413 U.S. 601, 611 (1973). The Court announced that,
since the overbreadth doctrine is a departure from the
traditional rules of standing, "the overbreadth of a statute
must not only be real, but substantial as well, judged in
relation to the statute's plainly legitimate sweep,"
"particularly where conduct and not merely speech is involved."
*Id*. at 616. Thus, "[f]acial overbreadth has not been invoked
when a limiting construction has been or could be placed on the
challenged statute." *Id.* at 613. Later, the Court clarified that
"where, despite some possibly impermissible application, the
remainder of the statute covers a whole range of easily
identifiable and constitutionally proscribable conduct, ... the

Court has required a litigant to demonstrate that the statute "as applied" to him is unconstitutional." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 964–65 (1984); *see also Bordell v. Gen. Elec. Co.,* 922 F.2d 1057, 1061 (2d Cir. 1991) (The overbreadth doctrine "only allows those who have suffered some cognizable injury, but whose conduct is *not* protected under the First Amendment, to assert the constitutional rights of others." (emphasis added)).

Here, however, Defendants neither demonstrate that the statute as applied to them is unconstitutional, nor show that, although it is constitutional as applied to them, a substantial amount of protected speech would be prohibited or chilled. Rather, they point to a laundry list of facts alleged in the amended complaint that entail speech, without explaining how or why that speech would be proscribed by the statute at issue. In fact, none of these facts fully encompasses the predicate conduct for a Section 1985 claim, which requires that Defendants engage in overt acts to hinder the authorities from providing equal protection of the law to Plaintiffs, and cause injury to Plaintiffs in doing so. The key predicate conduct, therefore, entailed assisting Lisa Miller in physically removing Isabella from the country so as to avoid the jurisdiction of U.S. authorities –conduct which, clearly, does not merely constitute

protected speech. Moreover, even Defendants' argument that the statute would have a chilling effect on attorneys who seek to represent their clients fails. Clearly, a limiting construction can and has been placed on Section 1985's hindrance clause to ensure that attorneys will not be punished under the law for merely representing a client. That construction is evident in the language of the statute itself, which requires an individual to actually aim to hinder state authorities from providing equal protection under the law. Here, Defendants created such an obstacle by physically and materially assisting Lisa Miller in kidnapping a child, and her attorneys did so by providing similar physical assistance and allegedly committing fraud to assist Lisa Miller in removing Isabella from the country. As such, the Court finds that Defendants have failed to show that the statute as applied to them is unconstitutional, or that statute is facially overbroad.

## 2. *Vagueness*

Next, Defendants also contend that Section 1985 is unconstitutional because the term "hinder" is impermissibly vague, especially "when it is the person's role to 'hinder' the operation of the system." ECF 227, p. 7. To be sure, "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned*

*v. City of Rockford*, 408 U.S. 104, 108–09 (1972). The Supreme
Court in *Grayned* found that a statute is impermissibly vague
when it offends several values. First, statutes must "give the
person of ordinary intelligence a reasonable opportunity to know
what is prohibited," thereby providing "fair warning." *Id.*
Second, laws must not "impermissibly delegate[] basic policy
matters" to those who enforce them, as this would constitute a
"broad invitation to subjective or discriminatory enforcement."
*Id.* at 108-09, 113. Third, "where a vague statute abuts upon
sensitive areas of basic First Amendment freedoms, it operates
to inhibit the exercise of those freedoms." *Id.* at 109 (internal
quotations omitted). Therefore, laws that permit "persons to be
punished for merely expressing unpopular views" may also be
unconstitutionally vague for this reason. *Id.* at 113.

None of these considerations make Section 1985
unconstitutionally vague in this case. First, the statute
provides sufficient fair warning to reasonably intelligent
people about the scope of the conduct it prohibits. Defendants
cite two cases in which the Supreme Court struck down statutes
(or interpretations of statutes) that included the word
"hinder." *See* ECF 227, p. 7 (citing *Cox v. Louisiana,* 379 U.S.
536, 551 (1964); *Thornhill v. Alabama*, 310 U.S. 88 (1940)). In
*Cox,* however, the Court did not single out the word "hinder" as

the cause of the constitutional defect, and instead relied on the overbreadth of the statute to reach its conclusion about vagueness. 379 at 552 ("A statute which ... is so vague and indefinite as to permit the punishment of the fair use of this opportunity [for free political discussion] is repugnant to the guaranty of liberty contained in the Fourteenth Amendment."). Likewise, *Thornhill* neither singled out the term "hinder" as a reason for holding that the statute at issue was unconstitutional, nor engaged in a vagueness analysis at all. 310 U.S. at 100.

