UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Janet Jenkins,                  )
                                )
        Plaintiff,              )
                                )
    v.                          )    Case No. 2:12-cv-184
                                )
Kenneth L. Miller, *et al.*,    )
                                )
        Defendants.            )

## OPINION AND ORDER

This case arises out of a parental rights dispute, related state court litigation, and the international kidnapping of a child. Plaintiff Janet Jenkins, one of the child's mothers, claims Defendants conspired with and aided and abetted Lisa Miller, the child's other mother, to defy family court orders and commit the kidnapping. Her causes of action include the intentional tort of kidnapping and violation of her constitutional rights under 42 U.S.C. § 1985. Defendants Liberty Counsel and Rena Lindevaldsen ("Defendants") have moved for summary judgment. For the reasons set forth below, their motions are granted.

## Factual Background

### I.   General Background

Isabella Miller-Jenkins was born in 2002. At that time, her biological mother, Lisa Miller, was united with Janet Jenkins in a Vermont civil union. When Isabella was seventeen

months old, Lisa Miller moved with her to Virginia and
petitioned the Vermont family court to dissolve the union.  In
2004, a Vermont court recognized Janet Jenkins as Isabella's
legal parent and granted her the right to parent-child contact.
That right was subsequently affirmed by the Vermont Supreme
Court, while courts in Virginia concluded that Vermont had
jurisdiction over the matter.

Lisa Miller repeatedly refused Janet Jenkins her court-
ordered visitation with Isabella and was held in contempt of
court as a result.  In May 2009, Jenkins filed a motion in
Vermont family court to transfer primary custody of Isabella
from Lisa Miller to herself.  In August 2009, a Virginia family
court held Lisa in contempt, instituted a fine of $100 per day
for each day Jenkins was supposed to have custody, and warned
that further violations could result in jail time.  In late
August 2009, the Vermont family court stated that it would grant
Jenkins' motion for transfer of custody if Lisa did not allow
visitation.  At the next hearing in early September 2009, the
Vermont family court ordered that visitation occur September 25,
2009 through September 27, 2009.

On September 21, 2009, Lisa Miller fled the United States
with Isabella.  They arrived in Managua, Nicaragua on September
23, 2009.  Jenkins claims that Lisa Miller did not act alone and
that her lawyers, Liberty Counsel and Rena Lindevaldsen, were

among the actors who helped her defy court orders and leave the country.

## II.  Liberty Counsel

Mathew Staver and Anita Staver co-founded Liberty Counsel in 1989.  Based in central Florida, Liberty Counsel is a non-profit law firm that reportedly engages in, among other things, *pro bono* constitutional litigation and advocacy in partnership with individuals, churches, and other religious organizations. In 2004, Liberty Counsel agreed to represent Lisa Miller in her custody dispute with Janet Jenkins.

Jenkins claims that Liberty Counsel was involved in advising Lisa Miller to defy court orders and helped facilitate her disappearance.  The latter claim is based, in part, on alleged phone contact between Philip Zodhiates, a criminally-convicted co-conspirator, and Liberty Counsel around the time of the kidnapping.  Jenkins also claims that Liberty Counsel misled the courts – thereby aiding and abetting the conspiracy – when its attorneys represented that they did not know of Lisa Miller's whereabouts after she left the United States.

Liberty Counsel argues that at no time did it advise or assist Lisa Miller with respect to her intentional violations of court orders.  Liberty Counsel also denies any involvement in the kidnapping.  While Attorney Lindevaldsen submits that, with respect to her own liability, there is insufficient evidence to

3

present to a jury, Liberty Counsel argues that Lindevaldsen was not an employee of the firm and that it cannot be held liable for her actions.

In addition to its arguments on the merits of the claims being brought against it, Liberty Counsel's motion for summary judgment contends that Lisa Miller's claims are time barred; that it never advised her to violate the law; that the Court lacks personal jurisdiction; that Lisa Miller and Janet Jenkins released it from liability; that it did not proximately cause Isabella's kidnapping; and that Jenkins has offered no admissible evidence of her damages, including the amount of damages.

## III. Rena Lindevaldsen

Rena Lindevaldsen was employed by Liberty Counsel prior to 2006. In 2006, she joined the faculty at Liberty University. The parties dispute Lindevaldsen's employment status with the firm after that time, with Liberty Counsel arguing she was an independent contractor.

Jenkins claims that Lindevaldsen was involved in Lisa Miller's decisions to defy court orders and leave the United States. Lisa Miller testified that Lindevaldsen once told her: "If she was my daughter, I wouldn't give the visitation, and I wouldn't allow this to happen, and I would leave." ECF No. 868-

5 at 80:15-18.[1]  Lisa Miller further testified that, according to Philip Zodhiates, "[o]riginally, I was to stay in the United States, . . . but Rena Lindevaldsen said I could not stay in the States, that I had to leave the country" and "needed to go to a place where there was not extradition and there would be extradition in the United States."  *Id.* at 99:10-14, 100:21-23. Lindevaldsen also reportedly asked Lisa Miller to provide a list of her debts, which Lisa took to mean that those debts would be taken care of in the event she went into hiding.  *Id.* at 87:3-5, 88:9-12.

Jenkins further claims that Lindevaldsen received certain emails from Philip Zodhiates.  The emails were allegedly delivered by Zodhiates' daughter, Victoria Hyden, who worked in the same building as Lindevaldsen.  Some of the email messages asked for Lindevaldsen's assistance with collecting items that Lisa Miller, after leaving the country, asked to be retrieved from her apartment in Virginia.  *E.g.* ECF No. 868-38, 868-40. As explained more fully below, Lindevaldsen denies ever receiving those emails.

Jenkins also accuses Lindevaldsen of misleading the Vermont courts about Lisa Miller's whereabouts.  Specifically, on

---

[1]  While certain evidence, including Lisa Miller's deposition transcript, has been filed under seal, the portions cited by the Court are discussed openly in the parties' unsealed filings.

December 18, 2009, Lindevaldsen allegedly misrepresented her knowledge about Lisa Miller's location. On December 22, 2009, Lindevaldsen told the Vermont court that she had no reason to believe her client was not home until informed of that fact by Jenkins' counsel. And on January 22, 2010, Lindevaldsen informed the Vermont court that she did not know where her client was and did not know anyone who would know. Lindevaldsen denies knowing about Lisa Miller's location at any of those times.

Like Liberty Counsel, Lindevaldsen now moves for summary judgment. Her motion incorporates several of the arguments asserted by Liberty Counsel, including the contention that the claims brought against her are untimely; that the Court lacks subject matter jurisdiction; and that Jenkins has failed to offer evidence of damages and the amount of damages. Lindevaldsen also argues that the factual record undermines the allegations against her, and that there is insufficient evidence to present to a jury.