In fact, the Supreme Court has warned that, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. Rather, the vagueness of particular words in a statute is circumscribed by their "particular context." *Id.* Thus, for example, in *Grayned*, the Supreme Court found that a law prohibiting certain disturbances was not vague even though the "prohibited quantum of disturbance is not specified in the ordinance," since "the prohibited disturbances are easily measured by their impact" on particular activities. *Id.*

Likewise, in this case, the term "hinder" is given a precise meaning by the context in which it appears. In particular, the hindrance clause prohibits conspiracies "for the

purpose of preventing or hindering the constituted authorities
of any State or Territory from giving or securing to all persons
within such State or Territory the equal protection of the
laws." 42 U.S.C. § 1985(3). Thus, as explained above, the
defendant must have acted with discriminatory animus against the
plaintiff, and his or her conduct must have had a measurable
impact on the capacity of the state to provide equal protection.
In this sense, whether a defendant's hindrance is prohibited
under § 1985 will be measured both by its intent and its impact.
Thus, pursuant to *Grayned*'s rationale, the statute is
sufficiently specific to provide fair notice. Moreover, these
limitations ensure that the statute will not constitute a broad
invitation to discriminatory enforcement.[23] Finally, the statute
is not vague as a consequence of punishing people "for merely
expressing unpopular views," because, as explained above,
significantly more than an unpopular view is required to make
out a claim under § 1985. Accordingly, Defendants' motion to
dismiss on this ground cannot prevail.

---

[23] Defendants also rely on *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051
(1991), arguing that careful review is required because "[t]he statute
necessarily implicates the rights of lawyers and others who have a
professional mission to challenge the actions of the State." ECF 227, p. 8.
However, the Court in *Gentile* focused its inquiry on whether the regulation
of lawyers would be subject to *less* stringent First Amendment scrutiny, not
more so. Moreover, the *Gentile* Court ultimately determined that the statute
"raise[d] concerns of vagueness and selective enforcement" because a
particular safeguard provision of the statute had led the defendant in that
case to believe that his conduct was *not* prohibited. *Gentile,* 501 U.S. at
1034. This case presents no such provision, and Defendants do not argue that
they believed their conduct was permissible because of the terms of the §
1985 statute itself. Accordingly, *Gentile* is inapposite to this case.

3. *Advocacy of illegality*

Finally, Defendants contend that § 1985(3) violates the First Amendment's protection of advocacy of illegality. In particular, they allege that Victoria Hyden's relevant conduct for purposes of this claim amounted only to fundraising and advocacy of civil disobedience. Therefore, they claim, § 1985 directly punishes her protected speech.

To be sure, the First Amendment does protect advocacy of illegality. *See Bradenburg v. Ohio,* 395 U.S. 444 (1969). However, that conduct by Hyden is not, in fact, the source of her potential liability under § 1985. Rather, Hyden committed overt acts to further the conspiracy by allegedly facilitating communication between her father, who has been convicted of the kidnapping, and Lindevaldsen, who allegedly lied to Vermont courts, in order to facilitate Lisa Miller's and Isabella's travel. That conduct is clearly distinct from merely advocating for civil disobedience without providing direct assistance in the commission of legal violations. Thus, Hyden's conduct does not fall within the category of speech protected by *Bradenburg*, which applies to "the mere abstract teaching of the moral propriety or even moral necessity for a resort to force and violence." *Brandenburg*, 395 U.S. at 448 (1969). Accordingly, the

Court denies Defendants' motion to dismiss on First Amendment grounds altogether.

**H.  Motions to Strike**

*i.  Introduction*

Along with their motions to dismiss, Defendant Wall and Defendants Liberty Counsel, Lindevaldsen and Staver filed two special motions to strike Plaintiffs' amended complaint. *See* ECF 239, 243. Defendants contend that Vermont law allows them to move to strike the complaint in its entirety because Plaintiffs' claims arise out of protected First Amendment activity. In response, Plaintiffs argue that these motions must be denied because (1) the anti-SLAPP statute does not apply in federal court; and (2) even if it did, Defendants have failed to meet their burden of showing that the anti-SLAPP statute should apply to the circumstances of this particular case. For the reasons outlined below, the Court agrees that the anti-SLAPP statute is inapplicable to the facts of this case, and therefore denies Defendants' motions to strike on this ground.