## Discussion

### I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A

disputed fact is material only where the determination of the fact might "affect the outcome of the [law]suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment, the movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in her favor. *Anderson*, 477 U.S. at 249. If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12

7

F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## II. Timeliness

Liberty Counsel and Lindevaldsen first argue that Jenkins' claims are untimely.  Jenkins filed her initial Complaint on August 14, 2012.  ECF No. 1.  She first moved to name Liberty Counsel and Lindevaldsen as Defendants in a filing dated October 7, 2016, ECF No. 204, and those Defendants formally became parties when Jenkins filed her Revised Second Amended Complaint on May 4, 2017, ECF No. 223.  Defendants now cite Jenkins' deposition testimony to argue she was aware of her claims against them in 2012, and that waiting several years to file those claims ran afoul of the applicable statutes of limitations.

There is no dispute that both of Jenkins' causes of action have a three-year limitations period.  *See* 12 V.S.A. § 512; *Eaton v. Prior*, 58 A.3d 200, 204 (Vt. 2012); *Meyer v. Frank*, 550 F.2d 726, 728 (2d Cir. 1967) ("An action brought under the federal Civil Rights Act is subject to the statute of limitations the state courts would apply in an analogous state action.").  The Vermont Supreme Court has held that "[a]n action accrues so as to trigger the statute of limitations 'when a

8

plaintiff discovers or reasonably should discover the injury, its cause, and the existence of a cause of action.'"  *Eaton*, 58 A.3d at 204 (quoting *Lillicrap v. Martin*, 591 A.2d 41, 47 (Vt. 1989); *see also Earle v. State*, 743 A.2d 1101, 1108 (Vt. 1999) (observing that the limitation period "begins to run when a plaintiff had information, or should have obtained information, sufficient to put a reasonable person on notice that a particular defendant may have been liable for the plaintiff's injuries") (quotation marks and citation omitted)).

Jenkins argues at the outset that the timeliness argument is barred by the law of the case, particularly with respect to her federal claim.  Liberty Counsel previously moved to dismiss both claims as untimely.  The Court, applying the legal standard for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), denied the motion.  ECF No. 277 at 72-78.

The Second Circuit has held that "[t]he doctrine of law of the case is 'discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.'" *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).  "And in any event, the doctrine would not preclude a district court from granting summary judgment based on evidence after denying a motion to dismiss based only on the plaintiff's allegations."

9

*Id.* Because the Court was previously ruling on a motion to dismiss based solely on Jenkins' allegations, it may now revisit the question of timeliness based on the record at summary judgment.

In its prior ruling, the Court accepted certain allegations to be true and concluded, based on those facts, that a reasonable person would not have suspected Liberty Counsel was liable for Jenkins' alleged injuries. ECF No. 277 at 73-74. Specifically, the Court accepted the allegation that Attorneys Staver and Lindevaldsen misled the state courts by asking to withdraw from representing Lisa Miller on the ground that they did not know where she was. *Id.* at 74. Such representations allegedly implied that those attorneys were not involved in Lisa Miller's disappearance. *See id.* The Court further accepted that Jenkins only learned of Liberty Counsel's potential liability at the 2016 criminal trial of Philip Zodhiates. *Id.* Accordingly, applying the motion to dismiss standard, the Court ruled that Jenkins' tortious interference claim initiated in 2017 was timely. With respect to her federal civil rights claim, the Court concluded that given the alleged efforts to mislead the courts, and the allegation that the Defendants were "continuing to hold Isabella abroad . . . the continuing nature of the hindrance of equal protection . . . extends the accrual date in this case to the present moment." *Id.* at 77-78.

10

Defendants now challenge the factual underpinnings of the
Court's decision, as well its ruling as to the accrual date.
With respect to the factual record, Jenkins' deposition
testimony reveals a series of concessions that call the
timeliness of her claims into question.  For example, Jenkins
was asked whether, when she filed her complaint in 2012, she
believed that Mathew Staver was advising Lisa Miller to violate
and disobey the Vermont court orders.  Jenkins responded:
"Absolutely."  ECF No. 823-28 at 59:20-24.  She also confirmed
her belief in 2012 that Liberty Counsel was "advising Lisa
Miller to violate and disobey the Vermont court orders."  *Id*. at
59:25-60:3.  When asked to identify the suspected co-
conspirators in the kidnapping, Jenkins listed "Rena
Lindevaldsen, Liberty Counsel, [and] Mat Staver" among others.
Counsel then clarified that this response applied to her
knowledge at the time she filed her initial Complaint: "And so
as of August 14, 2012, when you filed this [C]omplaint, you
believed that Rena Lindevaldsen, Mathew Staver, and Liberty
Counsel were part of the conspiracy that had devised the plan to
kidnap Isabella."  Jenkins responded: "Right."  *Id*. at 67:19-
68:13.

Jenkins argues that her "belief" in 2012 was not sufficient
for her causes of action to accrue at that time.  Additional
testimony confirms, however, that Jenkins was reasonably certain

11

about Liberty Counsel's alleged liability.  *See Eaton*, 58 A.3d
at 205 ("The law does not require absolute certainty for the
statute to run.").  With respect to Mathew Staver, Jenkins
testified that as of 2012 "all the roads led to him as far as
all the information I had learned in Timothy Miller and Ken
Miller's arrests and then [the 2012] court trial for Ken Miller.
You know, the timeline was pretty obvious."  ECF No. 823-28 at
71:24-72:3.  When asked why she believed in 2012 that Liberty
Counsel was involved in the kidnapping, she similarly stated
that "[a]ll the information up to that point was leading to them
. . . it was really clear to me of their involvement."  *Id.* at
73:4-10.  When counsel asked her to confirm that "[t]here was no
doubt in your mind" about Liberty Counsel's involvement in the
kidnapping, Jenkins responded: "None."  *Id.* at 73:22-25.

Jenkins highlights her deposition testimony, offered in
response to questioning by her own attorney, in which she stated
that the 2016 Zodhiates trial was where she learned much of the
information about Liberty Counsel's involvement.  ECF No. 823-28
at 334:22-24 ("I believe I mixed up 2012 and 2017 [sic] because
a lot of information I got at Philip Zhodiates' trial in 2017
[sic] and I was thinking it was 2012.").  Jenkins specifically
references certain FBI emails reportedly produced at the that
trial.  Those emails pertained to requests from Lisa and
Isabella while in Nicaragua, which Jenkins believed showed

Lindevaldsen's involvement in sending the requested items.  *Id.* at 65:8-14.