*ii.  Analysis*

Like other states, Vermont has enacted a statute to prevent so-called strategic lawsuits against public participation ("SLAPP") from advancing at an early stage. "The statute is

based upon two legislative findings: (1) There has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and freedom to petition the government for the redress of grievances[; and] (2) It is in the public interest to encourage continued participation in matters of public significance, and this participation should not be chilled through abuse of the judicial process." *Felis v. Downs Rachlin Martin PLLC,* 133 A.3d 836, 847 (Vt. 2015). Although Defendants do not raise the issue, Plaintiffs first challenge whether the statute applies at all in federal court under *Erie* and its progeny.

This Court has already held that the automatic stay provision of Vermont's anti-SLAPP statute cannot apply to Plaintiffs' federal claim. ECF 220. ("[S]uch a state norm cannot apply to a federal cause of action, since doing so would frustrate substantive federal rights and violate the Supremacy Clause.") (citing *Hillton v. Hallmark Cards,* 599 F.3d 894, 900–01 (9th Cir. 2010); *Doctor's Data, Inc. v. Barrett,* No. 10-cv-03795, 2011 WL 5903508, at *2 (N.D. Ill. Nov. 22, 2011)). Nevertheless, as the Court previously noted, the fact that this Court has federal question jurisdiction over Count Two of the amended complaint does not alone preclude the anti-SLAPP statute's potential applicability to the state law claim in

Count One. *See Wright & Miller,* 19 Fed. Prac. & Proc. Juris. §
4520 (3d ed.) ("It frequently is said that the doctrine of *Erie
Railroad Company v. Tompkins* applies only in diversity of
citizenship cases; this statement simply is wrong."); *Maternally
Yours v. Your Maternity Shop*, 234 F.2d 538, 541 (2d Cir.
1956)("[I]t is the source of the right sued upon, and not the
ground on which federal jurisdiction over the case is founded,
which determines the governing law. Thus, the Erie doctrine
applies, whatever the ground for federal jurisdiction, to any
issue or claim which has its source in state law.") (internal
citation omitted).

In three prior cases, this Court has applied the anti-SLAPP
statute's procedural scheme to state law claims brought in
federal court. *See, e.g., Ernst v. Kauffman*, 50 F. Supp. 3d 553,
559 (D. Vt. 2014), *on reconsideration,* No. 5:14-CV-59, 2016 WL
1610608 (D. Vt. Apr. 20, 2016); *Haywood v. St. Michael's Coll.,*
No. 2:12-CV-164, 2012 WL 6552361, at * 13-16 (D. Vt. Dec. 14,
2012), *aff'd,* 536 F. App'x 123 (2d Cir. 2013), *as corrected*
(Oct. 23, 2013). Plaintiff provides persuasive arguments for
reconsidering that tradition in this District. The Court need
not depart from that precedent to resolve the question at issue,
however. Even if the Court were to consider the applicability of
the anti-SLAPP statute with respect to Plaintiffs' state claim,

104

Defendants have failed to demonstrate that this is the type of case to which that procedural device would apply.

The state's anti-SLAPP claim is subject to a two-part burden shifting standard: first, "the defendant must show that the case arises from defendant's exercise of "the right to freedom of speech or to petition the government" and that the speech or petition is "in connection with a public issue." *Ernst v. Carrigan*, 814 F.3d 116, 119 (2d Cir. 2016). If the defendant meets that burden, then the motion must be granted unless plaintiff shows that the defendant's exercise of his or her right to freedom of speech and to petition was devoid of any reasonable factual support and any arguable basis in law, and the defendant's acts caused actual injury to the plaintiff. *Felis v. Downs Rachlin Martin PLLC*, 200 Vt. 465, 479-81 (2015). "At the very least, to meet the first prong of this test, Plaintiff must demonstrate that his claim is legally sufficient." *Haywood v. St. Michael's Coll.*, Case No. 2:12-cv-164, 2012 WL 6552361, at *15 (D.Vt. Dec. 14, 2012).

Thus, this Court has recently identified three elements of a defendant's anti-SLAPP claim:

> 1. The defendant asserting the SLAPP motion to strike must be sued "in an action arising from the defendant's exercise ... of the right to freedom of speech or to petition the government for redress of grievances." 12 V.S.A. § 1041(a).

2. Such statements are protected only if they are made "in connection with a public issue." *Id.*

3. The requirement that the content of a protected statement concern issues of public interest applies to statements made before a governmental body.