That testimony does not fully discount Jenkins' prior testimony as to her understanding of the facts in 2012, with specific reference to the 2012 trial of Kenneth Miller.  Jenkins allegedly learned at the Kenneth Miller trial that Philip Zodhiates called Staver shortly after dropping off Lisa and Isabella at the border.  *Id.* at 69:18-70:11.  She testified that this discovery led her to believe that Staver was involved in the conspiracy.  *Id.* at 70:18-24.  Jenkins also testified to knowing as of 2011 that Lindevaldsen had raised in one of her law school classes the issue of civil disobedience by Lisa Miller, which led Jenkins to believe that Lindevaldsen and Staver were advocating for Lisa to disobey court orders.  *Id.* at 102:16-103:3.  Moreover, on re-direct examination by Defendants' counsel, Jenkins confirmed that in 2012 she believed Liberty Counsel was involved in the kidnapping.  *Id.* at 349:2-21.

In its ruling on the motion to dismiss, the Court accepted as true that in 2012 Jenkins was unaware of Liberty Counsel's involvement in the alleged conspiracy.  The deposition testimony cited above counters that assertion.  Jenkins stated repeatedly that she was virtually certain as of 2012 that Mathew Staver, Rena Lindevaldsen, and Liberty Counsel were involved.  That is sufficient for the Court to find as a matter of law that her

state law cause of action accrued at that time, and that her
claims filed more than three years later against Liberty Counsel
and Rena Lindevaldsen were untimely.  Indeed, given the
testimony cited above, even when viewing it in a light most
favorable to Jenkins, no reasonable juror could conclude that
her claims against Defendants did not accrue until after 2012.

    With respect to Jenkins' federal cause of action, the
Second Circuit has held that "a plaintiff need not know each and
every relevant fact of his injury or even that the injury
implicates a cognizable legal claim.  Rather, a claim will
accrue when the plaintiff knows, or should know, enough of the
critical facts of injury and causation to protect himself by
seeking legal advice." *Kronisch v. United States*, 150 F.3d 112,
121 (2d Cir. 1998) (citation omitted).  That Jenkins alleges a
conspiracy does not impact the general rule.  *See, e.g.,*
*Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir. 1980)
("The existence of a conspiracy does not postpone the accrual of
causes of action arising out of the conspirators' separate
wrongs.  It is the wrongful act, not the conspiracy, which is
actionable."); *see also Pinaud v. Cty. of Suffolk*, 52 F.3d 1139,
1157 (2d Cir. 1995) ("[W]hen a plaintiff knows or ought to know
of a wrong, the statute of limitations on that claim starts to
run, and the later awareness that the actionable wrong was also

14

a part of a conspiracy does not expand the statutory time
limit.").

The Court's prior ruling on the federal claim accepted as
true that Liberty Counsel made efforts to conceal Lisa Miller's
location, and concluded that such ongoing efforts could extend
the limitations period.  That ruling makes sense in the context
of Jenkins' assertion that she was unaware of Liberty Counsel's
involvement in the alleged misconduct when she filed her initial
Complaint.  The record now shows that Jenkins did, in fact,
believe that Liberty Counsel was involved when she filed her
Complaint.  That evidence bars the application of an ongoing
limitations period.

The continuing wrong exception typically applies in
"inequitable situations that occur when the plaintiff's cause of
action would otherwise be barred before he discovers the
injury."  *Golino v. City of New Haven*, 761 F. Supp. 962, 966 (D.
Conn. 1991) (citation omitted); *see also Ruane v. Cnty. of
Suffolk*, 923 F. Supp. 2d 454, 460 (E.D.N.Y. 2013) (noting that
the continuing violation exception can apply "where there is a
pattern of covert conduct such that the plaintiff only belatedly
recognizes its unlawfulness").  Here, Jenkins has conceded,
contrary to her initial allegations, to believing in 2012 that
Liberty Counsel was involved in Miller's decisions to defy court

15

orders and relocate with Isabella outside the United States. She therefore knew of her injury at that time.

Jenkins argues, albeit in a footnote, that her claims are saved by the continuing tort doctrine. Vermont courts have never applied that doctrine, though they have acknowledged a possible variation for discrimination cases. *Nesti v. Vermont Agency of Transp.*, 296 A.3d 729, 741 (Vt. 2023). Even assuming established case support for its application, however, the doctrine would not apply here. The Vermont Supreme Court has explained that "[t]he continuing tort doctrine requires that a tortious act — not simply the continuing ill effects of prior tortious acts — fall within the limitation period. The necessary tortious act cannot be the failure to right a wrong committed outside the limitation period. If it were, the tort in many cases would never accrue because the defendant could undo all or part of the harm." *Gettis v. Green Mountain Econ. Dev. Corp.*, 892 A.2d 162, 170 (Vt. 2005) (citations omitted). Here, Jenkins claims that Defendants aided in the violation of her rights, and then continued the violation by failing to reveal Lisa Miller's location. As the *Gettis* court explained, applying the continuing tort doctrine to such a claim would mean the cause of action might never accrue, since Defendants could theoretically undo the harm at any time. Given the Vermont

Supreme Court's guidance, the Court declines to apply the doctrine here.

Jenkins also argues, again in a footnote, that her claims filed in 2017 relate back to her initial Complaint under Federal Rule of Civil Procedure 15(c)(1)(C). Her argument is that relation back applies because Defendants had notice in 2012 of the potential allegations against them. Rule 15(c)(1)(C) allows a claim to relate back if the new party "(i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C).

The Second Circuit has held that although "Rule 15(c) explicitly allows the relation back of an amendment due to a 'mistake' concerning the identity of the parties . . . [,] the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." *Hogan v. Fischer*, 738 F.3d 509, 519 (2d Cir. 2013). Jenkins' deposition testimony establishes that she knew of both Liberty Counsel and Lindevaldsen, and of their alleged involvement in Lisa Miller's actions, when she filed her 2012 Complaint. Consequently, the failure to name Liberty Counsel and Lindevaldsen at that time cannot be considered a mistake.

17

*See id.*  The 2017 amendment of her Complaint therefore did not relate back to the initial Complaint with respect to those two Defendants, and Jenkins' claims against them are untimely. Liberty Counsel and Lindevaldsen are entitled to summary judgment on that basis.

## III. The Merits

Even assuming Jenkins' claims were timely, the Court finds that Liberty Counsel and Lindevaldsen are entitled to summary judgment on the merits.  Briefly stated, when viewing the facts in the light most favorable to the non-moving party, the evidence does not support Jenkins' claim that those two Defendants were involved in Lisa Miller's tortious conduct, or that they aided and abetted such conduct as alleged in Count One.  Nor do the facts, again viewed in Jenkins' favor, show that Liberty Counsel or Lindevaldsen violated her constitutional rights as alleged in Count Two.  For reasons discussed below, those Defendants are therefore entitled to judgment as a matter of law.