*Ernst v. Kauffman*, Case No. 5:14-cv-59, 2016 WL 1610608, at *4-6 (D. Vt. Apr. 20, 2016). A defendant meets his or her burden of showing that that a particular activity constitutes "the exercise, in connection with a public issue, of the right to freedom of speech or to petition the government for redress of grievances under the U.S. or Vermont Constitution," 12 V.S.A. § 1041(a), "by demonstrating that the act ... fits one of the categories spelled out in subsection (i) of the anti-SLAPP statute." *Haywood v. St. Michael's Coll.*, Case No. 2:12-cv-164, 2012 WL 6552361, at *13 (D.Vt. Dec. 14, 2012).

Here, however, Plaintiffs' state law claim for intentional interference with Jenkins' custody does not arise from protected speech. Rather, it arises from Lisa Miller's furtive departure from the United States immediately before she would have been obligated to surrender Isabella to Jenkins pursuant to a court order, first temporarily and later, on a full-time basis. The claims which Plaintiffs assert against the remaining defendants center on the support that they allegedly provided to Lisa Miller to carry out this wrongful conduct. The fact that some of the activities that Defendants engaged in –including the Liberty

106

Counsel attorneys' representations to state courts, and Wall's fundraising support –might constitute protected speech in some contexts does not salvage the anti-SLAPP claim. Rather, it is the combination of these acts along with Defendants' alleged agreement with Lisa Miller to support her in unlawfully interfering with Jenkins' custody over Isabella, and Lisa Miller's actions in doing so, which give rise to the claim. Thus, while the amended complaint does include allegations that Defendants engaged in speech, the Court concludes that Plaintiffs' state law claim does not "arise from" that protected speech.

Admittedly, Wall, Staver and Lindevaldsen's affidavits deny that they provided any assistance to Lisa Miller to enable her to flee the country with Isabella or to disobey any court orders.[24] However, this evidence goes to show that Plaintiff's

---

[24] In general, in ruling on a special motion to strike under Vermont's anti-SLAPP statute, the Court may consider a broader range of evidence than it would in ruling on a motion to dismiss. In particular, the state anti-SLAPP statute provides that "[i]n making its determination, the court *shall* consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." 12 V.S.A. § 1041(e)(2); *see also Ernst v. Carrigan,* 814 F.3d 116, 119 (2d Cir. 2016) ("To decide such motions, courts look to the pleadings and supporting and opposing affidavits.") (internal quotation omitted). The Vermont Supreme Court has not yet determined how a plaintiff's allegations in pleadings should be weighed against supporting or opposing affidavits, and the wording of the statute does not evince what forms of evidence hold greater weight when affidavits conflict. In fact, states with similar anti-SLAPP statutes have reached different conclusions concerning whether plaintiffs must submit affidavits at all in responding to anti-SLAPP motions, or whether courts can simply rely on the allegations in a complaint. *See* Robert T. Sherwin, *Evidence? We Don't Need No Stinkin' Evidence!: How Ambiguity in Some States' Anti-SLAPP Laws Threatens to De-Fang A Popular and Powerful Weapon Against Frivolous Litigation*, 40 Colum. J.L. & Arts 431, 434–35 (2017) (explaining that

underlying claim is meritless, and therefore is relevant to the second prong of the anti-SLAPP test. *See Haywood,* 2012 WL 6552361, at *15 (To show that defendants' exercise of their right to freedom of speech was devoid of any reasonable factual support or arguable basis in law Plaintiff must demonstrate, at the very least, "that his claim is legally sufficient."). In determining whether or not claims "arise from" the protected speech, this Court must assess the nature of the allegations themselves. Here, the nature of the claim entails far more than speech. Accordingly, Defendants' special motions to strike the amended complaint are denied.

## IV. Conclusion

For the foregoing reasons, the Court **denies** Defendants' motions to dismiss and motions to strike the amended complaint in part. It **grants** these motions only to hold that Plaintiffs have failed to allege that Liberty University can be held vicariously liable for the acts of Staver, that the Court cannot exercise personal jurisdiction over Staver, and to dismiss Isabella Miller-Jenkins' claim under Count One.

---

although California and Texas' anti-SLAPP statutes use nearly identical language, courts in each state have reached opposite conclusions on the question of whether pleadings are sufficient evidence to establish a plaintiff's burden to defeat an anti-SLAPP motion).

Dated at Burlington, in the District of Vermont, this 29th day of September, 2017.

/s/ William K. Sessions III
William K. Sessions III, Judge
United States District Court