### A.    Causes of Action

Jenkins asserts two causes of action: an intentional tort of kidnapping in violation of her custodial rights, and conspiracy to deprive her of her constitutional rights in violation of 42 U.S.C. § 1985.  The Court previously addressed the validity of the first cause of action under Vermont law,

18

concluding that although the Vermont Supreme Court has not yet
determined whether it recognizes the intentional tort of
kidnapping, it would likely agree that a claim of custodial
interference consistent with Section 700 of the Restatement
(Second) of Torts is viable.  ECF No. 115 at 40-41 ("it has long
been the law in Vermont . . . that a parent my maintain an
action for wrongful interference with 'the custody, control, and
services of [a] minor child'") (citing *Bioni v. Haselton*, 134 A.
606, 607 (Vt. 1926); *Schuppin v. Unification Church*, 435 F.
Supp. 603, 608 (D. Vt. 1977)).

Count One also alleges a conspiracy.  The Court previously
determined that civil conspiracy requires an agreement, and that
the act done in furtherance of that agreement by each defendant
must be "unlawful in itself."  *Id.*; *see Akerley v. N. Country
Stone, Inc.*, 620 F. Supp. 2d 591, 600 (D. Vt. 2009).  The Court
has also addressed the requirements for a claim of aiding and
abetting, concluding that under Vermont law "aiding and abetting
another in the commission of a tort requires a plaintiff to show
'(1) the existence of a primary violation; (2) knowledge of this
violation on the part of the aider and abettor; and (3)
substantial assistance by the aider and abettor in the
achievement of the primary violation.'"  ECF No. 277 at 36
(quoting *Montgomery v. Devoid*, 915 A.2d 270, 278 (Vt. 2006)).
The *Montgomery* decision explained that

19

> [a] person is subject to liability for harm resulting
> to a third person from the tortious conduct of another
> if the person: (1) commits a tortious act as part of a
> common design with the other; (2) gives substantial
> assistance to the other knowing that the other's
> conduct is a breach of duty; or (3) gives substantial
> assistance to the other to accomplish a tortious
> result while also acting in a manner that is a breach
> of duty to the third person.

915 A.2d at 281 (citing Restatement (Second) of Torts § 876

(1979)).  When determining whether a person's actions constitute

"substantial assistance or encouragement," the Vermont Supreme

Court references the Restatement, which "calls for consideration

of five factors: (1) the nature of the wrongful act; (2) the

kind and amount of the assistance; (3) the relationship between

the defendant and the actor; (4) the presence or absence of the

defendant at the occurrence of the wrongful act; and (5) the

defendant's state of mind."  *Concord Gen. Mut. Ins. Co. v.

Gritman*, 146 A.3d 882, 888 (Vt. 2016) (citing Restatement

(Second) of Torts § 876 cmt. d).

Count Two alleges violation of Jenkins' rights under 42

U.S.C. § 1985(3).  A claim under Section 1985(3) requires a

conspiracy for the purpose of depriving a person of the equal

protection of the laws; an overt act in furtherance of the

conspiracy; and an injury to the plaintiff's person or property,

or a deprivation of a right or privilege of a citizen of the

United States.  *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir.

1999).  A conspiracy is "an agreement between two or more

20

individuals where one acts in further[ance] of the object[] of the conspiracy and each member has knowledge of the nature and scope of the agreement." *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 339 (E.D.N.Y. 2010), *aff'd*, 417 F. App'x 96 (2d Cir. 2011); *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 337–38 (S.D.N.Y. 1999), *aff'd sub nom*. *Dove v. O'Hare*, 210 F.3d 354 (2d Cir. 2000). A conspiracy "need not be shown by proof of an explicit agreement but can be established by showing that the 'parties have a tacit understanding to carry out the prohibited conduct.'" *LeBlanc Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995) (quoting *United States v. Rubin*, 844 F.2d 979, 984 (2d Cir. 1988)).

### B.    Legal Standards for Liability

At the outset, the Court must address the parties' disagreement about the applicable legal standard. Defendants contend that by focusing on their advocacy, fundraising, and law school teachings, Jenkins' claims arise "in the shadow of the First Amendment" and therefore call for a strict standard known as *strictissimi juris*. ECF No. 823-2 at 35-43. That standard requires the plaintiff to show substantial evidence of a specific intent to engage in a conspiracy. *Id.* at 41-43 (citing *United States v. Spock*, 416 F.2d 165, 179 (1st Cir. 1969)).

Jenkins contends that she is not seeking to hold Defendants accountable for their constitutionally-protected speech, and is

21

instead focused solely on their participation in a plan to kidnap and hide Isabella. The Court previously agreed, holding that Jenkins' claims do not "arise from protected speech," but rather "center on the support . . . allegedly provided to Lisa Miller to carry out wrongful conduct." ECF No. 277 at 106. Moreover, the Second Circuit has held that the doctrine of *strictissimi juris* is reserved for "very special circumstances," as when there is a risk of "unfair imputation of the intent or acts of some participants to all others." *United States v. Sanders*, 211 F.3d 711, 723 (2d Cir. 2000). Jenkins submits that she is not seeking to impute any such intent. Her lawsuit seeks to establish that Defendants own intentional actions furthered, aided, and abetted the conspiracy.

Defendants also argue that Jenkins must show they were the sole and exclusive cause of her injuries. This Court has held, however, that the "substantial assistance" prong for aiding and abetting another in the commission of a tort requires only proximate cause. ECF No. 277 at 36 (citing *Montgomery*, 915 A.2d at 278). The proximate cause standard also applies to Jenkins' claim under 42 U.S.C. § 1985(3). *See Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1039 (9th Cir. 1990) ("To be actionable, the conspiracy must result in overt acts, done in furtherance of the conspiracy, that are both the cause in fact and proximate cause of plaintiffs' injuries."). With these standards in mind, the

22

Court reviews the factual record to determine whether either or
both Defendants are entitled to summary judgment.

### C.   Liberty Counsel

Liberty Counsel claims that it played no role in Lisa
Miller disobeying court orders, the kidnapping of Isabella, or
concealment of the fact that Lisa and Isabella had left the
country.  The record evidence supporting those assertions
consists of Liberty Counsel's testimony and that of other
witnesses, including the three convicted co-conspirators:
Kenneth Miller, Timothy Miller, and Philip Zodhiates.  Jenkins
has little record evidence, and thus little basis for drawing
inferences in her favor, to counter Liberty Counsel's claims.

At the corporate deposition of Liberty Counsel, with Staver
testifying as the firm's designated representative, opposing
counsel asked whether anyone communicated with Liberty Counsel
about helping Lisa Miller leave the country.  Staver replied:
"No one ever communicated that in any form or fashion, in any
kind of communication.  And had anyone made such a
communication, it would have been expressly and unequivocally
rebuked and condemned because that would be illegal and
violating the Court's orders."  ECF No. 868-7 at 169:7-17.
Philip Zodhiates, who drove Lisa Miller to the border to help
her flee the United States, confirmed that Liberty Counsel was
not aware of Lisa leaving the country.  ECF No. 823-29 at 300:3-

11.  He was asked specifically whether he had any knowledge of
an agreement that Liberty Counsel might have entered into to
help Lisa flee the United States, to assist her in remaining
hidden, or to remove things from her apartment and send them to
her in Nicaragua.  In each instance, Zodhiates testified that he
had no such knowledge.  *Id.* at 440:13-442:21.

Kenneth Miller, who admitted to planning and arranging for
Lisa Miller to leave the country, also testified that Liberty
Counsel had no knowledge of, or involvement in, the conspiracy.
ECF No. 823-32 at 131:18-132:1.  With respect to Lindevaldsen,
Kenneth Miller testified that he was "not aware that Rena had
any involvement whatsoever in the planning or execution of
Lisa's disappearance."  *Id.* at 158:9-12.  He provided the same
answers when asked about "any involvement whatsoever" by Mathew
Staver and Liberty Counsel.  *Id.*  Timothy Miller, who helped to
shelter Lisa Miller and Isabella in Nicaragua, testified that he
never entered into any sort of agreement with "any person or
attorney affiliated with Liberty Counsel."  ECF No. 823-37 at
219:17-21.

Jenkins nonetheless claims to have evidence of Liberty
Counsel's involvement.  She first cites an email sent by
Zodhiates to William Sidebottom, Vice President of
Communications for Liberty Counsel.  The email, dated January
21, 2009, told Sidebottom that if Lisa Miller did not have

24

"legal recourse now," Zodhiates could "suggest to her some
personal options, which [Liberty Counsel] should not or would
not want to know about.  In other words, if there is nothing
else [Liberty Counsel] can do for her, I'd like her contact
information."  ECF No. 868-27.  The email itself acknowledged
that whatever Zodhiates had in mind, Liberty Counsel would not
want to be involved.  Jenkins notes that approximately three
months after Zodhiates sent the "personal options" email, an
unidentified person gave Lisa Miller the phone number for
Zodhiates' company, Response Unlimited, and told her, "Here, we
don't like . . . that you don't have a Plan B.  Call this phone
number."  ECF No. 868-5 at 47:21-24.

Liberty Counsel argues there is no evidence to suggest that
the person delivering Zodhiates' phone number to Lisa Miller was
affiliated with the firm.[2]  Jenkins contends that the firm's
protestations are not credible, particularly since Sidebottom
and Zodhiates had allegedly worked together for decades.
Speculation about Sidebottom, however, does not bolster Jenkins'
claim, as nothing in the record indicates that Liberty Counsel
acted upon, or was motivated by, that email at any time.  ECF

---

[2]   The information was given to Lisa Miller while she was at
church.  Lisa Miller testified that approximately 3,000 people
regularly attended Sunday services at her church.  ECF No. 812-5
at 24:7-22.

No. 868-7 at 122:20-123:2 (testimony of Liberty Counsel that Staver never received the email, and that Sidebottom did not recall receiving it and did not pass it on); *see Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (the non-moving party at summary judgment may not "rely on conclusory allegations or unsubstantiated speculation").

Jenkins submits that proof of Liberty Counsel's role in the conspiracy also lies in the fact that Zodhiates allegedly called Liberty Counsel's publicly-available phone number on the day of the kidnapping. Staver testified that he is "absolutely sure" and "very clear" that he did not speak with Zodhiates that day. ECF No. 823-25 at 208:12-209:29. Staver has also confirmed more broadly that he received no communication in any form "from Zodhiates or anyone on his behalf on about September 22, 2009, or at any time regarding Lisa Miller evading the jurisdiction of the courts or leaving the United States or disobeying any court order, her hearings, or any other option regarding Lisa Miller." ECF No. 238-2 at 14. Zodhiates has no recollection of any such conversation. ECF No. 823-29 at 292:24-293:12.

The Court previously concluded that such evidence "do[es] not demonstrate that Staver himself participated in the efforts to assist [Lisa] Miller in fleeing the country." ECF No. 220 at 31-32. The Court now finds that the allegation of a phone call,

even if placed, remains insufficient to generate a question of material fact about Liberty Counsel's role in the kidnapping.

Liberty Counsel submits that while it did not engage in, aid, or abet any sort of kidnapping plan, the record shows that it also played no part in Lisa Miller defying court orders. Lisa Miller herself testified that the Liberty Counsel attorneys uniformly advised her to follow the law.  In fact, she wanted it to be known publicly that defiance of court orders was her own personal choice.  At her deposition, counsel asked: "[Y]ou wanted it made known that [Liberty Counsel attorneys] were telling you to follow the law but that you, as a child of God, needed to do what you believed God was telling you to do?"  Lisa Miller responded, "Yes."  ECF No. 823-6 at 371:16-20.  With respect to family court orders specifically, counsel asked: "The decisions at each one of these points that you made to disallow the visitation between Isabella and Janet [Jenkins] were yours and yours alone."  Lisa Miller again responded, "Yes."  *Id.* at 380:21-25.

In response to Jenkins' claim that Liberty Counsel misled the courts about Lisa Miller's location, Liberty Counsel's testimony was unequivocal.  Staver, on behalf of the firm, testified that Liberty Counsel did not know where Lisa Miller was until the indictment of Timothy Miller.  ECF No. 823-5 at 168:22-169:4.  In fact, Liberty Counsel moved to withdraw as

27

Lisa Miller's attorneys in early 2010 because, according to
Staver, it had "lost contact with her" and "had no idea where
she was." *Id.* at 129:22-132:11.  Lindevaldsen similarly
testified that she "absolutely did not know where Lisa Miller
was."  ECF No. 823-27 at 170:15-16.

    In sum, the testimony of not only the Liberty Counsel
attorneys, but also of the three men involved in Isabella's
kidnapping, indicates that Liberty Counsel did not engage in,
aid, or abet any conspiracy.  Nor does the evidence suggest that
Liberty Counsel concealed Lisa Miller's location or otherwise
prevented the courts from providing Janet Jenkins equal
protection of the law.  As Mathew Staver testified under oath,
to engage in any such conduct would be "absolutely asinine" and
"contrary [sic] to our biblical, Christian ethics, our
professional ethics.  And we wouldn't do it for any client.  We
certainly didn't do it for Lisa Miller."  ECF No. 823-2 at
180:3-9.  Jenkins' limited, and largely speculative, evidence to
the contrary is insufficient to convince a reasonable jury that
Liberty Counsel could be held liable under either cause of
action.  The Court therefore finds that Liberty Counsel is
entitled to summary judgment.[3]

---

[3]    Jenkins also argues that Liberty Counsel is vicariously
liable for the actions of Rena Lindevaldsen.  The Court need not
address Liberty Counsel's argument that it did not control
Lindevaldsen's actions, as it finds that Lindevaldsen is also

### D.    Rena Lindevaldsen

Like Liberty Counsel, Rena Lindevaldsen argues that the allegations brought against her fail to create genuine issues of material fact.  Jenkins claims, among other things, that Lindevaldsen directly advised or encouraged Lisa Miller to defy court orders and leave the country.  As noted previously, Lisa Miller testified that Lindevaldsen told her: "If [Isabella] was my daughter, I wouldn't give the visitation, and I wouldn't allow this to happen, and I would leave."  ECF No. 868-5 at 80:16-18.  When she made that statement, Lindevaldsen made clear that was taking her "lawyer hat off" and putting "on her friend hat."  *Id.* at 80:9-11.  Jenkins views the "I would leave" statement as evidence that Lindevaldsen shares responsibility for Lisa Miller's, and Isabella's, disappearance.

The undisputed testimony does not support that inference.  Lisa Miller testified in her deposition that the "friend hat" conversation with Lindevaldsen did not convince her to leave the country.  ECF No. 823-6 at 398:19-24.  Instead, she was waiting for God to make the decision for her and to orchestrate any eventual departure.  Lisa Miller also testified that Lindevaldsen did not "press" her to leave, and offered no planning or specifics related to a potential departure.  *Id.* at

---

entitled to summary judgment on the merits of the allegations against her for reasons explained below.

394:20-400:4.  When Lisa Miller did leave the country, it was
"other people," not Lindevaldsen, who facilitated her
disappearance.  *Id.* at 397:12-400:4.

Lisa Miller also testified that Lindevaldsen asked her
about her financial situation, and specifically about whether
she planned to settle her debt with a certain attorney.
Lindevaldsen reportedly asked Lisa to make a list of her debts,
which Lisa understood to be an offer to arrange for financial
assistance if she left the area.  ECF No. 868-5 at 87:7-88:18.
Lisa did not agree at the time to make a list, *id.* at 87:14, and
there is no indication that Lindevaldsen ever received such a
list or that her alleged suggestion was part of a coordinated
effort with others to ease Lisa Miller's departure.

Kenneth Miller, the primary coordinator of Lisa's and
Isabella's disappearance, confirmed that Lindevaldsen played no
role in helping them leave the United States.  ECF No. 823-32 at
158:9-12.  Lindevaldsen herself stated under oath that she did
not learn of the kidnapping until well after Lisa left the
country with Isabella.  She explained in her deposition that it
was not until Timothy Miller's arrest in or about 2011 that she
discovered Lisa was still alive and living outside the United
States.  ECF No. 823-27 at 158:19-161:6 ("It was when Timo
Miller was arrested.  And there was a news article in 2011.  And

30

I sat there in my office and wept that she had fled to another country with her child.").

Lindevaldsen also addresses Jenkins' claim that she played a role in the choice of Nicaragua as the final destination. Kenneth Miller testified that he alone was responsible for that choice, and that nobody at Liberty Counsel, including Lindevaldsen, played a part in selecting Nicaragua. ECF No. 823-32 at 159:18-160:16. Kenneth explained that he chose Nicaragua because there were people there – a Mennonite community – that he trusted and whom he believed would be able to help Lisa. *Id.* at 133:20-134:9. While Jenkins submits that the final destination is less critical than the fact Lindevaldsen advised finding a place that lacked extradition, Kenneth Miller made clear that he performed his own research on that issue. *Id.*

Jenkins relies in part on Lisa Miller's statement that, according to Philip Zodhiates, it was Lindevaldsen who determined she should flee to somewhere without extradition. Zodhiates testified, however, that he never spoke with Lindevaldsen prior to driving Lisa and Isabella to the border. ECF No. 823-29 at 77:9-24. Zodhiates also directly disputed that he ever said anything to Lisa Miller about Lindevaldsen choosing her destination, *id.* at 428:3-10, and confirmed that it was Kenneth Miller who chose Nicaragua, *id.* at 159:2-161:3.

In addition to the possible inaccuracy of Lisa Miller's statement, her assertion about Lindevaldsen's alleged advice, relayed by Zodhiates, constitutes at least one level of hearsay. Because the Court may only consider admissible evidence at summary judgment, that portion of evidence does not factor into the analysis. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (explaining that a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment absent a showing that admissible evidence will be available at trial").

As to the broader question of helping Lisa Miller defy court orders, the record shows that prior to the kidnapping, Lindevaldsen's efforts were aimed at encouraging compliance with such orders. For example, she offered to have her husband drive thirteen hours to Vermont to facilitate visitation. ECF No. 823-27 at 399:18-24. She also offered the use of a time share in Vermont. *Id.* at 401:22-402:9. As Lindevaldsen once explained to Lisa, "that does NOT change the legal responsibility for you to comply. Thus, there is no legal excuse for your noncompliance with [a court] order." ECF No. 823-26 at 2.

Jenkins submits that once Lisa Miller fled the country, Lindevaldsen misled the Vermont courts about her knowledge of Lisa's whereabouts. The state court hearings in question

32

occurred in December 2009 and January 2010.  When asked if she
knew where Lisa was, Lindevaldsen consistently reported that she
had not been in contact with her client and had no other address
aside from Lisa's apartment in Virginia.  Lindevaldsen has since
testified that, at the time of those hearings, she "absolutely
did not know where Lisa Miller was."  ECF No. 823-27 at 170:12-
170:22.

Jenkins argues that Lindevaldsen's representations to the
courts were "half-truths."  On January 22, 2010, the Vermont
family court asked not only whether Lindevaldsen knew where Lisa
Miller was, but also whether she knew of anyone who would know.
ECF No. 868-48 at 12.  Jenkins contends that Lindevaldsen did,
in fact, know of people who could locate Lisa, and intentionally
misled the court.

That allegation ties into Jenkins' next claim, which is
that in October and November 2009 Lindevaldsen furthered the
conspiracy when she helped Zodhiates and others send certain
items to Nicaragua.  Specifically, Zodhiates received
notification of items that Lisa wanted retrieved from her
apartment.  He tried to forward the information to Lindevaldsen
via his daughter, Victoria Hyden.  Zodhiates involved
Lindevaldsen because she allegedly knew someone who had a key to
Lisa Miller's home.

Hyden testified that she received an October 23, 2009 email from her father, which included a list of items requested by Lisa Miller.  Although her father asked her to forward the information to Lindevaldsen, Hyden testified that she did not deliver it directly.  Instead, she placed it in an envelope and slid it under the door to Lindevaldsen's office.  She did not recall whether she wrote Lindevaldsen's name on the envelope, and never spoke to Lindevaldsen about whether it was received.  ECF No. 823-38 at 115:20-116:17.  Lindevaldsen testified that she never received the October 23, 2009 email.  ECF No. 823-27 at 133:7-135:7.  She also denied knowing anyone with a key to Lisa Miller's home.  *Id.* at 136:19-22.

On November 9, 2009, Zodhiates again asked Hyden to deliver a message to Lindevaldsen relating to Lisa Miller's belongings. Hyden testified that she did not relay the message to Lindevaldsen, and instead explained to her father that she did not want to be the "middleman."  ECF No. 828-38 at 118:15-18, 119:3-4.  Zodhiates sent his daughter another email on November 10, 2009, again to be delivered to Lindevaldsen.  Hyden testified that she did not deliver that message either.  *Id.* at 119:21-121:2.  Correspondingly, Lindevaldsen testified that she never received the November 2009 emails.  ECF No. 823 at 143:22-145:22.  She further attested that she "was not responsible for getting anything from [Lisa Miller's] apartment.  Did not enlist

34

the help of anybody.  Didn't . . . [retrieve] anything from her
apartment."  ECF No. 823-27 at 19-23.

   Linda Wall was allegedly the person with a key to Lisa
Miller's home.  Wall did come to possess a handwritten list of
items requested by Miller, which she reportedly found in her
mailbox.  ECF No. 823-33 at 182:6-11.  Wall does not know where
the list came from.  *Id.* at 183:12-13.  She testified that she
was contacted by a man from "the church" whom she did not know,
and was told that church members were going to put some of Lisa
Miller's belongings into storage.  *Id.* at 201:15-20, 202:15-19.
Linda Wall further testified that, to her knowledge,
Lindevaldsen never went to Lisa Miller's home and "didn't even
know where Lisa lived."  ECF No. 823-33 at 253:10-16.  She also
corroborated Lindevaldsen's testimony that she (Lindevaldsen)
was not involved in the retrieval of items from Lisa Miller's
home.  *Id.* at 252:3-25.  Like Wall, Kenneth Miller had no
knowledge of Lindevaldsen retrieving any personal items or
assisting with such retrieval.  *Id.* at 79:20-24.

   Zodhiates testified that he has no knowledge of whether
Lindevaldsen ever received his messages.  ECF No. 823-29 at
439:18-22.  As to the retrieval of items from Lisa Miller's
apartment, Zodhiates testified that people from Lisa Miller's
church, including Kenneth Miller, were involved in that task.
Zodhiates had no information about whether Lindevaldsen was

involved.  *Id.* at 440:6-12.  Lisa Miller testified that she
ultimately received two shipments of requested items.

Jenkins also claims that Lindevaldsen was aware of
arrangements to pay Lisa Miller's rent.  That idea was
communicated by Zodhiates in a November 2009 email, which Hyden
says she did not deliver and Lindevaldsen testified she never
received.  Nor did she ever speak with Hyden about someone
paying Lisa Miller's rent.  ECF No. 823-27 at 149:17-150:23.
With respect to messages from Zodhiates generally, Lindevaldsen
testified that she did not "know why a man I met once briefly at
a conference is deciding to send these e-mails to me."  *Id.* at
150:5-7.

Given the consistencies in the testimonies of all witnesses
involved in, or with knowledge of, the removal of Lisa Miller's
belongings, Jenkins has failed to create a genuine factual
question as to whether Lindevaldsen was involved.  Jenkins asks
the Court to allow for reasonable inferences, yet those
inferences must be supported by the factual record.  On this
record, the Court finds insufficient evidence to generate a
genuine issue of material fact in dispute.

With regard to misrepresentations to the courts, Jenkins
submits other facts to argue that Lindevaldsen may not have been
completely truthful in her statements.  For example, she
suggests that Lindevaldsen knew of people who could locate Lisa

Miller.  Kenneth Miller testified that he helped deliver a
letter from Lindevaldsen to Lisa Miller in Nicaragua.  ECF No.
868-30 at 85:19-20.  The letter was handwritten, and reportedly
informed Lisa that Lindevaldsen could not represent her anymore.
*Id.* at 88:1-11.  Kenneth testified that he received the letter
"in 2009 sometime."  *Id.* at 88:19-89:1.  He did not know whether
Lindevaldsen knew that he would be the person to mail it.  *Id.*
at 90:17-25.  When asked how Lindevaldsen got the letter to him,
Kenneth was unwilling to answer without consulting with his
attorney.  *Id.* at 91:1-7.

Jenkins also cites Zodhiates' testimony about speaking with
Lindevaldsen, for the first time, at a Liberty Counsel
fundraising event in early October 2009.  Lisa Miller had been
scheduled to speak at the event, but did not appear.  Zodhiates
testified that he and Lindevaldsen discussed Lisa, and he told
her that she and Isabella "were safe, and they were out of the
country."  ECF No. 823-29 at 77:4-79:4.  When asked about this
testimony, Lindevaldsen testified that she did not recall
hearing the statement.  ECF No. 823-27 at 130:8-12.  She also
explained that "even if [Zodhiates] said something like that, it
didn't mean [she] walked away thinking, oh, this man helped
[Lisa] flee the country," since many other people at the event
were trying to console her, telling her "[s]he's safe, she's

37

good, God's got her, she's in a good place." *Id.* at 130:8-20,
195:15-20.

Jenkins notes that in December 2009, Lindevaldsen
represented to the family court that she had no reason to
believe that Lisa Miller was not living at home. According to
Lindevaldsen's own testimony, however, she was extremely worried
when Lisa failed to show up at the Liberty Counsel event. *Id.*
at 198:15-20. Jenkins implies that, at the very least,
Lindevaldsen should have shared her concerns with the court.

On November 15, 2009, a woman named Deborah Thurman sent an
email to a third party stating that she had received
"confirmation through Lisa's LC attorney (Rena) that she and
Isabella are both OK." ECF No. 868-32 at 2. Thurman testified
at her deposition that she did not recall who she heard that
from, and that she had "no recollection of Rena telling me
anything of the sort." ECF No. 868-33 at 190:22-191:4.

Finally, with respect to liability generally, Jenkins
points to statements made by Lindevaldsen in teaching one of her
law school classes. Lindevaldsen reportedly told her students
that if Lisa Miller had asked one of them for advice, there
would be "legal issues to address or material to discuss,
including, for example, civil disobedience." ECF No. 868-29.
Jenkins contends that by advocating for civil disobedience,

Lindevaldsen revealed a tacit endorsement of, and possibly support for, Lisa's actions.

In opposing summary judgment, Jenkins relies on a series of events, all of which are discussed above, to support her argument that a jury must determine Lindevaldsen's liability. *See, e.g.,* ECF No. 868 at 35. She begins with the "personal options" email allegedly sent by Zodhiates to William Sidebottom of Liberty Counsel. Jenkins' assertion is that the email shows Liberty Counsel connected Zodhiates and Lisa Miller. Sidebottom testified that he does not recall the email and, in any event, never forwarded it to anyone. Lindevaldsen testified that she never received the email, that Sidebottom never mentioned it to her, and that she was not aware of any "personal option." ECF No. 213-2. Accordingly, the email does not support an inference that Lindevaldsen, or Defendant Liberty Counsel, played a role in introducing Lisa Miller to the conspirators.

Jenkins next contends that Lindevaldsen played a material role in advising Lisa Miller to go into hiding. The only evidence to support that assertion is the statement by Lindevaldsen, speaking as a friend rather than an attorney, that she herself would deny visitation and leave. Nothing in the record indicates that Lindevaldsen made this statement as part of a plan, was acting in concert with others, or that she was offering "substantial assistance." *Gritman*, 146 A.3d at 888.

39

Moreover, Lisa testified that she declined to accept any such advice until guided by God.  A brief subsequent discussion about Lisa's finances does not create a genuine question of fact about whether Lindevaldsen ultimately aided or abetted Lisa's eventual disappearance.

Jenkins argues that it was Lindevaldsen who provided advice about travelling to a place with no extradition.  That contention is countered in large part by Kenneth Miller, who took full credit for deciding on Nicaragua and researching the extradition question.  While it was Zodhiates who allegedly revealed Lindevaldsen's advice, he denies ever doing so.  As discussed above, the statement is also hearsay.  And again, Kenneth Miller, Timothy Miller, and Zodhiates each testified that Liberty Counsel, including Lindevaldsen, played no role in the kidnapping plan or conspiracy.

The evidence of Lindevaldsen's alleged role in collecting and delivering items to Lisa Miller is equally sparse.  Although Zodhiates tried to involve Lindevaldsen, the evidence strongly suggests that his messages never reached her.  While others, including Kenneth Miller, did engage in at least retrieving some of Lisa Miller's belongings, nobody involved in that activity confirmed any relevant contact with Lindevaldsen.  Discussions of possible rent payments are equally unsupported.

40

Jenkins' final claims are that Lindevaldsen misled the
family court, in the context of both her in-court statements and
her notice of withdrawal, by failing to reveal Lisa Miller's
location or identify someone who would know where she was.
Lindevaldsen testified that at no time prior to the arrest of
Timothy Miller did she know that Lisa and Isabella were
overseas.  Jenkins offers no concrete evidence to discredit that
testimony.  Whether Lindevaldsen knew of someone who could
contact Isabella, the mailing of her withdrawal letter suggests
that she may not have fully disclosed what she knew.  Even that
evidence, however, was muddied by Kenneth Miller's inability to
disclose how he received the letter.

At summary judgment, the Court is required to view all of
this evidence in a light most favorable to Jenkins.  The Court
is also mindful of the applicable legal standards, and in
particular the question of aiding and abetting.  With respect to
any conspiracy, Jenkins has failed to create a genuine issue of
material fact in support of her allegation that Lindevaldsen was
a co-conspirator in either the kidnapping or the subsequent
hiding of Isabella in Nicaragua.

To be liable for aiding and abetting, Lindevaldsen must be
found to have provided "substantial assistance or encouragement"
– a finding this record does not support.  *Id.*  Following the
analysis set forth in *Gritman*, which in turn reflects the

Restatement, the Court's considerations include the kind and amount of assistance, the presence or absence of the defendant at the occurrence or wrongful act, and the defendant's state of mind.  146 A.3d at 888.

The facts when viewed in Jenkins' favor arguably suggest that Lindevaldsen did not fully disclose everything she knew, or at least suspected, about whether Lisa was living at her home in late 2009 and 2010.  Jenkins argues, based upon a prior ruling by the Court, that such a misrepresentation to the Vermont family court is sufficient, standing alone, to deny summary judgment.  ECF No. 868 at 65 (citing ECF No. 277 at 37-38).  In its prior decision, the Court found that "if . . . Liberty Counsel's lawyers in fact knew of Lisa Miller's plan to flee with Isabella, a truthful statement would have likely aided law enforcement in preventing the kidnapping."  ECF No. 277 at 37.  At this subsequent stage in the case, however, no reasonable juror could find that Lindevaldsen possessed knowledge that would have helped prevent the kidnapping.

The Court also found that if, as alleged, the lawyers lied about their knowledge of Lisa Miller's location, they were doing so with the knowledge of Lisa's duty to respect Jenkins' custodial rights.  *Id.* at 38.  Again, the more developed record at summary judgment does not support a claim that the lawyers knew anything about Lisa's location.

42

At most, a reasonable juror could conclude that by placing a letter into the hands of someone who could get it to Lisa overseas, Lindevaldsen knew more than she revealed to the family court about persons with knowledge of the conspiracy. That act, however, does not amount to either a furtherance of the conspiracy itself, or a form of substantial assistance. When the Court considers the "kind and amount of the assistance," having a termination letter forwarded to a legal client was a minimal act that did nothing to assist the allegedly unlawful conduct. *Gritman*, 146 A.3d at 888.

Moreover, nothing in the record indicates that Lindevaldsen was present when any sort of tortious or unlawful acts occurred, or that her state of mind was sufficient to render her liable. *See id.* Reference to Lindevaldsen's classroom, her use of Lisa Miller's case as a teaching tool, and her encouragement of students to consider civil disobedience would not lead a reasonable juror to conclude, given the rest of the evidentiary record, that Lindevaldsen is subject to civil liability.

Indeed, the record fails to establish any issue of genuine material fact in dispute that would lead a reasonable juror to find Lindevaldsen liable under either of Jenkins' causes of action. The Court therefore concludes that Jenkins' claims are insufficient to clear summary judgment, and that Lindevaldsen is

43

entitled to judgment as a matter of law.  Lindevaldsen's motion
for summary judgment is granted.

### Conclusion

For the reasons set forth above, the motions for summary
judgment filed by Liberty Counsel (ECF No. 823) and Rena
Lindevaldson (ECF No. 824) are granted.

DATED at Burlington, in the District of Vermont, this 31st
day of March 2025.

                                    /s/ William K. Sessions III
                                    William K. Sessions III
                                    U.S. District Court Judge